## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**BRIAN PIERCE,**                            :
                                             :
                    **Plaintiff,**           :
                                             :
               **v.**                        :     **Civil Action No. 03-173E**
                                             :     **Judge Sean J. McLaughlin**
**PENNSYLVANIA DEPARTMENT OF**               :     **Magistrate Judge Susan Paradise Baxter**
**CORRECTIONS,**                             :
                                             :
                    **Defendant.**           :


## TABLE OF CONTENTS FOR ATTACHMENTS

**PAGE**

Appendix A................................................................................................1

Appendix B................................................................................................4

Appendix C................................................................................................9

Appendix D...............................................................................................52

Appendix E...............................................................................................64

# ATTACHMENT A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Pittsburgh Area Office**

Liberty Center
1001 Liberty Avenue, Suite 300
Pittsburgh, PA 15222-4187
(412) 644-3444
TTY (412) 644-2720
FAX (412) 644-2664

Mr. Brian D. Pierce
313 South Main Street
Cambridge Springs, PA 16403

Our Reference:        172A300147
                      Pierce v. PA Department of Corrections/SCI Cambridge Springs

Dear Mr. Pierce:

Your charge of discrimination referenced above was investigated pursuant to the Commission's policies and procedures in which it was determined the allegations were not substantiated as indicated below:

1.    Allegations:

      You alleged that you were discriminated against because of your sex, male, your religious beliefs, and in retaliation for engaging in a protected activity, in that you were subjected to harassment and discharged from your position as an LPN on May 13, 2002.

2.    Respondent defense:

      The Respondent denied your allegations of discrimination and stated you were discharged solely because of your repeated refusals to adhere to Department of Corrections policies.

3.    Examination of the evidence:

      Your attorney received a copy of the response submitted by the Respondent and a written rebuttal was requested regarding the Respondent's defense. The rebuttal received does not provide any evidence and/or any other information that substantiate your allegations. You received several written disciplinary actions, and you were suspended, as indicated by documentation received from the Respondent, for not following the policies and procedures. You were warned that if you failed to follow those policies and procedures, you could be terminated. There is no evidence that the Respondent disciplined and/or discharged you because of your sex and/or religious beliefs. Furthermore, there is no evidence that you were retaliated against because you were a witness for an individual who filed a charge with this Commission.

2

4.   Conclusion:

Your allegations of discrimination and/or retaliation cannot be substantiated. You were discharged solely for violating the Respondent's policies and procedures, and not because of your sex, religious beliefs and/or for engaging in a protected activity. None was discovered, not of your sex and/or religious beliefs, and who had engaged in the same or similar infractions and was not similarly disciplined and/or discharged.

Based upon the above, it is not likely that further investigation will result in a finding of a violation against the Respondent. Accordingly, enclosed please find the Commission's Dismissal and Notice of Rights. If you wish to pursue this matter further, you may file a lawsuit on your own behalf within 90 days of your receipt of the attached notice.

Sincerely,

Marjorie A. Gregory

2/25/03
Date

Marjorie A. Gregory
Investigator

Enclosure

cc: Neal A. Sanders, Esquire

3

# ATTACHMENT B



**JEFFREY A. BEARD, Ph. D**
SECRETARY
DEPARTMENT OF CORRECTIONS

**WILLIAM J. LOVE**
DEPUTY SECRETARY
FOR
SPECIALIZED FACILITIES &
PROGRAMS

COMMONWEALTH OF PENNSYLVANIA

STATE CORRECTIONAL INSTITUTION

AT CAMBRIDGE SPRINGS

*451 Fullerton Avenue*
*Cambridge Springs, PA 16403-1229*
*Telephone 814-398-5400*

May 10, 2002

**MARILYN S. BROOKS**
SUPERINTENDENT

Address All Replies
To-Superintendent



PLAINTIFF'S
EXHIBIT 18
*Puroux*
1-20-05

Brian Pierce
313 Main Street
Cambridge Springs, PA  16403

Dear Mr. Pierce:                                                    Employe#456590

This is to advise you that effective May 13, 2002, you are terminated from your position
as a Licensed Practical Nurse, Permanent Civil Service Status, with the Department of
Corrections at the State Correctional Institution at Cambridge Springs.

A Pre-Disciplinary Conference was held on April 23, 2002, to offer you the opportunity to
respond to charges of violation of the following sections of the Department of
Corrections Code of Ethics:

> Section A, General Responsibility of Department of Corrections Employees:
> Consistent with the responsibility of all correctional employes in the Common-
> wealth of Pennsylvania to perform their duties with integrity and impartiality
> and to avoid situations whereby bias, prejudice, or personal gain could
> influence official decisions, the following code is being promulgated.

> Section B, #1:  Specific Rules and Regulations – Department of Corrections:
> Each employe in the correctional system is expected to subscribe to the principle
> that something positive can be done for each inmate.  This principle is to be
> applied without exception.

> This involves an intelligent, humane and impartial treatment of inmates.
> Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of
> inmates will not be tolerated.  Corporal punishment shall not be utilized under
> any circumstances.

> Section B, #9:  Lawful orders by a supervisor to a subordinate must be executed
> promptly and faithfully by the subordinate even though the employe may question
> the wisdom of such order.  The privilege of formally appealing the order may be
> done at a later date through either the supervisory command structure, civil
> service appeal, or the grievance machinery.

> Section B, #10:  Employes are expected to treat their peers, supervisors and the
> general public with respect and conduct themselves properly and professionally
> at all times; unacceptable conduct or insolence will not be tolerated.

Section B, #14: Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

Section B, #29: All employes shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

The Pre-Disciplinary Committee substantiated violations of Sections A, General Responsibility, Section B, Number 1, Section B, Number 9, Section B, Number 10, Section B, Number 14, and Section B, Number 29.

It was established by the Pre-Disciplinary Committee, regarding incidents that occurred on March 9 and 10, 2002, that you directed and chose to alter the operation of the 4th medication line on March 10, 2002. You acknowledged, and statements from staff support, that you were upset by security questioning your integrity and character by checking on the short duration of the medication line and questioning you about the pre-pouring of medications on March 9, 2002. You admitted, during the fact-finding, that had the officer who had challenged you on March 9 not been on duty on March 10, the line would have run as usual. Your actions were clearly retaliatory and in violation of Section A, General Responsibility, and Section B, Number 10. You failed to show impartiality and integrity in the performance of your duties, and your actions were unprofessional and unacceptable conduct.

The Pre-Disciplinary Committee also found evidence to substantiate charges that you violated Section A, General Responsibility, and Section B, Number 1 and 9. On March 20, 2002, you refused to open the medication line window to inmates who arrived after medication line had closed, though you had been advised, by the team leader, that one of the inmates was on a life-sustaining anti-epileptic medication. You did not comply with the first two direct orders, and it was not until you were given a third direct order, that you opened the medication line window and provided the inmates their medications. It was further established that you had been informed that the inmates were late through no fault of their own. During the PDC, you stated that you were "pretty sure" that the anti-epileptic drug in question was not "life-sustaining". Although it was later established that the drug was not considered "life-sustaining" for the inmate in question, it was a critical medication, and you admitted that you were not sure at the time. It was not until a later date that you called the pharmacist to verify. You failed to perform your duties with integrity and impartiality, failed to provide humane and impartial treatment to inmates, and failed to follow lawful orders promptly.

Regarding an incident that occurred on April 1, 2002, the Pre-Disciplinary Committee found statements and evidence provided by a review of the narcotics sheets and blister cards, substantiated that you failed to accurately log the medication remaining in a blister pack of narcotics. This occurred not only when initially recording the narcotic sheet, but again when performing count at shift change. The Committee found that, by your carelessness, you failed to perform your duties with integrity as required by Section A, General Responsibility of Corrections Employees. You were previous issued a one-

PIERCE, BRIAN                                                                PAGE 3

day suspension on March 21, 2001 for medication count discrepancies, relating to an
incident that occurred at SCI Albion prior to your transfer to SCI Cambridge Springs.

On April 1, 2002, you ordered a 60-day supply of HIV medications for an HIV inmate
without required pre-release notification from the Records Department, in conflict with
policy that mandates a 30-day supply of HIV medication be provided. You were
overheard advising the inmate that you would "hook her up" and observed passing a
note to her. During the PDC, you admitted to making this statement to the inmate, and
ordering the 60-day supply, stating that you should have known that only a 30-day
supply was allowed by policy. Your response that this was an error, and
acknowledgment during the PDC that you had acted on the inmate's word that she was
leaving for a center rather than checking for written notice of her release per procedures,
does not excuse your actions. The Committee found the evidence substantiates
violation of Section A, General Responsibility. Documentation indicates that you were
advised in the inmate's presence that medications were not to be ordered until
notification by Inmate Records of the release, yet you proceeded to order the 60-day
supply. Your actions showed clear disregard for established policy and demonstrate that
you allowed your personal feelings and opinions to compromise your integrity and
impartiality.

On April 5, 2002, you violated established policy/procedure, when you went to the RHU
without the medication bag and the Medication Administration Record (MAR). Proper
procedure was discussed with you on August 28, 2001 and again on March 11, 2002,
and you acknowledged your understanding to the Corrections Health Care
Administrator. In addition, you were found to have pre-poured medications, borrowed
medications from other inmates' blister cards, and you failed to crush psychiatric
medications, as required by DOC Policy 13.4.1. Your actions were in violation of
Section B, Number 10 and Number 14. You failed to act in accordance with policy with
which you were required to maintain familiarity, regarding medication room
policy/procedure, and failed to conduct yourself properly and professionally. Evidence
presented in the form of staff statements verifies that you were aware of the violations,
yet chose to disregard policy and procedure.

You also violated Section B, Number 10, by failing to conduct yourself properly and
professionally during an incident that occurred on April 9, 2002. You engaged in a
conversation with inmates, during which you made negative comments about the
Residential Substance Abuse Treatment (RSAT) program. You commented that "it was
set up for them to fail, and so they would return", and stated that the DOC programs
"were a joke". Your actions, particularly in front of inmates, were unacceptable.

During the fact-finding regarding violations of medication policy and procedure, you
alleged that other nurses were violating policy and procedure regarding pre-pouring
medications, stock medications, and borrowing medications, but refused to provide
names, stating "I don't play that game". During the PDC, you again referred to other
staff and were given a direct order to provide names, and only then agreed to comply.
Your failure to cooperate during the fact-finding was in violation of Section B, Number
29.

You were suspended on March 21, 2001 for an incident that occurred at SCI Albion prior
to your transfer to SCI Cambridge Springs for violations of Code of Ethics sections B-8,
B-14, and B-22 regarding medication count. You were issued a verbal reprimand on    7

PIERCE, BRIAN                                                                 PAGE 4

September 28, 2001, for unprofessional conduct, and issued a written reprimand on
November 20, 2001, for failure to treat peers and supervisors with respect, and
unprofessional conduct.

Please return any state property including, but not limited to the following items:
identification cards, keys, tools, equipment, books, reports, or uniforms to your
supervisor before close of business on May 13, 2002.

Your Group Life Insurance Policy ends on your last day of work. Contact Prudential Life
Insurance Customer Service at 1-800-893-7316 regarding continuation of life insurance
on a self-paid basis.

The PA Employee Benefits Trust Fund will contact you directly concerning continuation
of policies on a direct pay basis. You are to return your Prescription
Drug Card to the Supplemental Benefits Division of the PEBTF, 150 South 43rd Street,
Suite 3, Harrisburg, PA 17111-5700. After May 13, 2002, you are no longer permitted
to use this or any other employee benefit. It will be necessary to contact the Regional
State Employees' Retirement System at PO Box 01561, Seneca, Pennsylvania, 16346
regarding your retirement account. You will be paid by supplemental check for any
accrued, unused leave balances.

Your appeal rights in this matter under the Civil Service Act are explained in the
instructions and information section on the attached Civil Service Appeal Form, (SCSC-
4112).

Your rights in this Personnel Action are explained in the Grievance and Arbitration
Section of the AFSCME Master Agreement.

A copy of this letter has been placed in your Official Personnel File.

Sincerely,

Marilyn S. Brooks
Superintendent
For
Jeffrey A. Beard, Ph.D.
Secretary
Department of Corrections

MSB/NW

cc:     Deputy Good, Deputy Wilkes, N. Wirth, HR Officer, BHR/Labor Relations, SCSC,
        AFSCME, Z. Rayner

# ATTACHMENT C

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA
 2
                         - - - -
 3
    BRIAN D. PIERCE,                   )
 4                                     )
                  Plaintiff,           )
 5                                     )
                     -vs-              )      Civil Action
 6                                     )      No. 03-173E
    PENNSYLVANIA DEPARTMENT            )
 7  OF CORRECTIONS,                    )
                                       )
 8            Defendant.               )

 9
                         - - - -
10
              DEPOSITION OF:  NANCY GIROUX
11
                         - - - -
12

13            DATE:    January 20, 2005
                       Thursday, 1:05 p.m.
14

15            LOCATION:  Law Offices of Neal Sanders
                         1924 North Main Street Ext.
16                       Butler, PA 16001
                         724-282-7771
17

18            TAKEN BY:  Plaintiff

19

20            REPORTED BY:  Toni Rennebeck, RPR
                            Notary Public
21                          NMR Reference No. 30738

22

23                 CERTIFIED COPY
24

25
```

1               DEPOSITION OF NANCY GIROUX,
a witness, called by the Plaintiff for examination,
2   in accordance with the Federal Rules of Civil
Procedure, taken by and before Toni Rennebeck, RPR, a
3   Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania, at the Law Offices of
4   Neal A. Sanders, 1924 North Main Street Extension,
Butler, Pennsylvania, on Thursday, January 20, 2005,
5   commencing at 1:05 p.m.

6                       - - - -

7

    APPEARANCES:
8
         FOR THE PLAINTIFF:
9   Neal A. Sanders, Esq.
    LAW OFFICES OF NEAL A. SANDERS
10  1924 North Main Street Extension
    Butler, PA 16001
11  74-282-7771

12
         FOR THE DEFENDANT:
13  Thomas G. Eddy, Esq.
    Senior Deputy Attorney General
14  Office of Attorney General
    Commonwealth of Pennsylvania
15  Litigation Section
    6th Floor, Manor Complex
16  564 Forbes Avenue
    Pittsburgh, PA 15219
17  412-565-3578

18

19

20

21

22

23

24

25

```
 1                           -  -  -  -

 2                      NANCY GIROUX,

 3                being first duly sworn,

 4            was examined and testified as follows:

 5                           -  -  -  -

 6                      EXAMINATION

 7                           -  -  -  -

 8  BY MR. SANDERS:

 9  Q.   Would you state your full name for the record.

10  A.   Nancy Ann Giroux.

11  Q.   Ms. Giroux, that is G-I-R-O-U-X?

12  A.   Yes; that's correct.

13  Q.   My name is Neal Sanders and I'm an attorney here

14       in the Commonwealth of Pennsylvania.  And in

15       particular we're here today in a civil case

16       involving Brian Pierce and the Pennsylvania

17       Department of Corrections and it is pending at

18       Civil Action No. 03-173 Erie.  And it's been

19       assigned to the Honorable Magistrate Judge Susan

20       Baxter and Federal District Judge Sean

21       McLaughlin.

22                  I want to thank you for coming to my

23       office in Butler, Pennsylvania this afternoon

24       for your deposition.  You were not the first

25       witness to be deposed this afternoon but we're
```

1  Q.  A male LPN that had worked at SCI Cambridge

2      Springs from January of '01 until May of '02.

3      Does that refresh your recollection?

4  A.  Yes.

5  Q.  Now, do you recall the vacancy that he filled in

6      January of '01?  The name of the employee who

7      had left SCI Cambridge Springs where Brian then

8      filled that position when he came over from

9      Albion?

10             Does Peggy Sue Haight --

11 A.  I was going to say would that be Peggy Haight?

12 Q.  Okay.  Do you remember Peggy Haight?

13 A.  Yes.

14 Q.  Now, was Peggy Haight an LPN?

15 A.  Yes.

16 Q.  And would you agree with me that she quit or

17     resigned as opposed to being terminated?

18 A.  Yes.

19 Q.  Now, I'm going to throw some names out at you

20     and see if you can recall any of these people.

21     You mentioned you knew Judy Weyers.

22 A.  Uh-huh.

23 Q.  Is that one of those verbal yeses?

24 A.  Yes.

25 Q.  Okay.  Do you recall that Judy Weyers was a

1   Q.   Okay.  Now, other than Brian Pierce, can you

2        think of any other male RN or LPN that was

3        terminated under your watch at Cambridge?

4   A.   I believe that Brian Pierce is the only one

5        that's been terminated.

6   Q.   Okay.  At Cambridge Springs.

7   A.   Yes.  I'm sorry.

8   Q.   I imagine you've heard the name Michael White,

9        Dominic White's cousin, who was terminated at

10       Albion?

11  A.   Yes.

12  Q.   It went to jury trial in Erie in the year 2002?

13  A.   Yes.

14  Q.   How did you come to know about Michael White or

15       his case?

16  A.   Through Brian Pierce.

17  Q.   Is it possible that you also had a discussion

18       from time to time, or at least one time, with

19       Maxine Overton about the Michael White case?

20  A.   I don't recall any conversations with Maxine

21       Overton about that case in particular.

22            I believe that most of my information

23       that I did have, which was minimal, came from

24       Brian Pierce.

25  Q.   Okay.  Now, a name has come up in this case by

```
 1        correctional officer at?

 2   A.   I don't believe any institution.

 3   Q.   Do you know why he might be listed as a

 4        correctional officer for the state?

 5   A.   No, I don't.

 6   Q.   What became of Mr. Kelley that he's not employed

 7        at Cambridge Springs any longer?

 8   A.   He resigned, or retired I should say.  Retired.

 9   Q.   He was a male individual; correct?

10   A.   Yes, sir.

11   Q.   Was he an RN or an LPN?

12   A.   He was an RN.

13   Q.   And you mentioned you knew about Michael White

14        you mentioned you thought through Brian Pierce;

15        is that correct?

16   A.   That's correct.

17   Q.   All right.  You knew Peggy Sue Haight.

18                  Let's talk about Yvonne McGuire.  Is

19        Ms. McGuire employed at Cambridge any longer?

20   A.   Yes, she is.

21   Q.   What is her current position?

22   A.   An LPN.

23   Q.   When you were at Cambridge Springs and Brian

24        Pierce was working as an LPN from January of '01

25        to May of '02, did Yvonne McGuire's name ever
```

```
 1              come up concerning anything that Brian Pierce
 2              was being investigated for?
 3    A.   Yes.
 4    Q.   Can you give me the names of my female LPN's
 5              that you know first-hand have been terminated
 6              from SCI Cambridge Springs between June of 2000
 7              and May of '02 as opposed to resigning?
 8              Actually being terminated for cause?
 9    A.   No.  We've had one person that resigned in lieu
10              of termination.
11    Q.   But in terms of actual terminations you have
12              none?  No females?  No female RN's, no female
13              LPN's that have been terminated for cause?
14    A.   No.  As I stated, Brian Pierce is the only one
15              that I know that was terminated, male or female.
16    Q.   You know from whatever your sources are that
17              Michael White was terminated.  He was a male LPN
18              or RN.  You know that; right?
19    A.   Correct.
20    Q.   Do you know of any other females that were
21              terminated from SCI Albion during the time that
22              you had interaction with the supervisors and
23              health care administrators at Albion?
24    A.   No.  I don't know either way.
25    Q.   Sandy -- if I don't pronounce it right you'll
```

```
 1        become, what did you say, the superintendent?

 2  A.    Yes.  May.  I believe it was May of 2004.

 3  Q.    Do you know Millie Eldred?

 4  A.    Yes.

 5  Q.    Who's that?

 6  A.    Elly Eldred.  She's an RN.

 7  Q.    Is she still employed at SCI Cambridge Springs?

 8  A.    No, she's not.

 9  Q.    Is she employed at any SCI?

10  A.    She's -- well, I'm sorry, I take that back.  She

11        was just retired as an annuitant at SCI

12        Cambridge Springs.

13  Q.    In other words, she retired and was hired back?

14  A.    Yeah, on a temporary basis.  I believe it's 90

15        days.

16  Q.    Okay.  What month of what year did she leave

17        initially as a retiree?

18  A.    I believe that she retired in November of '04.

19        Or October of '04.  I'm not really quite sure.

20  Q.    When Peggy Sue Haight quit in 2000, how was it

21        that that vacancy was let to be known over to

22        the folks at Albion?

23  A.    It's posted statewide that we have a vacancy.

24  Q.    Were there any other individuals who had applied

25        for that vacancy other than Brian Pierce?
```

| 1 | A. | There was multiple. |
| 2 | Q. | Did you have anything to do or any contact with |
| 3 | | the SCI Albion people before Brian Pierce was |
| 4 | | approved for transfer about him coming over and |
| 5 | | what his background was? |
| 6 | A. | As far as a conversation? |
| 7 | Q. | Yes. |
| 8 | A. | Yes. |
| 9 | Q. | With whom would you have talked at SCI Albion? |
| 10 | A. | Maxine Overton. |
| 11 | Q. | Anyone else? |
| 12 | A. | No. |
| 13 | Q. | What do you recall Maxine Overton telling you |
| 14 | | about Brian Pierce? |
| 15 | A. | That he was a good nurse. |
| 16 | Q. | Did she tell you that he was under investigation |
| 17 | | for an alleged incident in 2000? |
| 18 | A. | No. I didn't know about that until after he |
| 19 | | already came. |
| 20 | Q. | How did you find out about it after he came? |
| 21 | A. | Administration had set up a PDC, it's a |
| 22 | | predisciplinary conference, for him at our |
| 23 | | institution. |
| 24 | Q. | This Yvonne McGuire, do you know her to be |
| 25 | | involved as a union steward or a union rep from |

1      time to time?

2 A. She is a union rep for AFSCME.

3 Q. And you're familiar with the fact that there was

4      problems that were existing between Ms. McGuire

5      and Mr. Pierce at SCI Cambridge Springs?

6 A. Yes, there was. At times we would meet to

7      resolve them.

8 Q. From what you know, was Ms. McGuire ever

9      disciplined for any of the complaints that

10      Mr. Pierce had made about Ms. McGuire?

11 A. What complaints?

12 Q. Do you not know of any complaints that

13      Mr. Pierce made about Ms. McGuire in the way

14      that she was treating him when he came over from

15      SCI Albion in the first 30 to 60 days?

16 A. I can't really. I don't know. I'd have to look

17      at the file on McGuire.

18 Q. Isn't it true that you knew or came to know in

19      early '01 that Mr. Pierce was in and out of

20      Christine Massung's office repeatedly in

21      February of '01 concerning what he perceived as

22      problems that he was getting from Ms. McGuire

23      who was a union rep at the time?

24 A. I believe that Yvonne McGuire and Mr. Pierce had

25      personality conflicts.

```
 1   Q.   That wasn't my question.

 2              My question was did you know about

 3        the fact that Mr. Pierce was in and out of

 4        Christine Massung's office in February of '01

 5        concerning Ms. McGuire?

 6   A.   Offhand I don't recall that.  I just recall my

 7        dealings with Mr. Pierce and Ms. McGuire.

 8   Q.   Do you know of any discipline that Ms. McGuire

 9        has received, any written discipline that

10        Ms. McGuire has received since January of '01?

11   A.   Not without looking at a file.

12   Q.   Do you know whether she was ever suspended since

13        January of '01 to the present?

14   A.   No, she has not been suspended.

15   Q.   Do you know whether she's ever been the subject

16        of any kind of an investigation since January of

17        '01?

18   A.   Yes.

19   Q.   What were some of the issues that were being

20        investigated about Ms. McGuire?

21   A.   Since '01?

22   Q.   Since January of '01.  Since Brian came over to

23        you from SCI Albion.

24   A.   I believe that there was some comments that she

25        had made to another staff member and there was
```

```
 1        an investigation on that.

 2   Q.   What were the comments alleged to have been?

 3   A.   She had made a comment to a staff member that

 4        was calling off frequently that she didn't

 5        appreciate -- and I don't remember -- I can't

 6        quote her, but that she didn't appreciate all

 7        the calls because the other LPN's were getting

 8        stuck doing her overtime.

 9   Q.   Anything else?

10   A.   There's an investigation now about several staff

11        members that had made inappropriate comments to

12        another staff member.

13   Q.   Was she one of them?

14   A.   She's one of them, yes.

15   Q.   Okay.

16   A.   And that investigation is ongoing.

17   Q.   Were any of those other individuals being

18        investigated female?

19   A.   Can you clarify?

20   Q.   Is Yvonne McGuire female?

21   A.   Yes.

22   Q.   Are any of the other individuals under

23        investigation currently now, along with

24        Ms. McGuire, female?

25   A.   Yes.
```

```
 1        to mention her name, Nancy, but this inmate is a
 2        female; correct?
 3   A.   Correct.
 4   Q.   And the fact that this is addressed to you and
 5        ended up in Mr. Pierce's personnel file, would
 6        that indicate that this would have come across
 7        your desk or to your attention at some point in
 8        time after it was directed to you?
 9   A.   Yes.
10   Q.   Do you have an independent recollection of
11        interviewing Yvonne McGuire with regards to
12        this?
13   A.   To be honest, I don't.  Either way I don't
14        remember.
15   Q.   Do you have an independent recollection after
16        reading it, as you sit here today, of having
17        done anything after you got this?
18   A.   With this one, no, not in particular.  I'd like
19        to state that when these did come across my desk
20        I looked into all of them.
21   Q.   But you don't have any independent recollection
22        as you sit here today --
23   A.   No.
24   Q.   -- as to what, if anything, you did?
25   A.   No, I do not.
```

```
 1              (The witness reviewed the document.)

 2                          - - - -

 3  A.    I'm reading it.

 4  BY MR. SANDERS:

 5  Q.    Take your time.

 6  A.    It should not be on here.

 7  Q.    Okay.  But there's no mention of his name not

 8        withstanding; is that correct?

 9  A.    Correct.

10  Q.    And your recollection as you sit here today is

11        that you did not issue any type of verbal

12        warning or any kind of reprimand to

13        Ms. Pietrzak, only to Mr. Pierce?

14  A.    No, Ms. Pietrzak received a written reprimand as

15        well.

16  Q.    Have you issued anymore than that one to her in

17        the time that she's worked for you?

18  A.    Yes.

19  Q.    And is she still employed with you?

20  A.    No, she's not.

21  Q.    I think you mentioned earlier she's since left

22        for disability?

23  A.    Correct.

24  Q.    Did you ever recommend prior to her leaving for

25        disability, did you ever recommend to anyone
```

```
 1        senior to you at SCI Cambridge, or at Camp Hill,
 2        or any other location in the system for the
 3        Department of Corrections any stiffer penalty
 4        for Ms. Pietrzak other than a written warning or
 5        written reprimand?  In other words, a
 6        termination or a suspension?
 7   A.   Ms. Pietrzak was facing a PDC prior to her going
 8        on disability.
 9   Q.   Was the PDC something that involved conduct at
10        SCI Cambridge Springs?
11   A.   Yes, it does.  The particulars I really don't
12        remember at this point in time, but I'd have to
13        go back and look at her file.  But, yes, I
14        remember that it was a PDC that she was facing
15        prior to her resigning.
16   Q.   But she wasn't -- again this is the one we
17        talked about earlier.  She did not get
18        terminated.
19   A.   No.  She had been off for several months I
20        believe on disability prior to retiring.
21   Q.   Do you know any other female professionals, RN's
22        or LPN's, facing termination that left on a
23        disability other than her since you've been at
24        SCI Cambridge Springs?
25   A.   No, I don't think so.
```

```
 1         Mrs. Purvis?  Is that what you said,

 2         Mrs. Purvis?

 3    A.   Who's Mrs. Purvis?  No, I don't know --

 4    Q.   Who was it?  Mrs. Verga you said?

 5    A.   Mrs. Verga.  There's a gentleman by the name of

 6         Mr. Verga who is an RN II at Albion.  His wife

 7         worked at our institution for a short period of

 8         time.

 9    Q.   Okay.  Do you remember her first name?

10    A.   No, I don't.

11    Q.   So the individuals on this report of incident on

12         June 15 of '00 that you are familiar with would

13         be Ms. Weyers, Mr. Pierce, Mr. Verga; correct?

14    A.   Correct.  Again I may have met other ones but I

15         wouldn't recognize their names when I did their

16         management review.

17    Q.   Is it possible you did a management review for

18         Michael White?

19    A.   No.  A management review is when you sit down in

20         a room and you review all of the medical charts

21         from that area.  Each staff member would have to

22         go to another institution to do a management

23         review.

24    Q.   So you've gone to Albion to do that?

25    A.   I went once, yes.
```

| | | |
|---|---|---|
| 1 | A. | They had had some problems. |
| 2 | Q. | Can you think of the name of any male union |
| 3 | | stewards at that time?  April of 2002. |
| 4 | A. | I know.  I'm thinking. |
| 5 | Q. | Oh, I'm sorry. |
| 6 | A. | I know that the head was a gentleman by the name |
| 7 | | of Mr. Zolie. |
| 8 | Q. | Is it your testimony that Mr. Zolie was on site |
| 9 | | in Cambridge Springs in April of '02? |
| 10 | A. | No.  You're asking about a union rep and |
| 11 | | Mr. Zolie was the head for this region.  For our |
| 12 | | region. |
| 13 | Q. | All right.  But he was not on site as Sharalee |
| 14 | | was? |
| 15 | A. | No. |
| 16 | Q. | Sharalee actually worked at SCI Cambridge |
| 17 | | Springs at the time, didn't she? |
| 18 | A. | Yes. |
| 19 | Q. | Just like Yvonne McGuire did. |
| 20 | A. | Yes. |
| 21 | Q. | All right. |
| 22 | A. | I'd like to state that it would be AFSCME |
| 23 | | representatives.  They represented the clerk |
| 24 | | typists and also the LPN's. |
| 25 | | - - - - |

```
 1 │ Q.    Is it your claim that you investigated this
 2 │       matter as well?
 3 │ A.    Yes, I did.
 4 │ Q.    Did anybody help you with the investigation?
 5 │ A.    No, I don't believe so.
 6 │ Q.    What was the result of your investigation?  Did
 7 │       any of the individuals on this list receive any
 8 │       discipline?
 9 │ A.    Again I can't recall.  I'd need to check my
10 │       records.
11 │ Q.    But we know which ones are still employed and
12 │       which ones are not; correct?
13 │ A.    Yes.
14 │ Q.    You've already told me about all of them.
15 │ A.    Yes.
16 │ Q.    All right.
17 │                   Do you remember my client being
18 │       terminated on or about May 13 of '02?
19 │ A.    Yes.
20 │                      -  -  -  -
21 │                   (Deposition Exhibit No. 16 marked for
22 │       identification.)
23 │                      -  -  -  -
24 │          (The witness reviewed the document.)
25 │                      -  -  -  -
```

1        the one that was initiated against Mr. Pierce?

2   A.   That would be superintendent Brooks.  Or the

3        superintendent determines whether or not a PDC

4        will occur.

5   Q.   Are you aware of the fact that Mr. Pierce sought

6        to get unemployment compensation?

7   A.   Yes.

8   Q.   Do you know the outcome of that proceeding?

9   A.   It was denied.

10  Q.   Do you know if the same allegations or defenses

11       to him obtaining unemployment were used in that

12       proceeding as it served as the basis for his

13       termination from the Department of Corrections?

14                 MR. SANDERS:  I'm going to object on

15       the grounds of speculation.

16  BY MR. EDDY:

17  Q.   Well, you've seen Exhibit 18 I believe it is.

18                 MR. EDDY:  Off the record.

19                      - - - -

20          (There was a discussion off the record.)

21                      - - - -

22  BY MR. EDDY:

23  Q.   You were shown a copy of Exhibit 18.

24                      - - - -

25          (The witness reviewed the document.)

```
 1                          - - - -

 2  A.    Yes.

 3  BY MR. EDDY:

 4  Q.    And that is essentially the letter that notifies

 5        Mr. Pierce that he's been terminated; is that

 6        right?

 7  A.    Yes.

 8  Q.    Are you familiar with the charges that have been

 9        levied against Mr. Pierce in that termination?

10  A.    Yes.

11  Q.    In fact, you testified you were at that hearing.

12        The PDC hearing.

13  A.    Yes.

14  Q.    Do you know whether or not those same criteria

15        that were used for his termination were also

16        used in connection with his unemployment

17        hearing?

18  A.    Yes.  When Mr. Pierce had gone to the

19        unemployment hearing, I was also there as a

20        witness, and at that time Mr. Pierce had called

21        multiple nurses to that hearing and each one of

22        them --

23               The hearing examiner had asked if

24        they had done any of these things, and each one

25        of them had said at one time or another they had
```

1    done it, and each one had been disciplined for

2    it, and that each one of them had stopped doing

3    it.

4            And the basis of the unemployment

5    hearing, I believe, the denial was -- and this

6    is my thoughts -- was that when she questioned

7    Brian Pierce if he had done these things, and he

8    had said, yes, he had.  When she had asked if he

9    had been disciplined, he said, yes, he had.  And

10   when she asked him if he had stopped doing this,

11   he said, no, he had not because he felt that he

12   was in the right so he did not stop the

13   practice.

14   Q.  So if I understand what you're saying correctly,

15       he produced witnesses at his unemployment

16       hearing that he felt had done the same things

17       that he did for which he was terminated and

18       these individuals were not terminated?

19   A.  That's correct.

20   Q.  But Mr. Pierce stated that he either failed or

21       refused to correct those procedures whereas the

22       other witnesses said that they did comply with

23       the corrective behavior; is that what you're

24       saying?

25   A.  That's correct.

```
 1   Q.   You said that you agreed with the decision to
 2        terminate Mr. Pierce as contained in Exhibit 18.
 3   A.   (The witness nods head up and down.)
 4   Q.   I'll just ask you why do you agree with that
 5        decision?
 6   A.   I agree with the decision because even with
 7        everything that was going on, Mr. Pierce was
 8        showing no indication that he was going to
 9        change his behavior.
10   Q.   When you stated I believe that you investigated
11        all of the various commonwealth employee witness
12        statements that were submitted by Mr. Pierce
13        that we've seen I think as Exhibits 12, 13 -- or
14        13, 14, 15, 16 and 17, you said that you
15        investigated all of those statements that he
16        made?
17   A.   Yes.  Each person was called in and interviewed.
18   Q.   Were you able to corroborate any of his
19        allegations in those statements?
20   A.   I believe that most of the statements that he
21        had claimed were not founded.
22   Q.   Did you find any to have any merit?
23   A.   Yes, I do believe that there was some that had
24        admitted to some of those accusations.
25   Q.   Do you remember what you did as to those
```

EQUAL EMPLOYMENT OPPORTUNITY DISCRIMINATION COMPLAINT

OCT 26 2001

PERSONNEL

COMMONWEALTH OF PENNSYLVANIA
STD-484    REV. 2/87

## Equal Employment Opportunity
## DISCRIMINATION COMPLAINT

DOCKET NO. 2001-04

The information on this form should be completed for all alleged discrimination and sexual harassment complaints. The completed complaint form should be signed by the complainant. Upon completion, please forward to the Equal Opportunity Manager/Specialist or the individual responsible for EEO in your agency.

DEPARTMENT NAME AND ADDRESS
SCI-Cambridge Springs
451 Fullerton Ave.
Cambridge Springs, PA 16403

1. COMPLAINANT'S NAME
Brian Pierce

HOME TELEPHONE NO.
(814) 398-2574

2. ARE YOU CURRENTLY EMPLOYED BY THE ABOVE DEPARTMENT?
☒ YES    ☐ NO

HOME ADDRESS
313 S. Main St. Cambridge Springs PA 16403

3. PRESENT JOB TITLE
LPN

STATUS
Permanent Full Time

WORK UNIT
Medical

LOCATION
SCI-CBS

WORK TELEPHONE NO.
(814) 398-5549

LENGTH OF SERVICE IN CLASSIFICATION
7 years

4. DATE OF THE ALLEGED DISCRIMINATORY PRACTICE
10-15-01

6. THE DISCRIMINATION OCCURRED IN CONNECTION WITH
☐ INTERVIEW    ☐ DISCIPLINARY ACTION
☐ HIRING SELECTION    ☐ COMPENSATION
☐ PROMOTION    ☐ TRAINING OPPORTUNITY
☐ LAYOFF    ☒ OTHER (SPECIFY)
☐ TRANSFER    N/A

5. BASIS OF THE ALLEGED DISCRIMINATORY PRACTICE
☐ RACE    ☐ AGE
☐ SEX    ☐ DISABILITY
☐ NATIONAL ORIGIN    ☒ RETALIATION
☐ ANCESTRY    ☒ OTHER (SPECIFY)
☐ RELIGION    Hostile Working Environment

7. THE FACTS OF THE ALLEGED DISCRIMINATORY EMPLOYMENT PRACTICE ARE:

— See Attached —

S. Pietrzak and I have had numerous confrontations in the last 9 months in regards to my wanting to change a few policies and procedures in order to help make the department more efficient. She has also stated her distates for my ability to take the initiative without requiring her guidance or direction. As a result of those confrontations, this incident occured. During the 15 OCT incident, other staff members took the initiative to begin mobilizing the department for the drill, and they were not berated in front of their peers or inmates for their forethought, I was. I later found out that PA Stybowski witnessed the initial outburst by Ms. Pietrzak, and that Inmate Strawbridge OF 8376 was in her wheelchair in the hall outside the door when Ms. Pietrzak first addressed me.

(OVER)


EXHIBIT 10
1-12-05

Page 1 of 2

32

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On 10-15-01 I entered the institution at about 1:50 pm. I saw inmates going back to their housing units and I was told that there was a drill going on. As I got to building 3, PA Styborski met me on the walk and told me about the drill going on. I entered building 3 and into medical at about 1:55 pm and all the staff were talking about the drill. I talked briefly with V. McGuire LPN about a few issues and then went into the pharmacy to count with P. Smith R.

After we finished counting, V. McGuire and I exited medical and went on the walk in front of building 3. SGT. DeCoursey was coming down the walk from building 1. V. McGuire asked if she knew what was going on. SGT. DeCoursey said she did and that she had "found out by accident." I followed SGT. DeCoursey into building 3 and I asked her if she knew how long the drill was going to last. She told me that she did not know. I asked her if she knew if we were going to have to pass medications on the housing units. She said she didn't know. I said that we would need to know as soon as possible because it might take an hour to prepare to do that. She then radioed Lt. Wadel + he called her back on the phone. She related the information to him and she told me that he would have to find out.

| 10-16-01 | Brenda Lee |
|----------|------------|
| Date | Signature |

| | |
|--|--|
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

33

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I then went into medical and was talking to M. Kelly RN and T. Zuber RN. A few minutes passed and the building 3 officer came to us and told us that Lt. Wadel told him to tell us that we were to prepare to pass meds on the housing units. I went and told S. Pietrzak about what Lt. Wadel had said. She then began to organize the staff and had S. Cooper RN try to get a list of inmates by housing unit. M. kel, T. Zuber and I went into the medication room and began to prepare f the medication pass. I asked S. Pietrzak RN what meds needed to be passed out. She told me "All of them." I told her that I had been told the only life-sustaining med's needed to go. She then called C. Mason CHN for confirmation and we were directed to give only life sustaining meds and Antibiotics. I passed this information along to M. Kelly T. Zuber and we completed our assigned tasks.

| | |
|---|---|
| 10-16-01 | Brian Purr |
| Date | Signature |
| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

Not long after we had prepared to pass medications on the units, SGT. Decars entered medical and went into the room where S. Pietrzak was sitting. A few minutes later SGT. Decoursey came out of the room with S. Pietrzak right behind her. At that time, in the presence of SGT. Decoursey, M. Kelly, and T. Zuber, S. Pietrzak used a loud, hostile and demeaning tone and language to belittle me in front of my peers. She then went to C. Massung's office. T. Zuber came to me and asked "What was that all about?" About 5 minutes late S. Pietrzak reentered the nurse's station and began to harrass me again, in the presence of staff. AT that time I told her that if she had a problem with me, she needed to address it to me in private or in C. Massung's office and that I did not appreciate the demeaning way I had been treated earlier as well as now. She agreed to go to C. Massung's office, but C. Mass arrived in the nurse's station. S. Pietrzak then took an aggressive posture And began to "stare me down" with a hateful, angry stare. She the began to belittle me in the presence of my employer. we both began to exchange words in a loud manner.

| _10-16-01_ | _Bruce Penn_ |
|---|---|
| Date | Signature |

| _____ | _____ |
|---|---|
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

35

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

C. Massung stood by and observed, but did not intervene. At one point she walked away from us and entered S. Cooper's office. S. Pietrzak and I continued to exchange words, and as I was trying to explain what had happened to her, she began yelling "stop pointing at me!" "I consider that a threat!" At which point C. Massung came out and S. Pietrzak asked her "Did you see that? He threatened me!" C. Massung covered her eyes and stated "I didn't see anything. I have a bad headache." At which point S. Pietrzak began verbally attacking me and my character. C. Massung then said we needed to go to her office. We agreed, and began to go to her office. S. Pietrzak stopped and said she was going to bring someone in with her. I said that I wanted union representation as well, and since no one was on site at that time, we would have to wait and do it another day. At that, S. Pietrzak became angry and went into medical.

| | |
|---|---|
| 10-16-01 | _signature_ |
| Date | Signature |
| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

36

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I was so shaken by the confrontation, that I had fear of retaliation and the possibility of having insubordination charges put on me by S. Pietrzak if I stayed, that I went to C. Massing and told her that I was leaving. S. Cooper was in the room for the conversation and was a witness to the follow. I told C. Massing that "I am afraid of retaliation by Sandy, and that I can work in this hostile environment." I told her that I was very upset and stressed out by what happened and that I did not appreciate being treated like that by S. Pietrzak, especially in front of my peers. C. Massing asked when I would like to have the meeting to resolve the issues, and I said tomorrow (10-16-01). She told me that she was not going to be here, and I said, "then how about wednesday?" She told me that she was going to be out all week and she wanted it to be handled by the Deputy. I told her that I would like to "keep it in-house", if possible and try to resolve it first. C. Massing then said "well who's going to make the decision? who's going to handle this?" I simply said to her "you." She then told me that she will be back on Monday and we could do it then.

| 10-16-01 | [signature] |
|---|---|
| Date | Signature |

| | |
|---|---|
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I said that that would be fine. C. Massing told me that she was not sure I could take sick time for this, but that she would call personnel to clarify. S. Cooper told me that I should count off with someone before I left, so I did. While I Zuber and I were counting, C Massun told me that I could go, but I needed a doctor's excuse to justify my leaving. I told her that it was no problem and then thanked her.

Shortly after that I left the institution at 4:45 pm.

nothing else follows

| 10-16-01 | | | (signature) |
| --- | --- | --- | --- |
| Date | | | Signature |

| | | | |
| --- | --- | --- | --- |
| Date | | | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On 10-16-01 I came into work. upon entering medical, I was told by P. Smith RN and A. Chapman RN that the night shift nurse L. Mallard L had told them in shift report that S. Pietrzak and I had an arguement and that I walked off property. They told me that I WAS "bad mouthed" by S. Pietrzak on shift change with L. Mallard.

Later on, S. Cooper called me into her office and told me that S. Pietrzak was telling as many staff as she could "a very slanted" side of the picture and that she was making it look like she did nothing wrong. Also, S. Cooper told me that C. Massing had come into her office this morning and was saying terrible things about me and that I was a "cold, calculating individ. and it was part of his Agenda." S. Cooper also observed C. Massing talkin to several of the staff on 10-15-01 and 10-16-01 about this incident. I feel this only further encourages a hostile working environment and that by making slanderous comments about me to other staff, my peers is wrong!

____10-16-01____                    _____
        Date                              Signature

_____                    _____
        Date                            Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth.  If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 12, 2002

SUBJECT:   Brian Pierce LPN
           Fact finding 4/11/02 at 1415

TO:        Nancy Wirth
           Human Resource Director

FROM:      Nancy A Giroux
           Correctional Health
           Care Administrator



It was brought to my attention by fellow co-workers that over the last two weeks Mr. Pierce is not following medication room procedures and his behavior has been inappropriate. Y. McGuire, C. Heffern, T. Zuber, S. Cooper, and S. Pietrzak have provided statements (attached) to substantiate these complaints.

Overall synopses of these complaints are:
- Pre-pouring medication prior to the med line starting
- Leaving the pre-poured medications unattended prior to the med line
- Not crushing psychiatric medications nor placing them in water
- Borrowing medication from other inmates instead of utilizing stock meds
- Not signing out stock medications
- Not checking inmate ID's during the med line
- Not following procedures regarding dispensing of medication in the RHU
- Inappropriate conversations with inmates regarding DOC programming
- And informing inmates that he is "in a bit of trouble" and leaving
- Providing misinformation to LT regarding med room procedures and supervisors expectations.

During the fact finding with Mr. Pierce we covered many areas of concern. Mr. Pierce was asked if he is aware of the medication room procedures and where it is located. He stated he was and that there was a copy in the med room and one in his mailbox. Mr. Pierce stated that he "generally checks ID's and "always checks the MAR's. He also stated that he is crushing at least 75-80% of all psych meds and places them in water. He states that he is not pre-pouring medications and that he does not leave the medication unattended. He states that he is utilizing the stock medication and signs out the stock meds. He admits to borrowing medications from other inmates on a regular basis and then clarifies that he borrows only when not available in stock and it's a medication the inmate requires. He also admits to placing medication (Benadryl and CTM) in individual cups but clarifies that it is from the stock bottles not from the blister

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values* ............. *citizens; while respecting the rights of crime*

packs. Mr. Pierce states that his counterparts all do the same thing, he does not do it any more frequently then they do. Mr. Pierce was questioned about the RHU practice of how medication is dispensed to the inmates in the RHU and in particular the incident that occurred on 4/7/02. Mr. Pierce stated that he did deliver the medication to the RHU in cups in his pocket and he did not have the MAR or the RHU bag. He stated that he now knows what is expected of him after our conversation on Monday (4/8/02) but states he must have been confused about this issue prior to that. When I questioned him about the conversation we had on 3/11/02 regarding this issue, he stated he didn't remember having a conversation with me and then later stated that we talked about so many different things that he couldn't remember what we talked about. Mr. Pierce verbalized throughout the conversation that he understood the procedures regarding checking inmates ID's, crushing psych meds, borrowing medications and the usage of stock medications. Again Mr. Pierce stated that all his counterparts do the same thing that he does and if "they were honest they would tell you". Requested that Mr. Pierce provide me with the names of staff members that were violating med room procedures and he stated that he would not do that. At the end of the conversation he stated that he would provide me with the names if the nurses are not honest and tell me myself. "Call me in after you speak with them".

I also discussed with Mr. Pierce the issue of count being off on 4/1/02. The narcotic sheet read that we had 28 tablets of xanax 1mg and the blister pack contained 29. When count had been completed on the 2-10 shift the discrepancy was not picked up and was not discovered until the 600-hour count. Refer to the EO's attached. Mr. Pierce's explanation was that the count was correct at 2200 hrs and that he distinctly remembers giving inmate Houck two tablets. Therefore "someone disposed of the whole card of 28 xanax. I repeated his accusations and he stated count was correct at 2200 and was off at 600. Winkler didn't state that the count was incorrect at 2200 hrs so it wasn't. Again I asked are you insinuating that someone, meaning Winkler took a whole card of a narcotic? Pierce stated, it was a full card and I punched out two tablets that left 28 tablets. At 600 hrs the card had 29 tablets.

We then discussed his conversation with the inmates regarding the DOC programs and in particular the RSAT program. Mr. Pierce states that he did talk to the inmates about the programming. The conversation started out about the inmates questioning him about leaving and that he acknowledges that he is leaving within the next year or two. That he is looking for a counseling job within the DOC because he believes that he can provide the inmates with the skills needed to succeed out in the world. Mr. Pierce states that the inmates expressed sorrow over his leaving and that they told him he is the only one who cares. He talked about being able to better help them, equip them, and provide them with the tools to succeed. The inmates were commenting about programming and he stated, "It was a joke". When questioned about this Mr. Pierce stated that the inmates tell him it's a joke. I questioned Mr. Pierce about the differences between one inmate talking to another and a staff member talking to an inmate. Don't you think that

the inmates will place more weight on a statement made by a staff member? Pierce's response -"Truth is truth". "I was only telling them what the inmates have been telling me".

The majority of the nurses who dispensed medication in the med room were called into this office one at a time and informed that it was an official investigation and a breach in the code of ethics if they discussed this with other staff members. They were all asked the same questions pertaining to medication room policy and procedures and their interpretation of the policies. The last questioned asked was if they were aware of any nurse violating these procedures, if so who and how? All response from the 2-10 shift were that Mr. Pierce was violating multiple procedures in the med room, on 6-2 Ms McGuire stated Pierce and Ms Coopers statement collaborates this premise also.

Conclusion

There is a medication room procedure book housed in the med room, multiple memos posted in the med room, signs posted outside the med room windows and all staff questioned have been able to voice what the departments ᵃⁿᵈ ᵗʰᵉ ⁿᵘʳˢᵉˢ expectations regarding procedures in the med room. Mr. Pierce was able to verbalize when questioned the proper procedures required regarding inmates ID's, psych meds, stock meds, borrowing medications and pre-pouring medications. He states he was confused on the issue of the delivery of RHU medications and stated that he doesn't agree with our interpretation of pre-pouring but was able to state clearly what our expectations were.

The collections of statements from other staff members who have been working in the med room with Mr. Pierce clearly show that Mr. Pierce is not following medication room procedures. He has consistently over the last several weeks not checked the inmates ID's, is not crushing the psych medications nor placing them in water. He is not utilizing the stock supply of medications and instead is borrowing medications from other inmate's blister packs. This is creating problems when we attempt to re-order the inmates medications that have been borrowed due to it being an early refill. He is taking blister pack cards of stock medications and punching them out into cups i.e. CTM and Benadryl 50mg both, which are prescription medications. He is not signing the medications out and the stock inventory sheet is disappearing. It has been witnessed that he is pre-pouring inmates medications prior to the med line opening and then dispensing them. It has also been witnessed that he pre-poured the medications and then left the area, that goes against his theory or definition of pre-pouring medications. He was spoken to on 3/11/02 when he had dispensed medications to the RHU inappropriately and the proper procedures were reviewed with him. Therefore I do not believe that Mr. Pierce was "confused" regarding our expectations and procedures for the delivery of RHU medications. Several witnesses have written statements regarding Mr. Pierce's conversations with the inmates and have found them to be inappropriate.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive, law-abiding citizens, while respecting the rights of crime*

Ms Heffern witnessed the conversation between Mr. Pierce and the inmates out in the
hallway on 4/5/02 and Mr. Pierce recounted his conversation with the inmates to Mr.
Zuber, Ms Pietrzak and Ms Heffern later that evening. The statements demonstrate that
Mr. Pierce was promoting himself and indicating that the programs and the RSAT
program were a joke and designed to set the inmates up for failure.

Mr. Pierce avoided all responsibility regarding the incident with the count being
incorrect. All information points to the fact that that the count was incorrect at 2200 hrs
and that Mr. Pierce dispensed one tablet instead of two as ordered. Ms Winkler should
have noted the error during count at 2200 hrs but did not for whatever reason. Ms
Winkler states that count was a little confusing because Mr. Pierce was signing out
some of his narcotics that he dispensed that evening during count. Mr. Pierce indicates
that he believes that another staff member took a whole card of the xanax and disposed
of it, which in his opinion accounts for the narcotic count being off. His scenario doesn't
make any sense and the allegations he is making are extremely serious. I researched
the narcotic issue personally and had Ms Cooper RNII research the issue independently
to confirm my findings. Our conclusion is that the xanax is accounted for and that there
are no medications missing, never mind a whole card. See the attached copies of the
narcotic sheets and the copy of the blister pack which states the date the medication
was filled by the pharmacy and how many tablets they sent. Also attached is Ms
Cooper's statement confirming these findings.

These allegations constitute a violation of the code of ethics, specifically **Section B.
Specific Rules and Regulations-Department of Corrections; section 9.** Lawful
orders by a supervisor to a subordinate must be executed promptly and faithfully by the
subordinate even though the employee may question the wisdom of such an order.
**Section 10;** Employees are expected to treat their peers, supervisors and the general
public with respect and conduct themselves properly and professional at all times;
unacceptable conduct or insolence will not be tolerated. **Section 14;** employees will
promptly report to their supervisor any information which comes to their attention and
indicates violation of the law, rules, and/or regulations of the Department of Corrections
by either an employee or an inmate, and will maintain reasonable familiarity with the
provisions of this directives. And **section 29;** All employees shall comply and cooperate
with internal investigations conducted under the authority of the Department of
Corrections, and respond to questions completely and truthfully. Procedures in cases
that may result in criminal prosecution will include those rights according to all citizens
of the commonwealth.

NG/ng

CC    Superintendent Brooks
      Deputy Good
      Deputy Wilkes

*"Our mission is to protect the public by confining persons committed to our custody in safe,
secure facilities, and to provide opportunities for inmates to acquire the skills and values*
*respecting the rights of crime*

**COMMONWEALTH · PENNSYLVANIA**
**Department of Corrections**
**SCI-Cambridge Springs**
**(814) 398-5400**
November 20, 2001

**SUBJECT:**  **Written Reprimand**

**TO:**  Brian Pierce

**FROM:**  Nancy A Giroux
**Nursing Supervisor**

Mr. Pierce, it has been determined that you will receive a written reprimand for the incident that occurred on 10/15/01 involving Ms. Pietrzak.

Specifically relating to the altercation between Ms Pietrzak and yourself that occurred on 10/15/01 on the 2-10 shift during an emergency drill.

This is a violation of the Department of Corrections Code of Ethics, Section B, Number 10 which states '**Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.'**

As we have discussed, in situations like this you should remove yourself from the general medical area to continue the conversation. It should not be conducted in a public area that can be overheard by other staff and inmates that can cause embarrassment to both parties involved. If the issue cannot be resolved between the two parties then the conversation should be terminated at that time by mutual agreement and continued/resolved with a mediator (supervisor) at a future time and date. You antagonized the situation by speaking in a loud tone, pointing your finger at Ms Pietrzak repeatedly when she requested you not to and making derogatory statements about her character. This situation was not handled in a professional manner as is expected of DOC employees.

You are advised that continuation of such unacceptable actions will result in further disciplinary action, which may include suspension and/or termination. This written reprimand will be placed in your Personnel file and can remain there for up to one year.

NG/ng

CC    N Wirth. Human Resource Director
       C. Massung CHCA
       · Supervisor's File



EXHIBIT 4
1-20-05

*"Our mission is to protect the public by confining persons committed to our custody in safe,*
*secure facilities, and to provide opportunities for inmates to acquire the skills and values*



FREY A. BEARD, Ph.D
SECRETARY
TMENT OF CORRECTIONS

WILLIAM J. LOVE
DEPUTY SECRETARY
FOR
SPECIALIZED FACILITIES &
PROGRAMS

# COMMONWEALTH OF PENNSYLVANIA

## STATE CORRECTIONAL INSTITUTION

## AT CAMBRIDGE SPRINGS

*451 Fullerton Avenue*
*Cambridge Springs, PA 16403-1229*
*Telephone 814-398-5400*

April 17, 2002

MARILYN S. BROOKS
SUPERINTENDENT

Address All Replies
To Superintendent



Brian Pierce
313 Main Street
Cambridge Springs, PA 16403

Dear Mr. Pierce:                                    Employe#456590

This is to advise you that a Pre-Disciplinary Conference has been scheduled for Tuesday, April 23, 2002 at 2:00 pm in the Conference Room of Building One (Administration Building). At the Pre-Disciplinary Conference, you will be offered the opportunity to respond to reports of incidents that may have occurred while you were a Licensed Practical Nurse, Permanent Civil Service Status, with the Department of Corrections at the State Correctional Institution at Cambridge Springs. Allegations involve violation of the following sections of the Department of Corrections Code of Ethics:

Section A, General Responsibility of Department of Corrections Employees: Consistent with the responsibility of all correctional employes in the Common-wealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions, the following code is being promulgated.

Section B, #1: Specific Rules and Regulations – Department of Corrections: Each employe in the correctional system is expected to subscribe to the principle that something positive can be done for each inmate. This principle is to be applied without exception.

This involves an intelligent, humane and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated. Corporal punishment shall not be utilized under any circumstances.

Section B, #9: Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employe may question the wisdom of such order. The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil service appeal, or the grievance machinery.

Section B, #10: Employes are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

PIERCE, BRIAN                                                                    PAGE 2

Section B, #14: Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

Section B, #29: All employes shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

Alleged incidents include reports of the following:

On March 9, 2002, medication line was completed early and you may have pre-poured certain medications in violation of policy. After being questioned by an officer on duty about whether you pre-poured medications on March 9, 2002, you decided to change procedure and called one unit at a time on March 10, 2002, thereby significantly delaying completion of medication line. On March 20, 2002, on the 0600 to 1400 shift, after the medication line was closed, three inmates arrived for their medication. The RN on duty (team leader) contacted the unit officer and was advised that the inmates were late returning from meal and reporting to medication line through no fault of their own. You nonetheless refused to open the medication window, even though one of the inmates was on an anti-epileptic life-sustaining medication, stating that "they came late, fault doesn't matter". You were ordered by the team leader three times to open the window before complying.

On April 1, 2002, there was an error in count on a card of Xanax. The narcotic sheet you completed and signed indicated that we had 28 tablets of Xanax 1mg and the blister pack contained 29. You signed that you had given the inmate 2 tablets, yet the card for that inmate was found to still have 29 tablets remaining. When questioned, you stated that someone disposed of the card with 28 tablets, and that when you left the card was correct.

On April 1, 2002 you ordered a 60-day supply of medication for an HIV inmate being paroled to a Community Corrections Center. This was done without required pre-release notification from the Records Department. It was reported that you stated to the inmate that you would "hook her up". Policy specifically indicates that a 30 day supply is issued to inmates being paroled. In addition, HIV medications are only ordered for 30 days regardless of their destination. You were also observed passing a note you had written to this inmate through the medication window, while speaking in hushed tones to her.

On April 5, 2002, it is reported that you went to the RHU without the medication bag and the Medication Administration Record. You also admitted when questioned that you pulled the inmates' names and PRN medications from the RHU book, checked to see who was due medications, and pre-poured medications into cups that you took in your pocket to the RHU. After the shift commander questioned you about the procedures for delivering medications to the RHU, you called the RHU officer and became confrontational and questioned her about this issue. The correct procedures for

46

PIERCE, BRIAN                                                                    PAGE 3

delivering medications to the RHU were specifically addressed with you on March 11, 2002.

On April 9, 2002, it was reported that you had a conversation in the hallway with inmates about the RSAT program and DOC programming in general, stating that the programming "was a joke". It was further reported that you made negative comments about the RSAT program to the inmates.

Several staff statements report that you have pre-poured medications prior to the start of medication line, and that you have walked away and left the medications unattended during the last three week period. You admitted to borrowing medications from other inmates' blister cards rather than using stock medication. It was also reported that you are not crushing psychiatric medications as required. This is in direct violation of our procedures as well as DOC policy 13.4.1.

You have the right to have Union Representation during this conference if you so choose. It will be your responsibility to arrange such representation with an AFSCME A-1 designated representative.

Based upon the information established during the conference appropriate action shall be initiated up to and including possible dismissal. If you elect not to attend this conference, a decision will be made based upon the facts at hand.

Sincerely,

Marilyn S. Brooks
Superintendent
For
Jeffrey A. Beard, Ph.D.
Secretary

MSB/NW

CC:  Deputy Wilkes
     Deputy Good
     BHR/Labor Relations Division
     Sharalee Raun, AFSCME

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 17, 2002

This is to acknowledge that I, Brian Pierce, have received a copy of my PDC
Notification dated 4/17/02.

_____                    _____
Employee Signature                                Date

JEFFREY A. BEARD, Ph.D
SECRETARY
DEPARTMENT OF CORRECTIONS

WILLIAM J. LOVE
DEPUTY SECRETARY

C .AMONWEALTH OF PENNSYLVA
STATE CORRECTIONAL INSTITUTION
AT CAMBRIDGE SPRINGS
451 Fullerton Avenue
Cambridge Springs, PA 16403-1223
Telephone 814-398-5400

MARILYN S. BROOKS
SUPERINTENDENT

Address All Replies
To Superintendent

November 15, 2001

Brian Pierce
313 S. Main Street
Cambridge Springs, Pa 16403

Re:  Complainant: Brian Pierce (2001 – 04)
     State Correctional Institute SCI Cambridge Springs

Dear Mr. Pierce :

This letter is in response to your complaint received in this office on October 26, 2001.

Federal and state laws and/or Department of Corrections policy prohibit employment discrimination because of a person's race, color, religious creed, national origin, ancestry, sex, age of 40 years or over, non-job-related disability; AIDS; HIV status; because of opposing discrimination or participating in the discrimination complaint process; and because of citizenship status, sexual orientation or union activity.

A charge of discrimination is an allegation by an aggrieved person that (s)he was *harmed because of one or more of these prohibited bases*. Based on the information you have provided, you have not alleged this to be the case, and have, therefore, not made a charge of unlawful discrimination. Your case is therefore closed.

You may, however, still have a personnel issue that can be addressed by your supervisor, management, or Human Resources staff.

If at any time you feel you have been discriminated against (harmed because of a protected class), please feel free to contact us. Please keep in mind, however, that complaints must be filed with the Department of Corrections within 90 days of the date of the alleged act of discrimination.

You have a right to appeal these findings to the Director of the Office of Equal Employment Opportunity, PA Department of Corrections, PO Box 598, Camp Hill, PA 17001-0598 if not satisfied with findings for further review. For an appeal to be considered timely, it must be received by the Office of Equal Employment Opportunity, or postmarked within 20 calendar days from the date of the written notification resulting from the investigation of the complaint. I am also attaching a copy off the "Avenues of Recourse for Discrimination Complaints."

EXHIBIT //

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."

49

The State Employee's Assist                                    you
are experiencing personal probl                                ay
contact SEAP at 1-800-692-7454.

Cc:    file
       certified mail 11/6/0

# Avenues of Recourse for Discrimination Complaints

**PA Department of Corrections (D.O.C.)**
**Office of Equal Employment Opportunity and**
**Contract Compliance**
*Within 90 calendar days of alleged occurrence*
PO Box 598, 2520 Lisburn Road
Camp Hill, PA 17001-0598
Phone: (717) 975-4934
Fax: (717) 731-7115

**State Civil Service Commission**
*Within 20 calendar days of alleged occurrence*

Central Region
PO Box 569
Harrisburg, PA 17120
(717) 783-3058

Eastern Region
State Office Building, Room 101
1400 Spring Garden Street
Philadelphia, PA 19130-4088
(215) 560-2253

Western Region
State Office Building, Room 411
300 Liberty Avenue
Pittsburgh, PA 15222-1210
(412) 565-7661

**Pennsylvania Human Relations Commission**
**(PHRC)**
*Within 180 calendar days of alleged occurrence*

Harrisburg Regional Office
1101-1125 S. Front Street, 5th Floor
Harrisburg, PA 17104-2515
(717) 787-9780 (voice)
(717) 787-7279 (TT)

Philadelphia Regional Office
711 State Office Building
1400 Spring Garden Street
Philadelphia, PA 19130-4088
(215) 560-2496
(215) 560-5599 (TT)

Pittsburgh Regional Office
11th Floor State Office Building
300 Liberty Avenue
Pittsburgh, PA 15222-1210
(412) 565-5395
(412) 565-5711 (TT)

**Equal Employment Opportunity Commission**
**(EE0C)**
*Within 300 calendar days of alleged occurrence*
*(180 days for ADA complaints and immigration-*
*related discrimination complaints)*

Philadelphia Area Office
Bourse Bldg. Suite 400
221 South 5th Street
Philadelphia, PA 19106-2515
(215) 451-5700

Pittsburgh Area Office
Liberty Center
1001 Liberty Avenue, Suite 300
Pittsburgh, PA 15222-4187
(412) 644-3444
(412) 644-2720 (TTY)

Note: *Age* discrimination complaints against the *state government* are no longer to be filed with the EEOC, but can be filed under state law with the PHRC. *Ancestry* discrimination complaints may only be filed with PHRC. *Immigration-related* discrimination complaints... EEOC. Complaints of discrimination on the basis of *union activity* may be filed ...discrimination on the basis of

# ATTACHMENT D

```
 1         IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
 2
                        - - - -
 3
    BRIAN D. PIERCE,                    )
 4                                      )
                Plaintiff,              )
 5                                      )
                  -vs-                  )      Civil Action
 6                                      )      No. 03-173E
    PENNSYLVANIA DEPARTMENT             )
 7  OF CORRECTIONS,                     )
                                        )
 8              Defendant.              )

 9
                        - - - -
10
             DEPOSITION OF:  SANDRA PIETRZAK
11
                        - - - -
12

13              DATE:    January 20, 2005
                         Thursday, 3:20 p.m.
14

15              LOCATION:   Law Offices of Neal Sanders
                            1924 North Main Street Ext.
16                          Butler, PA 16001
                            724-282-7771
17

18              TAKEN BY:   Plaintiff

19
                REPORTED BY:   Toni Rennebeck, RPR
20                             Notary Public
                               NMR Reference No. 30738A
21

22

23
                        CERTIFIED COPY
24

25
```

```
 1                DEPOSITION OF SANDRA PIETRZAK,
       a witness, called by the Plaintiff for examination,
 2     in accordance with the Federal Rules of Civil
       Procedure, taken by and before Toni Rennebeck, RPR, a
 3     Court Reporter and Notary Public in and for the
       Commonwealth of Pennsylvania, at the Law Offices of
 4     Neal A. Sanders, 1924 North Main Street Extension,
       Butler, Pennsylvania, on Thursday, January 20, 2005,
 5     commencing at 3:20 p.m.

 6                         -  -  -  -

 7
       APPEARANCES:
 8
            FOR THE PLAINTIFF:
 9     Neal A. Sanders, Esq.
       LAW OFFICES OF NEAL A. SANDERS
10     1924 North Main Street Extension
       Butler, PA 16001
11     74-282-7771

12
            FOR THE DEFENDANT:
13     Thomas G. Eddy, Esq.
       Senior Deputy Attorney General
14     Office of Attorney General
       Commonwealth of Pennsylvania
15     Litigation Section
       6th Floor, Manor Complex
16     564 Forbes Avenue
       Pittsburgh, PA 15219
17     412-565-3578

18

19

20

21

22

23

24

25
```

```
 1                              - - - -

 2                        SANDRA PIETRZAK,

 3                     being first duly sworn,

 4                was examined and testified as follows:

 5                              - - - -

 6                           EXAMINATION

 7                              - - - -

 8   BY MR. SANDERS:

 9   Q.   Would you state your name for the record and

10        spell it for us.

11   A.   My name is Sandra Pietrzak.  P-I-E-T-R-Z-A-K.

12   Q.   Ms. Pietrzak, my name is Neal Sanders and I'm an

13        attorney here in Pennsylvania.  Specifically

14        we're here today in the Brian Pierce case

15        concerning his allegations of wrongful

16        termination against the Department of

17        Corrections or the Commonwealth of Pennsylvania.

18                  I want to thank you for coming to my

19        office.  Prior to your coming today to the

20        deposition they call this, have you ever been

21        put under oath and asked questions by an

22        attorney prior to this event today?  Have you

23        ever gone through this before?

24   A.   Yes.

25   Q.   How many times have you gone through this before
```

1   Q.   What occurred in November of 2002? Were you

2       terminated? Did you resign? What happened?

3   A.   I took disability retirement and I also retired.

4   Q.   So you took a disability retirement as opposed

5       to a regular retirement?

6   A.   Yes; that's correct.

7   Q.   What location were you working at when you took

8       your retirement for disability purposes in

9       November of '02?

10   A.   SCI Cambridge Springs.

11   Q.   What was your position at SCI Cambridge Springs

12       at that time?

13   A.   I was a registered nurse on the 2 to 10 shift

14       primarily working as team leader.

15   Q.   Did you know Brian Pierce LPN before he started

16       to work at SCI Cambridge Springs?

17   A.   No.

18   Q.   Were you treating for any stress related to your

19       profession prior to January of '01?

20   A.   January of '01?

21   Q.   Prior to that were you suffering any symptoms

22       that you felt were stress related to work?

23       Prior to January of '01?

24   A.   I had an ongoing illness of bipolar disorder.

25   Q.   So that would have preceded January of '01?

```
 1        as much as you are.  Let me ask you this.  When
 2        your illness gets out of hand, if it happens at
 3        work, can you tell me some of the things that
 4        you might do or say?
 5                 Let's try the do part.  Do you know
 6        any things that you might do that would be a
 7        function of your illness becoming a problem at
 8        work?  Would your voice go up?  Would you get
 9        angry?  Would you get sad?  Would you have
10        crying episodes?  Whatever.
11   A.   No.  My anxiety manifested itself in difficulty
12        sleeping.
13   Q.   Would that result in your being tired at work
14        from time to time because you didn't get the
15        adequate sleep?
16   A.   Perhaps.
17   Q.   Okay.
18   A.   Irritability.
19   Q.   All right.  There's been some testimony earlier
20        today from the prior witness, Ms. Giroux -- I
21        think I'm pronouncing it correctly.
22   A.   Giroux.
23   Q.   -- Giroux, that sometime just prior to your
24        announcing your leaving in November of '02 that
25        you were going to be called to a predisciplinary
```

```
 1 ║          conference.
 2 ║  A.    Uh-huh.
 3 ║  Q.    Do you know about that?
 4 ║  A.    Yes, I do.
 5 ║  Q.    Did you know about it before you took your
 6 ║          leave?
 7 ║  A.    Yes, I did.
 8 ║  Q.    Did you know any of the allegations that they
 9 ║          were making?
10 ║  A.    Yes, I did.
11 ║  Q.    What were some of the allegations they were
12 ║          claiming you as a nurse were being accused of?
13 ║  A.    That I was becoming irritable with inmates and
14 ║          staff.
15 ║  Q.    Did you agree with that having happened?
16 ║  A.    Yes.
17 ║  Q.    Anything else that they were going to be
18 ║          bringing up at the PDC that you never attended?
19 ║  A.    That's what I know to my knowledge.
20 ║  Q.    Did you ever get that in writing that that's
21 ║          what the subject of the PDC would be?
22 ║  A.    No, I didn't.
23 ║  Q.    You just got told verbally?
24 ║  A.    Yes.
25 ║  Q.    Do you remember who told you verbally that that
```

1  A.  With Nancy and with Paul.

2  Q.  Okay.

3  A.  The exact contents, no.

4  Q.  All right.  When you would get upset at work,

5      you would have this illness act up on you at

6      work, would you have occasion to lose your

7      temper or -- let's start with that.  Would you

8      lose your temper with co-employees?

9  A.  Not usually.  In fact, rarely.

10  Q.  All right.  What would you do that would cause

11     them to be writing you up and sending you to a

12     PDC then?  What was it you were agreeing with me

13     that occurred?

14  A.  I don't know that any employee wrote me up.

15  Q.  Did you ever write up any employees?

16  A.  Yes.

17  Q.  Do you remember any of their names?

18  A.  Yes.

19  Q.  What were some of them?

20  A.  Brian Pierce.

21  Q.  Anyone else?

22  A.  I would have to think.

23  Q.  Go ahead.

24  A.  Maybe two years earlier I had written up an

25     officer.

1  Q.  Whose name was, or is?

2  A.  Mark Kelley.

3  Q.  Mark Kelley?

4  A.  Uh-huh.

5  Q.  Anyone else?

6  A.  I can't recall.

7  Q.  But there were others?

8  A.  Maybe over 10 years.  Early on.

9              Yes.  An officer Ryan.  I wrote her

10      up on one occasion.

11  Q.  A female officer named Ryan?

12  A.  Yes.

13  Q.  R-Y-A-N?

14  A.  Yes.

15  Q.  What did you write up Mark Kelley about?

16  A.  It was an issue that had to do with threatening.

17  Q.  Him threatening you?

18  A.  Yes.

19  Q.  What about Ms. Ryan?

20  A.  Behaving inappropriately in front of an inmate

21      that I felt put the inmate in harm I believe.

22  Q.  Did you consider the PDC that you were about to

23      go to in terms of your timing as to when you put

24      in for your disability retirement?  Did it have

25      anything to do with your decision so that you

```
 1   Q.   So during the later part of your career you had

 2        occasions to have differences with Peggy Sue

 3        Haight and Yvonne McGuire and other people; is

 4        that correct?

 5   A.   I do not remember that Yvonne McGuire and I had

 6        an ongoing difficult relationship; no, I do not.

 7   Q.   But that's not the correct answer to the

 8        question about Peggy Sue Haight.  That you

 9        remember.

10   A.   Yes.

11   Q.   And, in fact, you were so upset with Peggy Sue

12        Haight and the way that she and you related with

13        one another that you had suggested that she be

14        terminated, didn't you?

15   A.   That's not correct.

16   Q.   Did you ever complain about her to any of your

17        supervisors?

18   A.   Yes, I did.

19   Q.   And Ms. Haight left the employ of SCI Cambridge

20        Springs in December of 2000?

21   A.   Yes, she did.

22   Q.   And it was her vacancy that Brian Pierce filled,

23        wasn't it?

24             If I tell you that Brian started with

25        you at SCI Cambridge Springs in January of '01
```

```
 1            and that he filled the Peggy Sue Haight vacancy,

 2            do you have any reason to doubt me?

 3    A.      No.

 4    Q.      Did you ever have occasion to go into Chris

 5            Massung's office from time to time with

 6            complaints?

 7    A.      On occasion.

 8                      MR. SANDERS:   That's all the

 9            questions I have of you, ma'am.

10                      THE WITNESS:   Okay.

11                      MR. SANDERS:   Mr. Eddy may have some.

12                      MR. EDDY:   I have none.

13                      MR. SANDERS:   Your deposition is

14            over, and Mr. Eddy may have a question to ask

15            you about whether you want to read this exchange

16            before it becomes final, but I'll leave that to

17            your lawyer, but, thank you for coming.

18                      THE WITNESS:   You're welcome.

19                      MR. EDDY:   The question simply is

20            whether or not you, after she types your

21            testimony, if you want to review it to make sure

22            that it reflects everything you said accurately,

23            or do you want to waive that?

24                      Do you want to read it?

25                      THE WITNESS:   I would.
```

```
 1  COMMONWEALTH OF PENNSYLVANIA )     CERTIFICATE
 2  COUNTY OF ALLEGHENY          )     SS:
```

3    I, Antoinette M. Rennebeck, RPR, a Court
4  Reporter and Notary Public in and for the
5  Commonwealth of Pennsylvania, do hereby certify that
6  the witness, SANDRA PIETRZAK, was by me first duly
7  sworn to testify to the truth; that the foregoing
8  deposition was taken at the time and place stated
9  herein; and that the said deposition was recorded
10 stenographically by me and then reduced to printing
11 under my direction, and constitutes a true record of
12 the testimony given by said witness.

13   I further certify that the inspection, reading
14 and signing of said deposition were NOT waived by
15 counsel for the respective parties and by the
16 witness.

17   I further certify that I am not a relative or
18 employee of any of the parties, or a relative or
19 employee of either counsel, and that I am in no way
20 interested directly or indirectly in this action.

21   IN WITNESS WHEREOF, I have hereunto set my hand
22 and affixed my seal of office this 31st day of
23 JANUARY, 2005.

24   _Antoinette M. Rennebeck_

25

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Antoinette M. Rennebeck, Notary Public
Richland Twp., Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries

NMR COURT REPORTERS
Gibsonia, PA   724-443-9301

# ATTACHMENT E

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
 2
                         -  -  -  -
 3
   BRIAN D. PIERCE,                    )
 4                                     )
                Plaintiff,             )
 5                                     )
                   -vs-                )       Civil Action
 6                                     )       No. 03-173E
   PENNSYLVANIA DEPARTMENT             )
 7 OF CORRECTIONS,                     )
                                       )
 8              Defendant.             )

 9
                         -  -  -  -
10
            DEPOSITION OF:  CHRISTINE MASSUNG
11
                         -  -  -  -
12

13            DATE:    January 20, 2005
                       Thursday, 3:50 p.m.
14

15            LOCATION:  Law Offices of Neal Sanders
                         1924 North Main Street Ext.
16                       Butler, PA 16001
                         724-282-7771
17

18            TAKEN BY:  Plaintiff

19
              REPORTED BY:  Toni Rennebeck, RPR
20                          Notary Public
                            NMR Reference No. 30738B
21

22

23
                    CERTIFIED COPY
24

25
```

1              DEPOSITION OF CHRISTINE MASSUNG,
     a witness, called by the Plaintiff for examination,
2    in accordance with the Federal Rules of Civil
     Procedure, taken by and before Toni Rennebeck, RPR, a
3    Court Reporter and Notary Public in and for the
     Commonwealth of Pennsylvania, at the Law Offices of
4    Neal A. Sanders, 1924 North Main Street Extension,
     Butler, Pennsylvania, on Thursday, January 20, 2005,
5    commencing at 3:50 p.m.

6                            - - - -

7
     APPEARANCES:
8
           FOR THE PLAINTIFF:
9    Neal A. Sanders, Esq.
     LAW OFFICES OF NEAL A. SANDERS
10   1924 North Main Street Extension
     Butler, PA 16001
11   74-282-7771

12
           FOR THE DEFENDANT:
13   Thomas G. Eddy, Esq.
     Senior Deputy Attorney General
14   Office of Attorney General
     Commonwealth of Pennsylvania
15   Litigation Section
     6th Floor, Manor Complex
16   564 Forbes Avenue
     Pittsburgh, PA 15219
17   412-565-3578

18

19

20

21

22

23

24

25

1        as a result of Peggy Sue Haight quitting, do you

2        remember that?

3   A.   Not offhand, no.

4   Q.   Do you remember Peggy Sue Haight?

5   A.   Yes.

6   Q.   Do you remember her being disciplined by SCI

7        Cambridge Springs before she quit in December of

8        2000?

9   A.   I remember her being disciplined at different

10       times but I don't remember that specific date.

11  Q.   Okay.  Do you remember Nancy Pietrzak being

12       disciplined?

13  A.   Yes.

14  Q.   Do you remember Yvonne McGuire being

15       disciplined?

16  A.   Yes.

17                MR. EDDY:  One thing, Neal.  Did you

18       mean to say Sandra?

19                MR. SANDERS:  I meant to say Sandra

20       Pietrzak.  Did I misspeak?

21                MR. EDDY:  You said Nancy.

22                MR. SANDERS:  All right.

23                THE WITNESS:  Oh, I thought -- I was

24       thinking Sandy anyway in my mind.  Sandy

25       Pietrzak.

```
 1                    MR. SANDERS:  I appreciate that, Tom.
 2                    THE WITNESS:  Yeah.
 3    BY MR. SANDERS:
 4    Q.    Do you recall Sandy Pietrzak being disciplined?
 5    A.    Yes.
 6    Q.    All right.  Now, who would have been your
 7          supervisor in the last two years of your career?
 8    A.    Deputy Good.
 9    Q.    Is Deputy Good male or female?
10    A.    It's a male.  Deputy Dave Good.
11    Q.    Who was your supervisor before Dave Good?
12    A.    I can't remember his name.
13    Q.    That's all right.
14    A.    He had passed away.
15    Q.    All right.  Did Deputy Dave Good ever indicate
16          to you at any time that he felt that you had not
17          met expectations in your performance as a health
18          care administrator?
19    A.    Not in that way.
20    Q.    Tell me the way that he represented it to you.
21    A.    We just talked about how -- what his
22          expectations are.  And he's the type of person
23          that would let me say what I wanted to do and
24          then we both just conversed about it, that's
25          all.
```

1           was anybody else.

2                       I'm trying to think of the nurses

3           themselves and --

4  Q.    Well, let's go beyond the nurses.  Marilyn Books

5           was at SCI Albion for a time and then she came

6           to SCI Cambridge Springs; right?

7  A.    Yes.

8  Q.    And you had other people that came from SCI

9           Albion to SCI Cambridge Springs other than Brian

10          Pierce.

11  A.    Yes.

12  Q.    All right.  Did you have a program set up for

13          orientation for people like Brian Pierce when

14          they came from SCI Albion so they could

15          understand the differences and the way you ran

16          things differently at SCI Cambridge Springs,

17          ma'am?  A formal program?

18  A.    We had an orientation program that we have set

19          up for all of them.  In fact, when they came

20          through, they had a written sheet of paper that

21          had what they had to accomplish during their

22          orientation.  They had to see like personnel and

23          all the different things like that.  Definitely

24          that had that.

25  Q.    And if I tell you that all happened on one day,

1  Q.   Did you personally ever request any disciplinary

2       action against Mr. Pierce?

3  A.   Not really.  Not to have a PDC hearing, no.

4  Q.   In any fashion other than a PDC?

5  A.   Just disciplining him for something he was doing

6       that he wasn't supposed to.

7  Q.   Do you have any specific recollection of that?

8  A.   Yes.

9  Q.   Could you elaborate please?

10 A.   Brian, when he came over to our facility, wanted

11      to do something that was -- he wanted to

12      pre-pour medications.  And when we had first

13      started the facility they said -- an inspector

14      came in and said we weren't allowed to pre-pour

15      medicines, so we never did that, thinking it was

16      -- you know, they said it was a law.  Weren't

17      allowed to do that.

18              When Brian came over --

19 Q.   Who said it was a law?

20 A.   I don't know their names because it was years

21      ago.  10 years ago.  But the inspectors that

22      came in to inspect us.  And because we had

23      inspectors come in like monthly or so to inspect

24      us making sure that everything was kosher.

25      Actually every year they came in.  But when they

```
 1        first started, they said we were not allowed to

 2        pre-pour medicines.

 3   Q.   Were those DOC employees?

 4   A.   Yes.

 5   Q.   Okay.

 6   A.   So what happened was I had told Brian, because

 7        he wanted to pre-pour medications, and I told

 8        Brian we are not to pre-pour medications because

 9        it's the rule in here that we're not to pre-pour

10        medications, and he challenged me on it.

11   Q.   How did he challenge you?

12   A.   Well, first of all he said -- he gave me all the

13        reasons why he thinks he should pre-pour them.

14        And I listened to that and I said that sounds

15        really good and everything but I also gave him

16        things that said it was wrong to do.  Why it

17        would not be good to do.

18                  But then what he would do is, because

19        we were on a -- I was on the first shift and he

20        was on the second shift, he did it anyway.  And

21        we actually walked in on him with pre-poured

22        medications sitting there, and he had gotten

23        caught.  And Nancy Giroux, I do know that she

24        had disciplined him a couple times.

25   Q.   When you say we walked in, who's we?
```

1  A.  I walked in one day, and at other times she had
2      walked in.
3  Q.  Oh, okay.
4  A.  And she had disciplined him.  And I thought it
5      was over with, but I had walked in on him, and
6      it was the med line time and he had pre-poured
7      medications and I said to him, Brian, you see
8      these pre-poured medications here?  You're not
9      allowed to pre-pour.  You knew you're not
10     allowed to pre-pour medications, but I am not
11     going to do it right now because there's inmates
12     standing there.  I mean, they couldn't hear you
13     from outside anyway but I said since you are in
14     the med line, I'm not going to stop this
15     business, but we're going to discuss this
16     business.  And that's what happened.  We
17     discussed it.
18 Q.  Did he admit to pre-pouring the medications?
19 A.  Yes, he did.
20 Q.  You said he knew he wasn't allowed to pre-pour
21     medications.  How would he know that?
22 A.  He had been disciplined by Nancy Giroux I know
23     of two times at least.  I don't remember the
24     dates or anything but I know that she did that.
25     And that's why I thought it was over with; that

```
 1        she told him no, no, no.

 2   Q.   You mean prior to the time that you observed him

 3        doing that?

 4   A.   Yes.  And then when I walked in, they were

 5        already pre-poured.  I talked to him about it.

 6        And he still argued the fact that he thought he

 7        should do them.  And so I said, okay, let me --

 8        I was being nice about it.  I said, let me go

 9        find different books if there's any rulings or

10        laws or anything like that.  And I do remember

11        going into books and things, and there was one

12        Fundamentals of Nursing that I looked into and

13        they said that wouldn't be a good idea to do,

14        and they gave the reasons, and I thought that's

15        basically what we were thinking but --

16   Q.   Do you remember the reasons?

17   A.   Yes.  For one thing those medications are out of

18        the bottles.  They're collecting dirt from the

19        air.  That's one thing.

20                   If you have them there and you happen

21        to have to leave in an emergency, somebody might

22        come in and not realize what those meds are and

23        stuff and have to give -- and you're supposed to

24        -- when you give them, you're supposed to be

25        popping them out to that person right then, not
```

1  be having them ahead of time, because if they
2  would leave, then -- you have to leave for some
3  reason and then somebody has to come in and fill
4  in for that, that's not a good idea to do that.
5  You could give them the -- you know, something
6  could be messed up.  That's basically the
7  reason.
8  Q.  Is there also a possibility of tampering?
9  A.  Tampering.  Anything could happen.
10 Q.  Did Mr. Pierce ever use the defense or state to
11     you that this was a practice at Albion and
12     that's why he did it here?
13 A.  I don't think he ever used that on me.  I don't
14     think so.
15 Q.  Do you know if they do that sort of thing at
16     Albion?
17 A.  I don't remember.  I don't know if they did, no.
18     I just said here we don't at least.  I don't
19     know if he did.
20 Q.  You made it clear to him that at least at
21     Cambridge Springs it doesn't happen there?
22 A.  Right.
23 Q.  But you stated that you felt that was a DOC
24     policy by virtue of these inspectors that had
25     come around and told you not to do that.

1     was in there, then things started to change with

2     the way he wanted things done when he wanted

3     them done. This is the way we should do it

4     here. This is the way it should be done here.

5     And it was just always that way.

6          Basically that was it. I always just

7     felt that he was trying to be contrary to what

8     we were doing there. And we did listen to him.

9     We did. We listened to him about the things

10    that he wanted to do, and we took it into

11    consideration. And then we would come and say

12    this is the reason why we don't want to, and he

13    just didn't like the reasons.

14  Q.  Did you ever discipline Mr. Pierce because he

15       was a man?

16  A.  No.

17  Q.  In the instances where you did discipline him,

18       in your opinion he was guilty of either

19       infractions of policy or refusal to correct

20       behavior for which he had been previously

21       warned?

22  A.  Yes.

23  Q.  Do you know of any female nurses who would have

24       been not disciplined for the same behaviors?

25  A.  No. Because like I said earlier, I did not

| | | |
|---|---|---|
| 1 | | remember how certain ones, like Ms. Haight, but |
| 2 | | she was disciplined for actions similar to that |
| 3 | | and we did that with her. And I just don't |
| 4 | | remember all the in's and out's about it or the |
| 5 | | basic things, but I remember her being |
| 6 | | disciplined for that kind of thing too. |
| 7 | Q. | Do you remember her correcting her behavior? |
| 8 | A. | Yes, she did. She corrected it. |
| 9 | Q. | So the distinction between things that might |
| 10 | | have happened to Mr. Pierce and somebody like |
| 11 | | Ms. Haight would lie in the fact that one |
| 12 | | corrected their behavior and the other refused |
| 13 | | to? |
| 14 | A. | Yes. |
| 15 | | MR. EDDY: That's all I have. |
| 16 | | - - - - |
| 17 | | RE-EXAMINATION |
| 18 | | - - - - |
| 19 | BY MR. SANDERS: | |
| 20 | Q. | You left out a little bit here. Let's go over |
| 21 | | some things. You remember you're under oath; |
| 22 | | correct? |
| 23 | A. | Yes. |
| 24 | Q. | One of the things that you forgot to tell |
| 25 | | Mr. Eddy when he was questioning you is that on |

```
 1  BY MR. EDDY:
 2  Q.  Were you aware that Mr. White had a
 3      discrimination case pending against the
 4      Department of Corrections at any time?
 5  A.  Yes.
 6  Q.  Were you ever a part of that proceeding?
 7  A.  No.
 8  Q.  Were you a decision-maker at all in connection
 9      with anything that might have happened to him?
10  A.  No.
11  Q.  Do you have an opinion on Mr. White?  Do you
12      have any personal animosity towards him?
13  A.  No.
14  Q.  Did you ever take any action, disciplinary
15      action against Mr. Pierce because he might have
16      been involved in Mr. White's case against the
17      department?
18  A.  Absolutely not.
19  Q.  Did anybody ever insinuate or infer or instruct
20      you to do that?
21  A.  No.
22              MR. EDDY:  That's all I have.
23                   -  -  -  -
24              RE-EXAMINATION
25                   -  -  -  -
```