IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN D. PIERCE,** | : | CIVIL ACTION NO.03-173E |
| | : | |
| | : | Hon. Sean L. McLaughlin |
| Plaintiff, | : | Magistrate Judge Susan |
| | : | Paradise Baxter |
| vs. | : | |
| | : | |
| **PENNSYLVANIA DEPT. OF** | : | |
| **CORRECTIONS,** | : | |
| | : | |
| Defendant, | : | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Statement of Relevant Facts.

In approximately 1994, Plaintiff, Brian Pierce, was initially employed by the Defendant, Pennsylvania Department of Corrections, as a Licensed Practical Nurse (LPN) at the State Correctional Institution (SCI) in Albion. (Pierce Dep. pp. 93-94[1]). Plaintiff had been a board certified LPN since 1991. (Pierce Dep. p. 89). Plaintiff remained at SCI Albion until on or about January 21, 2001, at which time Plaintiff was transferred to the SCI Cambridge Springs. (Pierce Dep. pp. 79-80, 94-97).

While Plaintiff was assigned to SCI Cambridge Springs, Plaintiff's supervisors were Nancy Giroux, R.N., who was R.N. supervisor until December, 2001 and Health Care

---

[1] True and correct copies of the relevant portions of the deposition transcript of Brian Pierce and the relevant exhibits thereto are attached hereto as Exhibit 1.

1

Administrator thereafter, Sandy Pietrzak, evening shift nursing supervisor, and Chris Massung, who left the position of health care administrator in approximately December, 2001. (Pierce Dep. pp. 163-165; Massung Dep. pp. 9-10, 28[2]). During the period that Plaintiff was assigned to Albion, Plaintiff's immediate supervisor was Maxine Overton. *Id.* The superintendent of SCI Cambridge Springs during the relevant time period was Marilyn Brooks. (Brooks Dep. pp. 7-8[3]). While Plaintiff was assigned to Cambridge Springs, Plaintiff was the only male LPN. (Complaint ¶ 12).

In March, 2001, Plaintiff was identified as a favorable witness by a former employee of the Defendant who had brought a lawsuit alleging reverse gender discrimination. (Pierce Dep. pp. 95-96, 244-247, 259-260, 300-302; Giroux Dep. Exh. 9[4]). Plaintiff had previously given testimony favorable to this individual at the administrative level in the Summer of 2000 and subsequently testified at the jury trial of this individual's claims. *Id.* Four days after this document was issued, Plaintiff received a suspension for an incident that allegedly took place in Albion in September, 2000. (Pierce Dep. pp. 124-125, 261). In fact, Plaintiff had been the person who discovered the infraction involved in the September, 2000 incident, not the one who committed it. (Complaint, ¶ 13b). Ms. Giroux acknowledged that she was aware of Plaintiff's involvement in the other employee's action. (Giroux Dep. p. 20, 45-48, 57)

On or about October 26, 2001, Plaintiff filed an administrative complaint of hostile work

---

[2]True and correct copies of the relevant portions of the deposition transcript of Christine Massung are attached hereto as Exhibit 2.

[3]True and correct copies of the relevant portions of the deposition transcript of Marilyn Brooks are attached hereto as Exhibit 3.

[4]True and correct copies of the relevant portions of the deposition transcript of Nancy Giroux are attached hereto as Exhibit 4.

environment and retaliation concerning Ms. Massung and Ms. Pietrzak. (Pierce Dep. pp. 113-119; Pierce Dep. Exh. E). This administrative complaint arose over an incident involving Ms. Pietrzak verbally attacking Plaintiff and his character when he had merely asked another employee how a delay in getting through security at the start of the shift would effect the running of the inmate medication line. *Id.* Marilyn Brooks, Superintendent, dismissed this administrative complaint without conducting any investigation after concluding that Plaintiff was not a member of a protected class. (Pierce Dep. pp. 119-120). Ms. Giroux acknowledged that she was aware of this complaint and of the fact that it was dismissed. (Giroux Dep. pp. 66-68).

On or about August 28, 2001, Ms. Giroux, Nursing Supervisor, disciplined Plaintiff for pre-pouring medications when he did not do so. (Pierce Dep. pp. 126-131; Pierce Dep. Exh. H). When Plaintiff had made written complaints that female employees were engaging in this activity a month earlier Ms. Giroux did not undertake an investigation or take any other action against the subject employees. *Id.*

On or about October 15, 2001, Plaintiff was issued a written reprimand for allegedly having an altercation with Ms. Pietrzak in a public area. (Pierce Dep. pp. 135-138; Pierce Dep. Exh. J). As part of this reprimand Plaintiff was falsely accused of raising his voice with Ms. Pietrzak and pointing his finger at her. *Id.* In fact, it was Ms. Pietrzak who had raised her voice to Plaintiff and backed him into a wall. *Id.* Ms. Massung acknowledged that she had observed Ms. Pietrzak yelling, screaming and losing her temper on other occasions. (Massung Dep. p. 43).

On or about March 10, 2002, Plaintiff was accused of making unauthorized changes to the inmate medication line, specifically having the inmates come to the medication line by housing unit, which resulted in the medication line remaining open past 2100 hours. (Pierce

3

Dep. pp. 138-149;Pierce Dep. Exh. K). In fact, a correctional officer had suggested this change, and Plaintiff had communicated the suggestion to the registered nurse supervising the line who, in turn, approved the change. (Pierce Dep. pp. 143-148). Plaintiff noted that much of the information that he gave to the officer investigating the incident was either taken out of context or deleted from the transcript. (Pierce Dep. pp. 142-148).

On or about March 20, 2002, Plaintiff was accused of wrongdoing in connection with initially informing inmates who came to the medication line late for non-life sustaining medications that he could not give them their medications as the line was closed. (Pierce Dep. pp. 149-153; Pierce Dep. Exh. K). Plaintiff did give the inmates their medications after being instructed to do so by the supervising R.N. *Id.* Plaintiff's initial refusal was based on the rules regarding the medication line. (Pierce Dep. pp. 149-150).

On or about April 1, 2002, Plaintiff was disciplined for a miscount on narcotics when the count had been correct when he went off duty the night before. (Pierce Dep. Exh. Q). Also on April 1, 2002, Plaintiff was disciplined for allegedly passing a note to an inmate and telling her that he would "hook her up" with regard to her medications upon her release. (Pierce Dep. pp. 207-209, 225-226;Pierce Dep. Exh. Q). The staff member who was subsequently brought forward during the PDC as a witness to this incident, Yvonne McGuire, was off on this day and was known to be hostile toward the Plaintiff. (Pierce Dep. pp. 225-226).

On or about April 5, 2002, Plaintiff was disciplined for taking pre-poured medications to the RHU instead of the RHU bag and the MAR. (Pierce Dep. Exh. N, O, Q). In fact, Plaintiff had taken a smaller bag to RHU, as the bag designated for the RHU was extremely bulky, but did not pre-pour the medications. (Pierce Dep. pp. 174-177, 187, 209-210, 229-230; Pierce Dep.

4

Exh. N, O, Q). Female employees regularly performed the same act and were not disciplined. (Pierce Dep. pp. 250-253). In fact, Plaintiff had written up incident reports concerning female employees engaging in this practice, both before and after Plaintiff was disciplined. (Pierce Dep. pp. 250-252; Giroux Dep. Exh. 14).

Also on April 5, 2002, Plaintiff was disciplined for "borrowing" medications from one inmate to give to another when this was a common practice. (Pierce Dep. pp. 231, 250-253; Pierce Dep. Exh. N, O, Q; Giroux Dep. Exh. 13).

On or about April 9, 2002, Plaintiff was falsely accused of criticizing the DOC's RSAT program during a conversation with inmates. (Pierce Dep. pp. 183-185, 188; Pierce Dep. Exh. O). In fact, the criticism for the program came up during a private conversation between Plaintiff, Ms. Pietrzak and Nurse Zuber, during which all three individuals expressed concerns with the program. *Id.* Ms. Pietrzak and Nurse Zuber were not disciplined. *Id.*

In April, 2002, Plaintiff took a sick day as a result of the depression and stress he was experiencing as a result of the unwarranted discipline that was being taken against him. (Pierce Dep. Exh. Q, 4/16/02 memo). The day that Plaintiff took off, the reason for his absence was posted publicly and this information was not removed until every employee on three shifts had the opportunity to see it. *Id.*

On April 11, 2002, two fact finding sessions were held concerning the March and April, 2002 incidents. (Pierce Dep. pp. 169-189; Pierce Dep. Exh. N, O). The report of this session falsely attributed many statements to Plaintiff and misrepresented the facts set forth in the preceding paragraphs. *Id.*

On or about April 23, 2002, a Pre-Disciplinary Conference was held concerning the

March and April, 2002, incidents. (Pierce Dep. Exh. Q). In addition to the matters set forth in the preceding paragraphs, during the Pre-Disciplinary Conference Plaintiff was falsely accused of passing notes to inmates, and of telling the inmates involved in the March 20, 2002 incident that "fault doesn't matter". (Pierce Dep. pp. 151-152, 205-208; Pierce Dep. Exh. Q).

By letter dated April 30, 2002, Marilyn Brooks summarized the findings of the Pre-Disciplinary Conference and recommended that Plaintiff's employment be terminated. (Pierce Dep. Exh. Q). As with the reports of the fact finding conferences, this letter attributed statements to Plaintiff that he had not made and took other testimony out of context. (Pierce Dep. pp. 213-239).

By letter dated May 10, 2002, Plaintiff's employment with the Defendant was terminated, effective May 13, 2002. (Pierce Dep. Exh. R).

In addition to the complaints concerning acts of other employees that Plaintiff filed during his employment, shortly before his termination, Plaintiff submitted several incident reports identifying female employees who had engaged in similar practices. (Giroux Dep. Exh. 13-16). Specifically, Sandy Pietrzak, Cheryl Heffern, Kelly Winkler, Nurse Gardner, Nurse Eldred, Nurse Chapman, and Nurse King, "borrowed" medications from one inmate to give to another on a regular basis and were not disciplined; Nurse Hefern,, Nurse Kelly, Nurse Pietrzak, Nurse Gardner and Nurse Eldred, gave inmates medications out of the stock without signing it out without being disciplined; and Nurse Cheffern, Nurse Kelly and Nurse Gardner pre-poured medications without being disciplined. *Id.*

Following Plaintiff's termination, Plaintiff filed a charge of discrimination with the

EEOC.[5] The body of this charge provides as follows:

> 1. I have been an employee of the Respondent since September, 1994. I was employed as a Male L.P.N. for eight (8) years with the Respondent since 1994. Throughout the eight (8) years my performance was always exemplary. Judy Weyers, Vickie Kormanic, Ed Brennan, Lt. Marquardt, Maxine Overton, Nancy Fellner, Henry Powell, Cassie Oberlander, Sue Roeble, Tom Fulcomer, Jeffrey Beard, Marilyn Brooks, Nancy Giroux, Christine Massung, Sandra Pietrzak, Yvonne McGuire, Carrie Hargenrader and Nancy Wirth with Respondent's support have been harassing me and discriminating against me because of my gender, my religious beliefs and retaliation for helping Michael White (Civil Suit 00-377 Erie).
>
> 2. I was terminated as an L.P.N. effective May 13, 2002. The union refused to help me because they are afraid for their jobs.
>
> 3. I believe that the Respondent discriminated against me in violation of Title VII as to gender discrimination and the PHRA and also Hostile Work Environment, Religious Beliefs and Retaliation for Protected Activity (Title VII and PHRA).
>
> 4. At all times I worked at Albion and Cambridge Springs, Pennsylvania facility.

(Exhibit 5).

Plaintiff was not disciplined in any form between 1995 and September, 2000. (Pierce Dep. pp. 312-313).

## II. Standard of Review.

Under F.R.C.P. 56(c), entry of summary judgment is proper only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.

---

[5] A true and correct copy of this document is attached hereto as Exhibit 5.

F.R.C.P.56(c). The moving party bears the initial burden of identifying for the Court those portions of the record which it believes demonstrate the absence of an issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).

The requirement is that there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2509-2510 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. McGough v. Bethenergy Mines, Inc., 837 F.Supp. 708, 709 (W.D. Pa. 1993), aff'd, 30 F.3d 1487 (3d Cir. 1994)(quoting Anderson, *supra.*, 477 U.S. at 247) See also Weldon v. Kraft, Inc., 896 F.2d 793, 797 (3d Cir. 1990). To establish a genuine issue of material fact, the non-moving party must demonstrate evidence of record beyond the pleadings to create an issue of material fact on "an element essential to the party's case and on which that party will bear the burden of proof at trial." Marshall v. Dunwoody Village, 782 F.Supp. 1034, 1037 (E.D. Pa. 1992), citations omitted. All inferences must be drawn and all doubts resolved in favor of the non-moving party. Weldon, *supra.*, at 797.

### III. Argument.

A. **The Parameters Of The Complaint In This Action Do Not Exceed The Scope Of The Underlying EEOC Charge.**

The Defendant first argues that the parameters of the complaint filed in this action exceed the scope of the charge filed with the EEOC. While Plaintiff agrees with the impressive amount of precedent cited by the Defendant for the principle that the parameters of the federal complaint are set by the scope of the EEOC charge and the reasonable administrative investigation, the fact that the Defendant does not identify any specific provisions of the complaint which do exceed the

scope of the EEOC charge makes it difficult to see how this precedent applies to this case.

The body of Plaintiff's EEOC charge is set forth in the facts section and the entire charge is attached hereto as Exhibit 5. This charge alleges that Plaintiff was discriminated against when he was terminated on May 13, 2002 and that he was subjected to a hostile working environment because of his gender and religion and because he engaged in protected activity by testifying for another employee in a discrimination action. (Exhibit 5).

In Count I of the federal complaint, Plaintiff alleges that he was subjected to a hostile work environment and was terminated because of his gender. In Count II of the federal complaint, Plaintiff alleges that he was subjected to a hostile work environment and terminated in retaliation for his participation in the other employee's legal action.

Plaintiff elected not to pursue his religious discrimination claim past the administrative level.

Finally, although the preamble of the federal complaint notes that claims are being asserted under the PHRA, as explained in the Plaintiff's Opposition to Defendant's Motion to Dismiss this was in error. Plaintiff believed that, following the Defendant's Motion to Dismiss, it was resolved that the federal complaint does not assert, or purport to assert, any claims under the PHRA.

From the foregoing, it is apparent that the claims set forth in the federal complaint are identical to those raised before the EEOC. Thus, the Defendant's Motion for Summary Judgment should be denied on this issue.

B.   **Summary Judgment Is Not Warranted Based On The Set Parameters Of The EEOC Complaint.**

It is difficult to construe the exact nature of the issue involved in the Defendant's second

argument. The Defendant begins with citations to precedent for the principle that it is necessary to timely exhaust administrative remedies before bringing a civil action under Title VII and that the scope of a civil action is limited to the scope of the EEOC charge. However, the Defendant does not, and can not, argue that Plaintiff's EEOC charge was untimely. The issue of whether the parameters of the federal complaint exceed the scope of the charge were addressed in the previous section.

The Defendant then makes citations to precedent for the principle that amendments to an EEOC charge that raise a new legal theory do not "relate back" to the original charge. However, the Defendant does not identify any amended charges that were filed in this case that raised a new legal theory and, in fact, the Plaintiff did not file any amended charges in this action.

The Defendant concludes that the scope of the charge is limited to the three claims of gender discrimination, discrimination based on religion, and retaliation in the form of harassment and discharge. It should be noted that, contrary to the Defendant's phrasing of these claims, the charge specifically states that "[various individuals] with Respondent's support have been harassing me and discriminating against me because of my gender, my religious beliefs and retaliation for helping Michael White". (Exhibit 5). Thus, the gender discrimination claim encompasses a claim of hostile work environment as well as a claim for wrongful termination.[6]

Once again, however, the Defendant does not address how, specifically, the federal complaint exceeds the scope of the EEOC complaint. As stated in the previous section, the claims raised in the federal complaint are identical to those asserted in the EEOC charge with the

---

[6]The Defendant does not address Plaintiff's hostile work environment claims in its Brief in Support of Motion For Summary Judgment. Accordingly, Plaintiff assumes that the Defendant concedes that there are genuine issues of material fact with respect to these claims.

10

exception that the Plaintiff opted not to pursue the claim of discrimination based on religion.

The Defendant's final argument seems to be that the findings of an administrative agency have preclusive effect in a subsequent civil action.

In <u>Chandler v. Roudebush</u>, 425 U.S. 840, 844-45 (1976), the Supreme Court noted that:

> Section 706 (f) of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5 (f) (1970 ed., Supp. IV), authorizes the Equal Employment Opportunity Commission (EEOC) to bring "civil actions" on behalf of private sector employees in federal district court. Alternatively, 706 (f) (1) authorizes an individual employee to sue on his own behalf if a specified period of delay has elapsed or if the EEOC has declined to represent him on the basis of its initial determination that "there is not reasonable cause to believe that the charge is true . . . ." 706 (b), 42 U.S.C. 2000e-5 (b) (1970 ed., Supp. IV). Sections 706 (f) through (k), 42 U.S.C. 2000e-5 (f) through (k) (1970 ed. and Supp. IV), provide specific rules and guidelines for private-sector "civil actions."
>
> It is well established that 706 of the Civil Rights Act of 1964 accords private-sector employees the right to *de novo* consideration of their Title VII claims. <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36 ; <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 798 -799; <u>Norman v. Missouri Pacific R. Co.</u>, 414 F.2d 73, 75 n. 2 (CA8). The "employee's statutory right to a trial *de novo* under Title VII [of the Civil Rights Act of 1964] . . .," <u>Alexander v. Gardner-Denver Co.</u>, *supra*, at 38, embodies a congressional decision to "vest federal courts with plenary powers to enforce the [substantive] requirements [of Title VII] . . . ." Id., at 47.
>
> The 1972 amendments to the 1964 Act added language to 706 which reflects the *de novo* character of the private sector "civil action" even more clearly than did the 1964 version. Section 706 (f) (4), 42 U.S.C. 2000e-5 (f) (4) (1970 ed., Supp. IV), for instance, requires the chief judge of the district in which a "civil action" is pending to "immediately . . . designate a judge in such district to hear and determine the case." The judge so designated must "assign the case for hearing at the earliest practicable date . . . ." 706 (f) (5). If the case has not been "scheduled . . . for trial within one hundred and twenty days after issue has been joined," then the designated judge may appoint a special master to hear it. Ibid. And, as under the 1964 version, if the district court "finds" that the respondent has intentionally committed an unlawful employment practice, then the court may order appropriate relief. 706 (g), 42 U.S.C. 2000e-5 (g) (1970 ed., Supp. IV). The terminology employed by Congress - "assign the case for hearing," "scheduled . . . for trial," "finds" - indicates clearly that the "civil action" to which private-sector employees are entitled under the amended version of Title VII is to be a trial *de novo*.

11

Chandler, 425 U.S. at 844-845. *See also*, Astoria Federal S&L Ass'n v. Solimino, 501 U.S. 104 (1991)(Judicially unreviewed findings of state administrative agencies have no preclusive effect on age discrimination proceedings in federal court).

Thus, the fact that the EEOC determined that it was unable to conclude that a violation of the statute occurred does not have any preclusive effect in this action, and Plaintiff is entitled to *de novo* consideration of his Title VII claims.

Thus, by reason of the foregoing, the Defendant's Motion for Summary Judgment on this issue or issues, whatever it or they may be determined to actually be, should be denied.

C. **Plaintiff Has Produced Sufficient Evidence To Establish A Prima Facie Case Of Gender Discrimination.**

The Defendant next argues that summary judgment is appropriate on Plaintiff's claim of gender discrimination.

Under the familiar burden-shifting analysis set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1973), a Title VII plaintiff must first establish a prima facie case. The specific items of proof required in making out a prima facie case vary with the factual setting. Id. 411 U.S. at 802 n. 13.

To establish a *prima facie* case under Title VII in a setting in which it is alleged that a Plaintiff was terminated for cause, such as that involved here, a plaintiff must prove the following: (1) he is a member of the protected class; (2) he was qualified for the position; (3) he was discharged; and (4) the plaintiff was discharged under circumstances giving rise to an inference of discrimination. Berndt v. Kaiser Aluminum & Chemical Sales, Inc., 789 F.2d 253, 257 (3d Cir. 1986); Massarsky v. General Motors Corp., 706 F.2d 111, 118 (3d Cir. 1983), *cert.*

12

*den'd*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); Bullock v. Children's Hospital, 71 F.Supp.2d 482, 487 (E.D. Pa. 1999).

The usual methods used to establish the fourth of the above elements are proof that the plaintiff was replaced by someone outside the protected class or by proof that similarly situated employees outside the protected class were treated more favorably. Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356-357 (3d Cir. 1999); Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 938 (3d Cir. 1997); Bullock, 71 F. Supp. 2d at 489.

With respect to the first element, in cases, such as the one at bar, where reverse discrimination is claimed, this element of the prima facie case is somewhat modified. Specifically, the first element is modified to require the plaintiff to show "background circumstances supporting the suspicion that the defendant is the unusual employer who discriminates against the majority." Davis v. Sheraton Society Hill Hotel, 907 F.Supp. 896, 899 (E.D.Pa. 1995); Mills v. Health Care Serv. Corp., 171 F.3d 450, 455 (7th Cir. 1999).

To determine if sufficient background circumstances are present, the courts look to see whether the number of female employees significantly outweighs the number of males, and whether there has been differential treatment of women and men. Davis 907 F.Supp. at 902; Mills, 171 F.3d. at 457. In Mills, the Court found that there were sufficient background circumstances where the number of women hired was disproportionate to the number of men, nearly all promotions went to women, and women filled most of the supervisory positions in the relevant office.

Mills, 171 F.3d at 457. In finding that this was sufficient, the Mills court stated, "...these facts, while far from actual evidence of discrimination, are enough to overcome the background

presumption that a white man was not subject to employment discrimination." Id.

Similarly, in Davis, the Court found sufficient background circumstances where the plaintiff had a delay in receiving a pay increase that was not applied to his female co-workers, plaintiff allegedly did not receive tuition reimbursement benefits that were provided to women (this fact disputed by the defendant), the female employees outnumbered the male employees, and females dominated the supervisory positions. Davis, 907 F.Supp. at 902.

Here, the Defendant claims that it is "questionable" whether Plaintiff established a *prima facie* claim, but fails to point to any record evidence which demonstrates that there is not a genuine issue of material fact.

As set forth fully in the statement of facts, female employees dominated the supervisory positions in the health care department and female employees regularly engaged in the acts for which Plaintiff was disciplined. Thus, Plaintiff has established the first element of the *prima facie* case of gender discrimination.

It is uncontested that Plaintiff is a board certified LPN and, thus, qualified for the position. It is also uncontested that Plaintiff was terminated. Thus, the second and third elements have been established.

Finally, as set forth fully in the statement of facts, numerous female employees regularly engaged in the same acts for which Plaintiff was disciplined and, ultimately terminated, and were not disciplined. Thus, the fourth element is satisfied.

D.   **Plaintiff Has Established A Prima Facie Case Of Retaliation.**

It is well settled that "[t]he allocation of the burden of proof for federal retaliation claims follows the familiar Title VII standards. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d

Cir. 1997). Thus, as Plaintiff is proceeding under a "pretext" theory, the standards set forth in McDonnell, *supra*, apply. *See*, Woodson, 109 F.3d at 920.

In order to establish a prima facie case of retaliation, a plaintiff must prove the following elements:

    1)    the plaintiff engaged in protected activity;

    2)    the employer took an adverse employment action against the employee; and

    3)    there was a causal connection between plaintiff's participation in the protected activity and the adverse employment action.

Nelson v. Upsala College, 51 F.3d 383, 386 (3rd Cir. 1995).

Here, the Defendant only contests the Plaintiff's ability to establish a causal connection between the protected activity and the adverse action.

The most common method of establishing the causal link is by establishing that the adverse employment action occurred close in time to the protected activity. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). ([T]emporal proximity between the protected activity and the termination is sufficient to establish a causal link.) *See also*, Krouse v. American Sterilizer, 126 F.3d 494 (3d Cir. 1997) ("the courts generally look to whether the adverse employment action was taken within such a close time to the protected activity as to permit an inference of retaliatory motive"). With respect to the degree of temporal proximity required, "...courts generally hold that if at least four months pass after the protected action without employer reprisal, no inference of causation is created." Wood v. Bentsen, 889 F.Supp 179 (E.D. Pa. 1995).

The Courts have, however, recognized several ways in which the causal link can be

15

established in the absence of temporal proximity. First, "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Id. at 920-921. Furthermore, the Third Circuit has

> held that an atmosphere of condoned... harassment in a workplace increases the likelihood of retaliation for complaints in individual cases. In other words, evidence of condoned harassment can support an inference by the fact-finder that the employer, having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff.

Id. at 922.

In Woodson, the court found that the causal link was established based on evidence that racist graffiti appeared in the men's room subsequent to the plaintiff's complaint coupled with evidence that the employer's response to this incident was inadequate. Woodson, 109 F.3d at 115-120.

Similarly, the court in Kachmar v. Sungard Data Systems, Inc. et. al., 100 F.3d 173 (3d Cir. 1997), the Court found that the plaintiff had established a causal link based on evidence that the employer had engaged in a pattern of antagonism between the time the plaintiff engaged in protected activity and her termination. Id. at 179. The facts which established a pattern of antagonism where that plaintiff was told to start looking for another job shortly after she engaged in protected activity, and was further told that she was being taken off the management track, allegedly due to her protected activity. Id. at 176-179.

Here, there is evidence of a pattern of antagonism far more extensive than that which was found sufficient in Wood and Kachmar.

As a starting point, it is necessary to pinpoint when the protected activity occurred. As set forth fully in the statement of facts, Plaintiff provided favorable testimony during the

16

administrative proceedings of another male nurse alleging gender discrimination in the Summer of 2000. In March, 2001, Plaintiff was identified as a witness in the same employees civil action, and did, subsequently, testify at the jury trial of that individuals claims. Finally, on October 26, 2001, Plaintiff filed an internal complaint alleging hostile environment and retaliation.

In September, 2000, shortly after Plaintiff gave his initial testimony, Plaintiff was accused of committing an infraction when he had been the one to discover the infraction. Within four days of the time that he was listed as a witness in the other employee's case, Plaintiff was suspended for the alleged September, 2000 infraction. Plaintiff had not been the subject of any discipline from 1995 until the September, 2000 incident.

Plaintiff's October 26, 2001 internal complaint was dismissed without investigation based on Ms. Brooks' finding that Plaintiff was not a member of any protected class. This occurred despite the fact that Plaintiff had alleged hostile environment and retaliation, and that Plaintiff had engaged in prior protected activity.

Within approximately four months of the dismissal of Plaintiff's internal complaint, Plaintiff began to be disciplined for acts that were performed regularly by other employees. As set forth fully in the statement of facts, many of the allegations made against Plaintiff were wholly false, statements, including admissions, were attributed to him that he did not make during the investigations of these incidents, and other statements were placed in the investigative reports completely out of context. These allegations eventually formed the basis for Plaintiff's termination. Finally, during Plaintiff's PDC, one of the witnesses to one of the alleged incidents was not at work on the day she purportedly witnessed the event.

Thus, based on Wood and Kachmar, this Court should find that Plaintiff has established the third element of a *prima facie* claim of retaliation.

E.  **There is sufficient record evidence to establish that the reasons offered by the Defendant for Plaintiff's discharge are a pretext for discrimination.**

As previously stated, the framework developed in McDonnell Douglas applies to actions for retaliation as well as discrimination. Delli Santi v. CNA Ins. Co., 88 F.3d 192, 199 (3d Cir. 1996).

Under this framework, once the plaintiff establishes his *prima facie* case, the burden then shifts to the defendant to articulate a non-discriminatory reason for its actions. *See* Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981). Once the defendant meets this burden, it is then incumbent upon plaintiff to establish that the defendant's proffered reason is merely a pretext for discrimination. Id. 101 S.Ct. at 1094-1095 (1981).

The Court in Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3rd. Cir. 1995), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2611 (1995), clarified the analysis of a motion for summary judgment with regard to a employment discrimination claim at this stage:

> to defeat a summary judgment motion based on a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only point to evidence establishing a reasonable inference that the employer's proffered explanation is not worthy of credence . . . A plaintiff is not required to produce evidence which necessarily leads to the conclusion that the employer did not act for nondiscriminatory reasons.

Sempier, 45 F.3d at 728 (citations omitted).

Accordingly, in order to defeat summary judgment at this point, the plaintiff must submit evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). To proceed under the first prong, the plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id. at 765. (citations and internal quotations omitted).

Here, the Defendant argues that Plaintiff cannot establish pretext by merely reiterating its proffered nondiscriminatory reasons for Plaintiff's discharge, specifically the reasons set forth in the May 10, 2002 termination letter. (Pierce Dep. Exh. R).

In the absence of any specific arguments supporting the legitimacy of these reasons or the weaknesses in Plaintiff's evidence showing pretext, it is difficult to frame a response. However, as set forth fully in the statement of facts and the exhibits referenced therein, the acts for which Plaintiff was disciplined, and ultimately discharged, were regularly performed by female employees/employees who had not engaged in protected activity. The allegations made against Plaintiff were often wholly fabricated. The reports of the investigations and fact finding meetings attributed a number of statements, including admissions, to Plaintiff that he did not make. In other instances, the reports took Plaintiff's statements and other portions of the discussion out of context so that it appeared that Plaintiff made admissions that he did not. At the PDC, one of the witnesses had not even been present at work on the day that she purportedly

witnessed the event in question.

Based on the foregoing, and in the absence of any specific argument on the issue of pretext by the Defendant, this Court should find that there is a genuine issue of material fact on the issue of pretext.

**F.   Plaintiff Has Not Asserted Claims Under The PHRA.**

The Defendant's final arguments call for summary judgment on Plaintiff's PHRA claims. As previously set forth, Plaintiff has not asserted any claims under this statute.

### IV.  Conclusion.

By reason of the foregoing, this Court should deny the Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

LAW OFFICES OF NEAL A. SANDERS

Dated: September 9, 2005          By: _____
Neal A. Sanders, Esquire
Counsel for Plaintiff,
Brian Pierce

LAW OFFICES OF NEAL A. SANDERS
1924 North Main Street Ext.
Butler, Pennsylvania 16001

(724) 282-7771
PA ID No. 54618