1

1

2                    IN THE UNITED STATES DISTRICT COURT

3              FOR THE WESTERN DISTRICT OF PENNSYLVANIA

4                            - - - - -

5    BRIAN D. PIERCE,          )
                               )
6              Plaintiff,      )
                               )
7              vs.             )  Civil Action
                               )  No. 03-173E
8    PENNSYLVANIA DEPARTMENT)
     OF CORRECTIONS, an        )
9    Agency of the Common-     )
     wealth of Pennsylvania )
10   SCI Cambridge Springs, )
                               )
11             Defendant.      )

12                           - - - - -

13

            DEPOSITION OF BRIAN D. PIERCE
14

15                           - - - - -

16

17

18

     REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
19   WITHOUT AUTHORIZATION FROM THE CERTIFYING
     AGENCY
20
                             - - - - -
21

22          CERTIFIED TRANSCRIPT
23          NOT AN ORIGINAL

24          PLAINTIFF'S
            EXHIBIT
25            1

79

1              B. Pierce - by Mr. Eddy

2         Q.    That was just done by you and the

3    church member?

4         A.    Correct.  It was a charity roof.

5         Q.    And some other people helped out?

6         A.    Yes.

7         Q.    Kind of like a barn raising kind of

8    deal where everybody just got together to help

9    out to do it?

10        A.    Yes.

11        Q.    What was your rate of pay at Reed?

12        A.    $17.  $17 an hour or $18 an hour.

13   Right in that pay range.

14        Q.    Again, you have income records --

15        A.    Yes.

16        Q.    -- that you will supply for that?

17        A.    Yes.

18        Q.    I think we've established this, but

19   your employment was terminated with DOC on

20   May 10 of '02?  Does that sound right to you?

21        A.    Yes.

22        Q.    Do you remember when you were

23   transferred from SCI-Albion to Cambridge

24   Springs?

25        A.    The application went in in December

80

1              B. Pierce - by Mr. Eddy

2    and the transfer was effective in January.

3         Q.    Of?

4         A.    December of 2000, and the transfer

5    was effective January of 2001.

6         Q.    2001?

7         A.    Correct.

8         Q.    Refresh my memory, after May 10 of

9    '02, when did you first start working for what

10   was the first employer?

11        A.    At Bayside.

12        Q.    When did you first start there?

13        A.    August of '02.

14        Q.    So, basically, two or three months

15   after termination you started there?

16        A.    Yes.

17        Q.    Did you submitted an employment

18   application?

19        A.    Yes.

20        Q.    A resume?

21        A.    I don't know if they required a

22   resume or not, but I did the application.

23        Q.    What is typically required when you

24   apply for a job as an LPN?

25        A.    Depends on where you work.  The two

1           B. Pierce - by Mr. Eddy

2       Q.    So you worked for Millcreek with the

3   full expectation of leaving and going with the

4   DOC if and when a position became available?

5       A.    Yes.

6       Q.    Obviously, one did become available?

7       A.    Correct.

8       Q.    Were you notified telephonically, by

9   mail?  What?  Did you receive a letter?  Do you

10  remember?

11      A.    I believe there was a letter that

12  came in the mail.

13      Q.    What, did it invite you to come in

14  for an interview or something like that?

15      A.    I don't know if the interview

16  happened while I was first employed early in my

17  career at Millcreek or if it was at the end of

18  that.  But there was an interview and I was

19  notified through mail.  I'm not sure of what

20  date.

21      Q.    Well, there wasn't a break between

22  when you left Millcreek and started for DOC,

23  was there?

24      A.    No.  No.

25      Q.    You basically gave a two-week notice

94

1              B. Pierce - by Mr. Eddy

2   and started working for the DOC?

3          A.    Yes.

4          Q.    That position was, when you started

5   out with the DOC, was an LPN position?

6          A.    Yes.

7          Q.    Was that at SCI-Albion?

8          A.    Yes.

9          Q.    How long did you work as an LPN at

10  SCI-Albion?

11         A.    Approximately six and a half years.

12         Q.    '94 through roughly 2000, right

13  around December-ish of 2000?

14         A.    Correct.

15         Q.    How did your transfer to

16  SCI-Cambridge Springs?  What occasioned that?

17         A.    In December -- I had applied to

18  Cambridge Springs on three separate occasions

19  prior to actually moving over.  Each of those

20  three requests were denied.

21         Q.    So you wanted to be transferred to

22  Cambridge Springs?

23         A.    Yes.

24         Q.    Okay.

25         A.    First two times because it was close

95

1          B. Pierce - by Mr. Eddy

2    to home.  The next two times because things

3    were brewing at Albion that I just want to get

4    away from there.

5          Q.    What was brewing at Albion?

6          A.    All the issues that brought us here

7    today.  It started with, you know, I believe it

8    was the summer of 2000 when Michael White filed

9    a Complaint against the Department of

10   Corrections and I was a favorable witness for

11   him, and the harassment just started after

12   that.

13         Q.    Michael White is, what, related to

14   you?

15         A.    No.  He was a -- he's a plaintiff?

16   Is that the right word?  He was, yes, a

17   plaintiff against the Department of

18   Corrections.

19         Q.    He had sued -- was he a nurse?

20         A.    Yes.

21         Q.    He had sued the DOC while you were

22   at Albion?

23         A.    At that time, no.  He just filed a

24   Complaint against them over some improper

25   proceedings.

1              B. Pierce - by Mr. Eddy

2          Q.    Was it an internal Complaint, do you

3    know, or --

4          A.    Yes.

5                     MR. SANDERS:  No.

6                     MR. EDDY:  It was a formal

7    EEOC Complaint.  Your lawyer is shaking his

8    head yes.

9                     MR. SANDERS:  I was his

10   lawyer.

11                    MR. EDDY:  It was a formal

12   EEOC Complaint?

13                    MR. SANDERS:  Yes.

14   BY MR. EDDY:

15         Q.    Go ahead, I'm sorry.

16         A.    Because I was a witness for him in

17   that.  Within a couple of weeks, another

18   incident arose with him where I was a direct

19   witness to again, and I was the only one to

20   come forward to defend him.

21         Q.    This was in the year 2000, or prior

22   to your going to Cambridge Springs?

23         A.    Correct.  It was the summer of 2000.

24         Q.    Summer of 2000.  Okay.  How did the

25   transfer then occur to Cambridge Springs?

97

1                     B. Pierce - by Mr. Eddy

2          A.    They knew of my interest.  They

3    being the Human Resources Department, Henry

4    Powell and Maxine --

5          Q.    At Albion?

6          A.    Yes.  Maxine Overton, my immediate

7    supervisor at Albion.  They knew, Henry Powell

8    and Maxine Overton knew, that I wanted to go

9    over there.

10                 In December, Henry Powell told

11   Maxine Overton, who subsequently told me, that

12   there is a spot open at Cambridge Springs if I

13   wanted it, and I said, yes.

14         Q.    And you took it?

15         A.    Yes, I took it.

16         Q.    You wanted to go to Cambridge

17   Springs, there's no issue of you being

18   transferred unwillingly?

19         A.    No.

20         Q.    That's where you wanted to go?

21         A.    Correct.

22         Q.    Then you were at Cambridge Springs

23   roughly from, what, January of '01 through

24   May 10 of '02?

25         A.    Correct.

113

1              B. Pierce - by Mr. Eddy

2    elevate your stress level to that point?

3         A.    I would say that's fair.

4         Q.    Let's look at Exhibit E.

5              (Pierce Exhibit E was marked

6    for identification.)

7         Q.    Well, first of all, let me ask you

8    this:  Did you file an internal EEO

9    Discrimination Complaint in or about October of

10   2001?

11              MR. SANDERS:  Internal or

12   external?

13              MR. EDDY:  Internal.

14        A.    No, not internal.  It was external.

15        Q.    This wasn't with the DOC?

16        A.    No.

17        Q.    This was with the EEOC?

18        A.    Yes.

19        Q.    So let's take a look at Exhibit E

20   here.  Is this a copy of the Discrimination

21   Complaint that you filed?

22        A.    Yes.

23        Q.    Could you read that first sentence

24   beginning with S. Pietrzak.

25        A.    "S. Pietrzak and I had numerous

114

B. Pierce - by Mr. Eddy

1

2       confrontations in the last 9 months in regards

3       to my wanting to change a few policies and

4       procedures in order to help make the department

5       more efficient."

6           Q.    Okay.  That's consistent, is it not,

7       with what you reported to Dr. Mercatoris in

8       Exhibit A when you said, "My gift is being able

9       to problem solve and make things more

10      efficient"?

11          A.    No.  What this is referring to is

12      she was alleging and confronting me on a

13      frequent basis saying that I was trying to do

14      those things, and I was refuting those

15      allegations on a regular basis.

16          Q.    In other words, is it your position

17      that you were not trying to change or implement

18      changes in policies in order to help the

19      department to be more efficient?

20          A.    Not at that time, no.

21          Q.    But it does say, "in regards to my

22      wanting to change a few policies and procedures

23      in order to help make the department more

24      efficient"?  That's what that says; right?

25          A.    Correct, that's what that says.

115

B. Pierce - by Mr. Eddy

1

2      Q.    That emotion that you have there,

3  would you say that's also consistent with your

4  description of your personality being a type

5  AA, wanting to make things perfect?

6      A.    I'm not sure I understand your

7  question.

8      Q.    The attitude that you would want to

9  go in and make changes to make a place run more

10  efficiently and smoothly, would you say that's

11  consistent with your personality traits of

12  being type AA who wants to make things perfect?

13      A.    In general, yes.

14      Q.    Now, it sounds to me like you had

15  some issues with Ms. Pietrzak.  Is that pretty

16  accurate?

17      A.    Yes.

18      Q.    Who was she at that time?

19      A.    She was my evening shift supervisor.

20      Q.    Tell me what happened on 10/15 of

21  '01.

22      A.    Would you like me to read it?

23      Q.    If you can recall.  You can read it

24  if you would like, but do you have any present

25  recollection of what happened on 10/15/01?

116

1                    B. Pierce - by Mr. Eddy

2          A.    Best of my recollection, this had to

3     deal with a disaster drill that they were

4     doing.

5          Q.    Okay.

6          A.    And if I recall correctly, there

7     was -- let me take a look for a second.

8                This was in regards to a suspicious

9     white powder substance that had entered the

10    Department of Corrections in the mailroom, the

11    mailroom sitting right inside the front door of

12    the main lobby of the prison.

13         Q.    This was shortly after 9/11?

14         A.    Yes.

15         Q.    Back when there was the Anthrax

16    scares?

17         A.    Yes.

18         Q.    Go ahead.

19         A.    As it says in here that Yvonne

20    McGuire and I entered the building about the

21    same time.

22         Q.    Who is Yvonne McGuire?

23         A.    She was a fellow LPN.  She was a day

24    shift LPN, I was an evening shift.

25         Q.    She wasn't a supervisor?

117

1            B. Pierce - by Mr. Eddy

2        A.    No.

3        Q.    Okay.  Go ahead.

4        A.    At the time we walked in, we were

5    directed to an area of the building where we

6    were out of the quote/unquote contaminated zone

7    where we were dealing with the potential

8    threat.  We were stuck there for an inordinate

9    length of time.

10            We left there.  When we were finally

11    cleared to walk through the area out in the

12    main prison, there's a Sergeant DeCoursey

13    listed here.

14        Q.    I see that.

15        A.    Yvonne McGuire and I asked her, you

16    know, if she knew what had gone on, and she had

17    said, yes, yada, yada.  But we asked her in

18    passing how this was going to affect the

19    running of the medication line.

20        Q.    Okay.

21        A.    It was a transient comment, it was a

22    valid question.  Apparently, that got back to

23    Sandy Pietrzak, the evening shift supervisor,

24    and she -- everybody knew that she was just not

25    playing with a full deck.  She had told

118

1                   B. Pierce - by Mr. Eddy

2      everybody that she has had bipolar disorder,

3      that she was on medication, so on and so forth.

4                   So when she exploded in a public

5      area in front of inmates and fellow staff

6      members, my peer group, and accused me of

7      jumping the chain of command, essentially not

8      allowing her to make that decision and make

9      those calls, everybody around us was just

10     stunned at the way she was behaving.

11          Q.    Now, all these things that you've

12     just said I don't see anywhere in this

13     statement of yours, necessarily.

14          A.    Let me see.

15          Q.    I mean, you do make statements here,

16     "at which point Sandra Pietrzak began verbally

17     attacking me and my character."

18                   You essentially had an exchange of

19     words with Ms. Pietrzak on that date, for lack

20     of a better word?  We can call it an

21     altercation?

22          A.    Yes.

23          Q.    And what you were offended by is the

24     notion that it happened out in the hallway as

25     opposed to saying, hey, let's go in this office

119

1              B. Pierce - by Mr. Eddy

2   and discuss this, because it had the

3   potentially humiliating effect on your

4   co-workers and peers and the inmates and so

5   forth?

6        A.    Yes.

7        Q.    Do you remember what the outcome of

8   this Complaint was?

9        A.    At the time, Superintendent Brooks,

10  Marilyn Brooks, who was essentially brand new,

11  within a month of taking over superintendent at

12  Cambridge, she never investigated this.  She

13  just wrote me a letter in November stating that

14  the claim would go no further, that there were

15  no bases for my allegations for hostile working

16  environment and discrimination, and she dropped

17  it.

18       Q.    She dismissed it or closed it?

19       A.    Correct.

20       Q.    The doctor's excuse that was

21  attached to Exhibit A, was it for this

22  incident?

23       A.    Yes, it was.

24       Q.    And what happened?  You left work

25  because you were upset over this incident?  Is

1                    B. Pierce - by Mr. Eddy
2      that --
3             A.    Yes.
4             Q.    You needed to have a doctor's excuse
5      to do that?
6             A.    That's what they required.
7             Q.    Pietrzak told you that?
8             A.    No.   Actually, Nancy Giroux.
9             Q.    Nancy Giroux told you that?
10            A.    Correct.
11            Q.    And you left and contacted
12     Dr. Martin, and he wrote you that --
13            A.    Yes.
14            Q.    -- excuse that's attached to
15     Exhibit A?
16            A.    Yes.
17            Q.    Let's look at Exhibit F.
18                  (Pierce Exhibit F was marked
19     for identification.)
20            Q.    That's a letter to you dated
21     November 15 of 2001?
22            A.    Yes.
23            Q.    That's from Marilyn Brooks?
24            A.    Yes.
25            Q.    And this is the response to your

124

1              B. Pierce - by Mr. Eddy

2      Q.    All right.  Was there an incident

3  that occurred at SCI-Albion on or about

4  September 24 of 2000 prior to you coming to

5  Cambridge Springs?

6      A.    Yes.

7      Q.    Let's take a look at Exhibit G.

8              (Pierce Exhibit G was marked

9  for identification.)

10     Q.    That's a letter dated March 19 of

11 2001?

12     A.    Yes.

13     Q.    Again, addressed to you?

14     A.    Yes.

15     Q.    That's from William J. Wolfe for

16 Jeffrey A. Beard?

17     A.    Yes.

18     Q.    He was the superintendent at where?

19 Cambridge Springs or Albion at the time?

20     A.    Cambridge Springs at the time.

21     Q.    This letter advises you of a one-day

22 suspension?

23     A.    Correct.

24     Q.    It was effective on March 23 of

25 2001?

125

1              B. Pierce - by Mr. Eddy

2        A.    Yes.

3        Q.    This incident, it involved a count

4   discrepancy with a narcotic known as Vicodin?

5        A.    Correct.

6        Q.    Did you serve that one-day

7   suspension?

8        A.    Yes, I did.

9        Q.    Did you appeal this?

10       A.    No, I did not.  I was advised not to

11  by my union representative.

12       Q.    How about the last one that we

13  talked about in '95, was that one appealed?

14       A.    No.

15       Q.    Do you remember?

16       A.    No.

17       Q.    Take a look at Exhibit H.

18             (Pierce Exhibit H was marked

19  for identification.)

20       Q.    This is a memorandum dated

21  November 28 of 2001; do you see that?

22       A.    Yes.

23       Q.    It's from Nancy Giroux --

24       A.    Giroux.

25       Q.    Have you ever seen this before?

126

1              B. Pierce - by Mr. Eddy

2         A.    Yes.

3         Q.    It refers to an incident that

4    occurred on or about August 28 of 2001?

5         A.    November 28.  Yes, you are right,

6    I'm sorry.  I was reading the date in the

7    corner again.  Yes.

8         Q.    That's concerning prepouring

9    medications for the RHU?

10        A.    Yes.

11        Q.    And RHU, for the record -- you know

12   what that stands for.  Do you recall meeting

13   with Ms. Giroux?

14        A.    Giroux?

15        Q.    Yes.

16        A.    Yes.

17        Q.    And that was on August 28 of 2001

18   when you met with her?  At least that's the

19   first sentence says, "meet with Mr. Pierce at

20   1400 on 8/28/01."

21        A.    Yes.

22        Q.    "Regarding delivering medication up

23   to the RHU prepoured into cups over the

24   weekend"?

25        A.    Yes.

B. Pierce - by Mr. Eddy

1

2      Q.    This is the same type of thing that

3   we referred to in the prior exhibit where the

4   notation was made that you hadn't been

5   instructed not to do this anymore?

6      A.    No.

7      Q.    No?  How is it different?

8      A.    This was a completely baseless

9   allegation against me.  This is retaliatory

10  against me because in the previous month, I had

11  written up two female nurses for making errors,

12  so on and so forth.

13          Those complaints were never

14  investigated, no discipline was handed down,

15  and this was utterly ridiculous.

16      Q.    Are you saying that you did this but

17  other people did it as well, or are you saying

18  you didn't do it at all and other people did

19  it?

20      A.    I'm saying I didn't do that at all,

21  and that was my statement to her.

22      Q.    So are you saying that Ms. Giroux is

23  lying in this memorandum?  Do you agree that

24  you met regarding --

25          MR. SANDERS:  Let's get an

128

                    B. Pierce - by Mr. Eddy

1    answer, Tom.

2        A.    Yes.

3        Q.    The whole letter is a complete

4    fabrication?

5        A.    Not the complete letter because I

6    had spoken to her in regards -- if you read

7    down further through there, that --

8        Q.    How about --

9            MR. SANDERS:  Keep going.  Let

10   him go, Tom.

11       A.    She had taken my statement of what I

12   had seen other nurses do, the female nurses

13   that I had written up for other allegations,

14   and inserted me into that.  I did discuss with

15   her the practices at Albion because in the six

16   and a half years that I worked there, that's

17   the basis, the knowledge base that I had to

18   work with as far as how department did the

19   runs.

20       Q.    You are referring to that second

21   paragraph where it says, "He stated that he

22   only had one or two inmates that were requiring

23   medication and that at Albion it is an

24   acceptable practice to prepare the medication

1                    B. Pierce - by Mr. Eddy

2     prior to going to the RHU"?

3          A.    Correct.

4          Q.    "And he also stated that at Albion,

5     this issue had been resolved with management

6     pharmacy and the union, as long as the person

7     preparing the medication did not allow the

8     medication out of their sight once they

9     prepared it and it remained in their sight

10    until dispensed, he stated it was determined

11    that that was not prepouring"?

12         A.    Correct.

13         Q.    Do you remember having that

14    conversation with Ms. Giroux?

15         A.    Yes.

16         Q.    And those statements in there, you

17    remember making those statements?

18         A.    Yes.  With the exception of that it

19    says that I crushed the medications in the med

20    room and transported them to the RHU.

21         Q.    So you deny that you stated that you

22    crushed the meds in the med room and

23    transported them to the RHU in the appropriate

24    bag?

25         A.    Right.

130

1          B. Pierce - by Mr. Eddy

2          Q.    So I guess you would deny the

3    statement above that says, "the medications

4    were psych meds that he had actually crushed

5    prior to his trip to the RHU"?

6          A.    Correct.

7          Q.    Are you saying you didn't do that?

8          A.    No, I didn't do that.  We were

9    discussing other nurses at that time, and I'm

10   not sure if she -- because she was transcribing

11   generally as we were speaking and then typed

12   this up a few days later off of her notes.

13   There is no other person in the room, you know,

14   to transcribe for both of us, so to speak.

15         Q.    Let me see if I get this right.  You

16   are saying that you met with Ms. Giroux?

17         A.    Giroux.

18         Q.    About delivering medication to the

19   RHU by prepouring, but that that meeting was a

20   result of your having turned in a couple of

21   nurses that you observed engaging in that

22   practice?

23         A.    No.

24         Q.    And the meeting was regarding your

25   complaints about other nurses?

1                   B. Pierce - by Mr. Eddy

2        A.    Now you are actually combining the

3    two things that we were talking about, which is

4    what she did here.

5              We had been talking about other

6    nurses doing similar acts.  It had been alleged

7    that I had done those things but it had not

8    been proven because there are no statements, no

9    witnesses that I actually did these things.

10             This was retaliation against me for

11   the four write-ups that I gave to other female

12   nurses about doing similar things and other

13   inappropriate things in the department.  This

14   came back, somebody alleged that I did these

15   things.  I didn't do these.

16        Q.    Who would have alleged, do you know?

17        A.    She never told me who my -- who the

18   people were.

19        Q.    So you are saying that you would

20   have told her about other nurses doing this or

21   things similar to this?

22        A.    Yes.

23        Q.    This prepouring.  As a result of

24   that, somebody said you do it and that you had

25   a meeting concerning your doing it?

135

1              B. Pierce - by Mr. Eddy

2     Exhibit J.  Are we doing all right here on

3     time, Neal?

4                    MR. SANDERS:  Yes.

5     BY MR. EDDY:

6          Q.    Let's look at Exhibit J now.  That

7     is to you from Nancy Giroux?

8          A.    Yes.

9          Q.    Dated November 20, 2001?

10         A.    Yes.

11         Q.    Do you recognize this?

12         A.    Yes, I do.

13         Q.    Did it concern an incident on

14    10/15/01 with Sandy Pietrzak?

15         A.    Yes.

16         Q.    Is what how you pronounce her name,

17    by the way?

18         A.    Pietrzak, yes.

19         Q.    Does this concern the altercation

20    that we discussed in the prior exhibit with

21    Ms. Pietrzak?

22         A.    Yes.

23         Q.    Your EEOC Complaint?

24         A.    Yes.

25         Q.    Which I think was what exhibit?

136

1              B. Pierce - by Mr. Eddy

2     Exhibit E.

3              This letter constitutes a written

4     reprimand for that incident?

5         A.    Yes.

6         Q.    Is that all you received for that?

7     You weren't suspended or anything like that for

8     that incident?

9         A.    Correct.  But this came five days

10    after I had filed or I had received the

11    rejection Complaint letter from Superintendent

12    Brooks, right.

13        Q.    And then this followed?

14        A.    Correct.  Which, you know, this was

15    retaliatory -- the written reprimand was in

16    response to the Complaint that Superintendent

17    Brooks dismissed.  They had to do something.

18        Q.    I understand that you claim that

19    Ms. Pietrzak probably engaged in like or

20    similar conduct with you, but do you disagree

21    that you pointed your finger at her and spoke

22    in a loud tone?

23        A.    I thoroughly disagree with that.

24        Q.    What did you do?

25        A.    Mostly was backing up as she

137

1            B. Pierce - by Mr. Eddy

2    advanced on me and was hollering at me through

3    the entire ordeal.  And the witnesses of, you

4    know, several staff members and inmates, I

5    didn't quite know what to take from that.

6            By the time she had me backed up

7    against the opposite wall, you know, I

8    started -- "hey."

9        Q.    Is it your position that you never

10    even got loud?

11        A.    I may have gotten loud, but it was

12    to -- it would have been only to --

13        Q.    I understand that your position is

14    that she did like or similar things.

15        A.    Right.

16        Q.    But I'm just asking you whether you

17    disagree that it turned into a loud argument

18    with finger pointing and so forth.

19        A.    No.  Most of the loudness was from

20    her to me.  The only time that I got loud with

21    her was trying to interrupt her tirades so that

22    I could get a word in edgewise trying to defend

23    myself --

24        Q.    And explain the situation?

25        A.    -- in front of all of my peers.

1                    B. Pierce - by Mr. Eddy

2     Now, I have inmates out there watching this

3     ordeal and that's completely -- that violates

4     half the Code of Ethics in the department.

5          Q.    Did you feel that your integrity or

6     character was being attacked?

7          A.    My authority with the inmates was

8     definitely being undermined by her comments and

9     everything to me.  Inside of my peer group, the

10    people that were there around me, I'm being,

11    you know, yelled at by a supervisor in a public

12    arena.

13         Q.    You felt that was humiliating?

14         A.    I would say that was very

15    humiliating.

16               (Pierce Exhibit K was marked

17    for identification.)

18         Q.    Let's move into 2002.  Was there an

19    incident which occurred on or about March 9 or

20    10 of 2002?  Do you recall?

21         A.    Actually, is it in this document?

22         Q.    Yes.  Exhibit K is actually a

23    compilation of several documents that we will

24    get into here, but if you want to take a look

25    at this first page there, it may refresh your

139

1              B. Pierce - by Mr. Eddy

2    memory on the dates.  It had to do with a

3    medication line and running it by the book and

4    so forth.

5              Does that kind of refresh your

6    memory?

7         A.    Yes, it does.

8         Q.    Do you recall that incident

9    occurring on or about March 9 or 10 of 2002?

10        A.    Yes.

11        Q.    Was there another incident on

12   March 20?

13        A.    That's in here.  I'm not sure what

14   it was about.  I'm sure we will get to that.

15        Q.    Yes.  Do you know whether or not

16   these incidences were investigated by a

17   Lieutenant Berk Bossard?  Do you know

18   Lieutenant Bossard?

19        A.    I do.

20        Q.    You can see there, Exhibit K, that

21   appears to be an investigation that was

22   performed by Lieutenant Bossard concerning the

23   March 9 and 10 and March 20 incidences?

24        A.    Yes.

25        Q.    In fact, you were interviewed by

140

B. Pierce - by Mr. Eddy

1

2    Lieutenant Bossard, were you not, in connection

3    with this?

4         A.    Yes, I was.

5         Q.    That was on 3/26 of '02?  If you

6    flip to the second page, there purports to be a

7    series of questions and answers that were asked

8    by the lieutenant and your responses?

9         A.    I'm sorry, I was reading.

10        Q.    I'm sorry.

11        A.    I didn't hear your question.

12        Q.    Under the notation there of

13   3/26/02 --

14        A.    Uh-huh.

15        Q.    -- following that is a list of

16   questions and answers.  Questions that were

17   asked to you by Lieutenant Bossard and your

18   responses?

19        A.    Yes.

20        Q.    Your union representative was there

21   with you at the time; isn't that right?

22        A.    Yes.

23        Q.    Who was that?

24        A.    At this time, I do not recall.

25        Q.    I don't know that it was indicated

141

1            B. Pierce - by Mr. Eddy

2    in here.

3        A.    No.

4            MR. SANDERS:    Just for the

5    record, is counsel suggesting that this is the

6    entire transcript or is this excerpts from the

7    transcript?  In other words, is counsel

8    representing in this transcript or in this

9    exhibit that the 3/26/02 questions that are

10   attached here is the end of the questions that

11   were asked of Mr. Pierce by Mr. Bossard or is

12   this a portion?

13           MR. EDDY:    Is this an

14   exhaustive list of the questions; is that what

15   you are asking me?

16           MR. SANDERS:    Is this the

17   entire exchange?

18           MR. EDDY:    I don't know.    To

19   the extent there may be -- I'm not aware of any

20   others.  To the extent there are, I guess we

21   could ascertain that and I would certainly make

22   them a part of --

23           MR. SANDERS:    I think you will

24   agree that these are not numbered.

25           MR. EDDY:    No, they are not

142

1              B. Pierce - by Mr. Eddy

2    numbered.  That's correct, they are not

3    numbered.

4                MR. SANDERS:  These pages

5    aren't numbered.

6    BY MR. EDDY:

7        Q.    But it also refers to a witness

8    statement is attachment six and seven, which I

9    assume he received from you and must have

10   formulated his questions based on that written

11   witness statement.  Does that sound right to

12   you?

13       A.    No.  Actually, I believe he had me

14   write the witness statement after the

15   question-and-answer period.

16       Q.    Okay.  All right.

17       A.    And would have written this up as a

18   result after all of that.

19       Q.    Do you recall being interviewed on

20   the 26th?  Do you have any reason to believe

21   that these questions and answers aren't

22   accurate?  You can go ahead and read them, if

23   you want.

24       A.    Okay.

25       Q.    Any reason to doubt any of those

143

1              B. Pierce - by Mr. Eddy

2     statements?

3          A.    A lot of missing information and a

4     lot of questions in between that aren't there

5     and a lot of information --

6          Q.    But what is there --

7          A.    I recall some of that, yes.

8          Q.    Those answers and those questions?

9          A.    I want to say that the answers that

10    I gave here, what is listed here, are partial,

11    that they are not complete explanations.

12          Q.    You mean, for example, if the

13    question there at the bottom says, "Did you

14    purposely run the medication line slow to show

15    Sergeant Sittig?  Answer:  No.  Two days in a

16    row Sergeant Sittig questioned my procedures on

17    closing so quickly so I decided to run it by

18    the book," that you had additional statements

19    in connection with that question that aren't

20    reproduced or are you saying that there's other

21    questions that were asked that had a bearing on

22    that question that aren't included?

23          A.    Both.  And just going back up to the

24    second question, it says, "On March 10, 2002,

25    did you have a conversation with Officer

1          B. Pierce - by Mr. Eddy

2    Phillips concerning running medication line 'by

3    the book' and calling one unit at a time?", the

4    only portion of my answer there is the word

5    yes.  What is left out there is the additional

6    information that I provided him that Officer

7    Phillips was the one who suggested a "by the

8    book" running of the med line.  I asked, "What

9    does that mean?"  And he said, "By DOC policy,

10   the inmates are only supposed to be called down

11   one unit at a time so that there is no

12   opportunity for them to interact."

13          If one inmate is angry with another

14   inmate from a different housing unit or if they

15   are passing stuff along or dating, you know,

16   for lack of a better term, because that went on

17   in the institution, and also, too, it provided

18   a more controlled environment by policy so that

19   there wasn't an opportunity for an excessive

20   amount of inmates to be in one location in

21   order to provide an environment for them maybe

22   to start a riot or overtake the officer,

23   overwhelm the medical department and get --

24   take the narcotics that were in there.  Those

25   kind of things.

145

1            B. Pierce - by Mr. Eddy

2        Q.    So you felt that that made sense to

3    you?

4        A.    Yes.

5        Q.    You are saying he suggested it, but

6    it made sense to you, so you adopted it,

7    essentially?

8        A.    It made sense to me, yes.

9        Q.    But he, Sergeant Sittig, doesn't

10   have any direct authority over you; right?

11       A.    Sergeant Sittig is female.

12       Q.    Okay.  She.

13       A.    She was the evening shift sergeant

14   of the guard, for lack of a better term.  She

15   would have been the sergeant in charge of all

16   the other corrections officers.  She handled --

17       Q.    But she didn't have direct authority

18   over you?

19       A.    No.  No.  No direct authority over

20   me, no.

21       Q.    All right.  Do you disagree about

22   the question, "What time did you complete the

23   medication line on Sunday, 3/10/02?

24   Approximately 2215"?

25       A.    No.

1              B. Pierce - by Mr. Eddy

2        Q.    And then the next question, "What

3    time did you complete medication line on

4    Saturday and Monday?  2025/2045"?

5        A.    Correct.

6        Q.    "Why was it so much later on

7    Sunday?"  Answer:  "We ran it by the book a

8    controlled environment."  That's essentially

9    what you said by adopting Sergeant Sittig's one

10    line at a time approach?

11        A.    Not Sergeant Sittig's, Officer

12    Phillips'.

13        Q.    Officer Philips, okay.

14        A.    Yes.  That would be -- but it's only

15    a partial answer, again.  Like I said, the rest

16    of that information would have been in

17    conjunction with the previous answer of Officer

18    Phillips had given that explanation that there

19    was policy in place that that's what you are

20    supposed to do.

21        Q.    And that made sense to you?

22        A.    Yes.

23        Q.    And the next one, "Did you purposely

24    run the medication line slow to show Sergeant

25    Sittig?"  Answer:  "No.  Two days in a row,

147

B. Pierce - by Mr. Eddy

1  Sergeant Sittig questioned my procedures on

2  closing so quickly so I decided to run it by

3  the book."

4  

5        Do you disagree with that answer?

6     A.    I do because it's a

7  misrepresentation of what is there.  It implies

8  that I had the authority in the medical

9  department to alter that.  In fact, I did not.

10    Q.    To alter, what do you mean alter it?

11    A.    As in like to change from what we

12  had been doing before into what had happened

13  that evening.

14    Q.    But you did change it?

15    A.    I personally did not, no.

16    Q.    Well, a minute ago you said that

17  based on your discussion with Officer Phillips,

18  that you adopted his explanation and decided to

19  do it that way; correct?

20    A.    Semantically, yes, you are correct.

21    Q.    I'm not trying to trick you.

22    A.    That's fine.  What I was getting to

23  is that there was a female RN who was in charge

24  of the shift that evening, Lilly Eldred, she

25  was a supervisor.  I had discussed that with

148

B. Pierce - by Mr. Eddy

1   her.  She agreed that it was a good idea for a

2   couple of reasons.  One was because she doesn't

3   work evening shift.  She's a day shift nurse.

4   Two, she doesn't do medication line all that

5   often, so she -- and she was always admitting

6   to being very nervous around the inmates.

7           So for it to be in a controlled,

8   quiet environment versus having 50 to 100

9   inmates in that lobby where the echoes and

10  sounds and everything would have been a

11  distraction for her, she gave the permission to

12  go ahead and do that.  As the evening shift

13  supervisor in charge, she said, "That's fine,

14  let's do it that way."

15      Q.    So you approached her about it and

16  you got her approval, essentially; is that what

17  you are saying?

18      A.    I had taken to her the suggestion by

19  Officer Phillips, to her, correct.

20      Q.    She gave you the green light or

21  whatever?

22      A.    Yes.  Because she was actually in

23  that medication line running it with me.  There

24  were two windows.  I was in one, she was in the

1              B. Pierce - by Mr. Eddy

2     other.

3          Q.    On the next page, it says, "On

4     3/20/02 after you closed medication line three

5     other inmates arrived late.  Did you refuse to

6     give them their prescribed medication?"

7     Answer:  "Yes.  The medication line had been

8     closed."

9              Do you dispute that?

10         A.    No.

11         Q.    And then the next one, "Did Nurse

12    Eldred tell you" -- and this is what you were

13    referring to a second ago that -- no, it's not.

14    "Did nurse Eldred tell you that this was no

15    fault of the inmates and they must receive

16    them?"

17         A.    Yes, she did.

18         Q.    And you eventually gave them to them

19    but under protest?

20         A.    Yes.

21         Q.    Your position again for refusing to

22    give them is because they were late and the

23    line was closed?

24         A.    Correct.

25         Q.    By the book, if they weren't there,

150

1                  B. Pierce - by Mr. Eddy

2    then they weren't there?

3           A.    Right.

4           Q.    Okay.

5           A.    And inside of that, because, again,

6    I'll give you a little bit extra here, too, is

7    that --

8                      MR. SANDERS:   Who asked you

9    to?

10                     THE WITNESS:   That's true.

11   All right.   You can look at it.   But this

12   investigation took place as a result of her

13   retaliating against me for embarrassing her the

14   previous -- with that med line.

15          Q.    Now, that was, what we just read

16   there -- it says right there on 3/20.   So those

17   are the two incidences?

18          A.    Right.   Can we take a really quick

19   break?

20                     MR. EDDY:   Yes.

21                     (Recess was taken.)

22   BY MR. EDDY:

23          Q.    Let me ask you this:   When you call

24   one line at a time, was that kind of, for lack

25   of a better analogy, when you are boarding an

1          B. Pierce - by Mr. Eddy
2    airplane and the steward's will say, we are now
3    boarding rows eight through six, and those
4    people come up, is that the kind of way that
5    that would occur with these lines?
6          A.    Essentially, it would be more --
7          Q.    As you said, there wouldn't be any
8    mixing of different cell blocks and so forth?
9          A.    Right.  They call them down one
10   housing unit at a time.
11         Q.    One housing unit at a time, okay.
12         A.    Yes.
13         Q.    On 3/20, these three inmates that
14   showed up late, Ms. Eldred told you that it
15   wasn't their fault that they were late, was it
16   your position that fault didn't matter in that
17   situation, late is late?
18         A.    No.
19         Q.    You gave a statement concerning this
20   incident; didn't you?
21         A.    Yes, I did.
22         Q.    Do you recall in that statement
23   saying that you instructed Officer Phillips to
24   call the housing units one at a time?
25         A.    That wasn't my statement.

152

B. Pierce - by Mr. Eddy

1

2     Q.    Do you recall saying that you told

3     Phillips you wanted to run the medical line "by

4     the book"?

5     A.    No.

6     Q.    All right.  At the end of the

7     statement, did you say at no time did you

8     consider to retaliate against Sergeant Sittig

9     or the security staff in general?

10    A.    When was this?  Would that have been

11    at the hearing that this statement is being

12    made or in the investigation part?

13    Q.    In connection with the

14    investigation, right.

15    A.    I believe that's -- well, my answer

16    is there on that page, the bottom of the third

17    page, "No, two days in a row, Sergeant Sittig

18    questioned my procedures on closing so

19    quickly."

20              MR. SANDERS:  Remember

21    Michelle here?

22    A.    Sorry.  "No, two days in a row,

23    Sergeant Sittig questioned my procedures on

24    closing so quickly, so I decided to run it by

25    the book."

1          B. Pierce - by Mr. Eddy

2          Who would me be?  Who would you

3 report those types of accusations to?

4     A.    There's a whole chain of command

5 involved there.  It could be anybody from my

6 immediate supervisor up through the Health Care

7 Administrator, the deputies.  So I --

8     Q.    Who would be your immediate

9 supervisor?  Ms. Giroux or Pietrzak?

10     A.    Evening shift would have been

11 Ms. Pietrzak.

12     Q.    When you say evening shift, ending

13 at five?

14     A.    No.  Ending at ten o'clock at night.

15 I was a two to ten nurse.

16     Q.    It says meeting ending a 1700?

17          MR. SANDERS:  Pietrzak was

18 gone by this time, just for the record, she

19 testified to Tom and I.

20          THE WITNESS:  Okay.

21     Q.    So who came in after Ms. Pietrzak?

22          MR. SANDERS:  Who was your

23 last supervisor that you had before they fired

24 you?

25          THE WITNESS:  I want to say

164

1           B. Pierce - by Mr. Eddy

2    that was -- the director -- well, the nurse

3    supervisor that oversees all the RNs would have

4    been Paul Smith at that time.  Nancy Giroux

5    would have been the Health Care Administrator

6    at that time.  I don't remember who the evening

7    shift supervisor would have been.  At that

8    time, this was all probably at the --

9         Q.    You said evening shift again and --

10        A.    Right.

11        Q.    Again, this indicates that the

12   meeting ended at five.  So are you saying that

13   maybe the meeting would have occurred before

14   your evening shift or occurred at the end of

15   the day shift?

16        A.    It could have occurred in the middle

17   of the evening shift.  Traditionally, there are

18   some people that stay around after their shift

19   is over, so it could have occurred with

20   somebody off of the day shift as well.  I have

21   no idea.

22        Q.    You don't recall who your supervisor

23   was at this time?

24        A.    No.

25        Q.    To whom would you report errors that

1          B. Pierce - by Mr. Eddy

2     you would have observed and unethical behavior?

3          A.    By policy, it would have been the

4     nurse supervisor.  It would have been like Paul

5     Smith or Nancy Giroux.

6          Q.    You are just not sure who that was

7     at the time?  Was it Chris Massung?

8          A.    She was gone by then.  Chris Massung

9     was gone before 2002 came in, I would say

10    around December of 2001.

11         Q.    Well, this new supervisor whose name

12    you can't remember, do you also believe that

13    they were a part of some grand conspiracy to

14    discriminate against you and your gender?

15         A.    Yes, I do.

16         Q.    But you don't know their name?

17         A.    The top -- I still believe it was

18    Sandy Pietrzak was still there when I left,

19    when I was terminated in May, and that she

20    didn't leave the department until after that.

21    I'm not sure.

22              MR. SANDERS:  Okay.

23         Q.    This would have been --

24         A.    While I was still employed.

25         Q.    Just about a month before you were

169

         B. Pierce - by Mr. Eddy

1    for identification.)

2         Q.    Take a look at Exhibit N.

3         A.    Okay.

4         Q.    This appears to be the codification

5    of a fact-finding session with you on April 11,

6    2002?

7         A.    What date?  I'm sorry.

8         Q.    April 11, 2002.

9         A.    Yes.

10        Q.    And it says that it took place in

11   Nancy Giroux's office.  Do you recall this

12   meeting?

13        A.    Yes.

14        Q.    This session?

15        A.    Yes.

16        Q.    It says that you were present along

17   with Nancy Giroux, Sharalee Raun.  Was that

18   your union representative?

19        A.    She was brought in as my union

20   representative, yes.

21        Q.    And Robin Weidner, which was the

22   court reporter, I guess.

23              So this would have been a recorded

24   session?

170

1              B. Pierce - by Mr. Eddy

2        A.    Actually, no.  Because Robin Weidner

3    was not there to do that.  She wrote these

4    notes off of Nancy Giroux's notes and Sharalee

5    Raun's notes.  They were typed up at a later

6    date.

7        Q.    You don't think it was recorded?

8        A.    It wasn't recorded at the time.

9        Q.    Now, I don't want to have to go

10   through every one of these statements.  If we

11   have to, we will.

12              This was the kind of thing I was

13   referring to earlier, but if you could take a

14   look at this document, again, like we did with

15   a previous exhibit, could you tell me, are

16   there any statements in there that are

17   characterized as being made by you that you

18   don't -- they are in quotes, that you don't

19   think you made?

20              MR. SANDERS:  Take it one page

21   at a time.

22              THE WITNESS:  Okay.

23              MR. SANDERS:  Are there any

24   statements by you associated with you on this

25   first page of this exhibit that are inaccurate?

1              B. Pierce - by Mr. Eddy

2                   THE WITNESS:  No.

3    BY MR. EDDY:

4         Q.    Okay.  Let's look at the second page

5    now.

6         A.    The statements in that top paragraph

7    starting with "I borrow from other inmates

8    medications because this breeds all new

9    paperwork if we don't have the inmates

10   medications, it's easier to just borrow," that

11   is a compilation of many statements.  It is not

12   one continuous statement and was put

13   together -- it's not a proper statement.

14        Q.    You are saying it's misrepresented

15   as being in quotes?

16        A.    Yes.

17        Q.    To what do you disagree with in

18   there?  Are you saying it's just not complete?

19        A.    It's a compilation of numerous

20   statements throughout our discourse that we

21   had.

22        Q.    Is the gist of what is said there

23   represented by what you say is a number of

24   statements?

25        A.    No.

172

1            B. Pierce - by Mr. Eddy

2       Q.    If not, how would it be different?

3       A.    The borrowing inmates -- borrowing

4  from other inmates medications would have been

5  one statement, and then something -- other

6  questions were asked, and then part of this,

7  "because this breeds all new paperwork if we

8  don't have any -- from the inmates medications,

9  that was based on a question she asked me about

10  the procedures in the medication room and what

11  the night shift does and why certain things

12  happen in certain ways.

13       Q.    Do you agree that's easier to just

14  borrow?

15       A.    Yes.

16       Q.    You agree that you borrow from other

17  inmates, you just don't necessarily agree with

18  the sentence after that that "it breeds all new

19  paperwork if we don't have the inmates

20  medications"?

21       A.    Those are partial statements, but

22  they are --

23       Q.    But you have borrowed --

24            MR. SANDERS:  But they are

25  what?  You need to complete a sentence for us.

173

B. Pierce - by Mr. Eddy

1

2    A.    Sorry, I was in the middle of a

3    thought.  They are just -- because they are

4    incomplete sentences, they are not fully

5    correct.  They don't represent everything that

6    transpired there.

7    Q.    But you have borrowed medications

8    from other inmates?

9    A.    As often as the rest of my

10   counterparts.  Probably less, though.

11   Q.    I understand that's your position

12   but --

13   A.    Yes.

14   Q.    How about the next sentence, "Did

15   you feel this causes problems?"  What about

16   your answer there?

17   A.    That statement is correct.  It's

18   like two or three sentences put together, but

19   it's --

20   Q.    The rest of that paragraph,

21   anything?

22   A.    Yes.  That's essentially correct.

23            MR. SANDERS:  Take a look at

24   the big paragraph now.  While he's reading

25   that --