174

B. Pierce - by Mr. Eddy

1

2          (Discussion was held off the

3    record.)

4          A.    There's a lot of stuff in quotes

5    here that I didn't say that's here, and, again,

6    they are partial statements and fabrications of

7    things put together back and forth.  Just -- in

8    my opinion, this is another example of an

9    attempt to retaliate against me for --

10          Q.    Tell me in what particulars you

11    agree with, disagree, or how they are taken out

12    of context.

13          A.    All of it so far.  I'm down to about

14    halfway down that first paragraph -- that

15    paragraph.

16          Q.    You didn't say you understand the

17    policy on taking medications to the RHU?

18          A.    I said that.

19          Q.    Okay.

20          A.    In the course of conversation, I was

21    asked if I understood the policies.  That had

22    been asked on numerous occasions while

23    answering false allegations against me.  Again,

24    a lot of this -- I didn't say some of the stuff

25    and --

1                     B. Pierce - by Mr. Eddy

2          Q.     You disagree that on the night of

3     April 5, that you pulled the inmates' names and

4     PRN medications out of the RHU book, checked to

5     see who was due medications?

6          A.     Yes.

7          Q.     Prepoured medications in the cups in

8     the medications room, three separate cups

9     taken, no book, about six pills were taken to

10    RHU to be dispensed?  Do you disagree with

11    that?

12         A.     I do because that statement of I

13    prepoured medications, and that's what was

14    alleged against me, that's not something that I

15    said.

16         Q.     Are you denying that you prepoured

17    medications?

18         A.     I am denying that.  I didn't do it

19    because I knew at this point where we were

20    going, knowing that at this point I was being

21    retaliated against for my EEOC Complaint that

22    led to Chris Massung's leaving the Department

23    of Corrections, and also because I had brought

24    testimony, written testimony, against other

25    females.

B. Pierce - by Mr. Eddy

1

2          I'm a male who is making testimony

3    against females in my profession, either at my

4    grade or higher.  Nothing's being done to them,

5    but here I am sitting here answering

6    allegations of things that they had no proof

7    of, and all they did was fabricate this.

8          Q.    You are saying all these people

9    referenced in here are all fabricating

10   allegations against you?  Zuber, Kidd, all

11   these people have it out for you?  Is that your

12   position?

13         A.    No.  My position is that statements

14   taken were altered, changed, or people were

15   never even contacted to do this.  I don't know

16   who made the allegations against me.

17         Q.    Who wouldn't have been contacted?

18         A.    I don't know if anybody was

19   contacted or in -- I don't recall if they were

20   contacted or not contacted, but it's as easy as

21   saying --

22         Q.    Well, there's obviously references

23   of people being contacted and giving statements

24   here.  So who do you think was not contacted

25   that would have altered these statements?

1                    B. Pierce - by Mr. Eddy

2          A.     It's the possibility that some,

3     none, or all.  I could say that, you know, I

4     contacted Mr. Sanders, say that I saw you

5     letting air out of his tires, but I in fact

6     never contacted him.  These are just fabricated

7     statements.

8          Q.     That's what I'm asking you, how are

9     they fabricated?

10         A.     A lot of stuff I never said.  Some

11    of the stuff that's in quotes, like I prepoured

12    medications in cups in the medication room,

13    three cups, three separate cups taken, no book,

14    about six pills were taken to RHU to be

15    dispensed, that was the allegation against me.

16    I never stated that.

17              So they are putting in quotes saying

18    that I said these things and admitted to these

19    things, and I didn't.  And this is all just

20    their attempt to retaliate against me for my

21    EEOC Complaint and my writing up my female

22    counterparts in an attempt to discriminate

23    against me and get me out of there.

24              Some of these things are -- the

25    quote in here about the Milk of Magnesia, where

1              B. Pierce - by Mr. Eddy

2    is that at?  This is referencing to -- I'm

3    sorry, it doesn't actually say Milk of Magnesia

4    on here, but it says here, then RN Zuber

5    returned and stated he talked to CO Kidd and

6    "best to give it to avoid a problem than not to

7    give it."  I recall that conversation with him.

8         Q.   Did you state the book said every

9    third night and she wasn't due the medication

10   tonight?

11        A.   Yes, I did.

12        Q.   Okay.

13        A.   Because we actually went to the

14   medication book.  Mr. Zuber had called Officer

15   Kidd -- or I take that back.  Strike that.

16             Officer Kidd called Mr. Zuber to

17   tell him that I had refused to give an inmate

18   medication, when I had told the officer that I

19   would go back to check to be sure if she was

20   due to receive that medication.

21             The policy and procedure for that

22   area was to call up there before doing

23   medication line to see who needed as-needed

24   medications.  That inmate was on an as-needed

25   medication, didn't request it.

B. Pierce - by Mr. Eddy

1
2     Q.     Okay.

3     A.     By the time I got back, Mr. Zuber

4  was thoroughly enraged about Officer Kidd, you

5  know, jumping through -- trying to get him to

6  do all these things.  He had actually made it

7  halfway up to the RHU with the bottle of Milk

8  of Magnesia when I showed him the book and

9  said, "She's not due."  That it just had been

10  given the previous night.

11     Q.     It says here, "RN Zuber stated gave

12  the inmate some the previous night."  You are

13  not saying you gave it to her, are you?

14     A.     No, no.  RN Zuber did give it the

15  previous night.

16     Q.     Did you then call Kidd back and ask

17  why she called another nurse to bring the

18  medication over when you said you would take

19  care of it?

20     A.     Yes, I did.

21     Q.     She had no response?

22     A.     Correct.

23     Q.     And you asked a second question, why

24  did you do a end around, go around me, the CO

25  had no response?

180

         B. Pierce - by Mr. Eddy

1    A.    No.

2    Q.    You didn't make that statement?

3    A.    No.

4    Q.    Did you ask a third question that

5    resembled the first two?

6    A.    No.

7    Q.    Did you say, I didn't appreciate her

8    letting the inmates split staff?

9    A.    No.

10   Q.    Did you want to -- go to the next

11   page.

12   A.    In this first paragraph, they are

13   referencing back to that meeting that I had

14   with Mrs. Giroux.  Again, those were

15   allegations against me back then that were

16   never proven.  These notes are just being

17   inserted here to bolster their very weak

18   attempt to, you know, impose discipline on me.

19   Q.    So you deny --

20   A.    It's retaliation.

21   Q.    You deny that you said you were

22   under a lot of stress and emotion and maybe

23   that's why you can't clarify on this issue?

24   A.    The clarity of the issue was in

180

          B. Pierce - by Mr. Eddy

1    A.    No.

2    Q.    You didn't make that statement?

3    A.    No.

4    Q.    Did you ask a third question that

5    resembled the first two?

6    A.    No.

7    Q.    Did you say, I didn't appreciate her

8    letting the inmates split staff?

9    A.    No.

10   Q.    Did you want to -- go to the next

11   page.

12   A.    In this first paragraph, they are

13   referencing back to that meeting that I had

14   with Mrs. Giroux.  Again, those were

15   allegations against me back then that were

16   never proven.  These notes are just being

17   inserted here to bolster their very weak

18   attempt to, you know, impose discipline on me.

19   Q.    So you deny --

20   A.    It's retaliation.

21   Q.    You deny that you said you were

22   under a lot of stress and emotion and maybe

23   that's why you can't clarify on this issue?

24   A.    The clarity of the issue was in

181

1                B. Pierce - by Mr. Eddy

2       recollection to --

3                   MR. SANDERS:  That's not the

4       question.  The question is did you say that?

5                   THE WITNESS:  Oh, yes, I said

6       that.

7          Q.    How about the next paragraph?  Next

8       topic of discussion.

9          A.    That's all.

10         Q.    Next paragraph.  What is the RSAT

11      program?

12         A.    I believe it stands for the

13      Rehabilitative Substance Abuse Treatment

14      program.

15         Q.    Treatment?  Okay.

16         A.    No, I never had these conversations

17      with the inmates.  These are false statements.

18         Q.    So you are saying that that's in

19      quotes as something you said, you never made

20      that statement, "yes, about a bunch of topics"?

21         A.    Correct.

22         Q.    "Did you tell the inmates you were

23      going to quit and become a counselor?"  "Yes,

24      after the inmates asked what was wrong that I

25      hadn't been myself lately.  I told them I was

182

1              B. Pierce - by Mr. Eddy

2    really stressed out and had a lot of health

3    problems from this place and that I was looking

4    for another job, I also told staff I was

5    looking.  You know there are no secrets in

6    jail."  You never made that comment?

7         A.    No.

8         Q.    You weren't looking for another job?

9         A.    I was, but I wasn't telling anybody

10   else that.  That was under the advice of my --

11        Q.    Your doctor; correct?

12        A.    My doctor, correct.

13        Q.    You don't disagree that you weren't

14   yourself lately and so forth, do you?

15        A.    No.  I was under a tremendous amount

16   of stress.

17        Q.    See down about in the middle it

18   says, "I told the inmates I was seeking a job

19   as counselor but not at this institution.  It

20   will probably one to two years at length prior

21   to leaving.  They expressed sorrow at my

22   leaving because I'm the only one who cares,"

23   you have no recollection of that?

24             MR. SANDERS:  Hold on a

25   second.  Take a break here.

183

1            B. Pierce - by Mr. Eddy

2                (Recess was taken.)

3    BY MR. EDDY:

4        Q.    I'm not sure where we were here.  I

5    think we were on the bottom paragraph of

6    Page 3.  I read to you the sentence about I

7    told inmates I was seeking a job as counselor

8    but not at this institution, and I think you

9    said that you didn't make those comments?

10       A.    Correct.

11       Q.    Is it your position that you never

12   spoke to inmates at all about your personal

13   situation?

14       A.    No, I have never spoken to them

15   about my personal situations.

16       Q.    Or about leaving?

17       A.    No.

18       Q.    What about telling the inmates that

19   this RSAT program was a joke?

20       A.    I never said that to the inmates.

21   That would have undermined the credibility of

22   the program.

23       Q.    So you also then deny that you would

24   have told Nancy you were commenting on the

25   highlights of the conversation, that's a

184

1              B. Pierce - by Mr. Eddy

2     negative reference, I was engaging the inmates

3     in a conversation which is a commonly held

4     belief by the inmates and then we transitioned

5     that into a conversation about RSAT?

6         A.    I never made those comments.

7         Q.    Did you have a conversation with

8     Nurse Zuber, Nurse Pietrzak, and Nurse Heffern

9     about RSAT, not giving the inmates the current

10    tools necessary in order to succeed in society?

11        A.    I had a conversation with them about

12    that.  It was initiated by Nurse Pietrzak about

13    a new admission into the facility.

14        Q.    Did you have a good laugh about

15    inmate Morales who returned to jail after four

16    months after being a recent RSAT graduate?

17        A.     Actually, that was a comment made in

18    direction to Pietrzak and Heffern, the two

19    female nurses that were there.  Nurse Pietrzak

20    had processed inmate Morales back in, and she

21    made a comment about that being a statement of

22    how well of a program or how good of a job that

23    program actually did.  Because Morales was a

24    graduate of the RSAT program, and she was going

25    back in and reoffending on a drug charge.

185

1          B. Pierce - by Mr. Eddy

2     Q.    You don't recall saying that your

3 conversations with inmates were before the

4 conversations with nurses?

5     A.    No.  I didn't have any conversations

6 with the inmates about RSAT.

7     Q.    So that then you deny the remainder

8 of that paragraph then?

9     A.    Yes, I do.

10    Q.    Total fabrication?

11    A.    Complete fabrication.

12    Q.    She just made all of this up?

13    A.    To say this to the inmates would

14 have been grounds for termination.

15          MR. SANDERS:  The question was

16 did she make it all up?

17          THE WITNESS:  Oh, yes.

18    Q.    So you never told the inmates you

19 wanted to leave but not yet?  The inmates

20 didn't express sorrow to hear you were leaving?

21    A.    No.

22    Q.    Didn't tell you you were the only

23 one who cares?

24    A.    No.

25    Q.    Go to Exhibit O.

186

1              B. Pierce - by Mr. Eddy

2                   (Pierce Exhibit O was marked

3      for identification.)

4          Q.    I think this is pretty much the same

5      as the last.  It's another fact-finding of

6      April 11, '02.  Does that sound right, Brian?

7          A.    Yes.

8          Q.    That's dated April 12 of '02, same

9      date as the other exhibit?

10         A.    Yes.

11         Q.    So this is the same day.  Do you

12     remember these allegations being made against

13     you there?

14         A.    Yes, I do.

15         Q.    Do you remember this fact-finding

16     session?

17         A.    Yes.  It was in conjunction with the

18     last one.

19         Q.    Again, I'm going to have to ask you

20     to read this and tell me where you disagree

21     with any characterization of your statements or

22     conduct.

23         A.    The first page is correct.

24         Q.    Okay.

25         A.    This statement in there at that top

1              B. Pierce - by Mr. Eddy

2   paragraph in regards to the RHU incident on

3   4/7/02, "Mr. Pierce stated that he did deliver

4   the medication to the RHU in cups in his

5   pocket," I did not -- I stated that I did not

6   deliver the medication.  The word not was left

7   out of that.

8        Q.    The next sentence right after that

9   says, "He stated he knows what is expected of

10  him after our conversation on Monday, 4/8/02.

11  Does that refresh your memory of who that

12  meeting might have been with on April 8 of '02?

13        A.    This document is from Nancy Giroux.

14  If she's referring to that same document that

15  we were before, then it would have been with

16  her.

17        Q.    Right.  That's what I was asking

18  you.

19        A.    Okay.  So, yes, with the exception

20  of that RHU --

21        Q.    Statement above?

22        A.    -- statement, the rest of that is

23  correct.  That's correct.

24        Q.    Okay.

25             MR. SANDERS:  We are going on

188

```
 1              B. Pierce - by Mr. Eddy

 2     to the paragraph, "we then discussed his

 3     conversation"?

 4                    THE WITNESS:  Correct.

 5                    MR. SANDERS:  Are you there?

 6                    THE WITNESS:  Yes.  That's

 7     just a refabrication of the fabrication in the

 8     previous document.  All she did was reword in

 9     her own words the untrue statements that she

10     had written down in the previous document.

11     BY MR. EDDY:

12          Q.    So you are saying that that bottom

13     paragraph on Page 2 is totally false?

14          A.    That's correct.

15          Q.    You had no conversation whatsoever

16     about the RSAT program or --

17          A.    Not with the inmates.

18          Q.    With -- oh, okay.  Right.

19          A.    And that portion of that top

20     paragraph that finishes the paragraph in the

21     previous page, again, that's part of the --

22          Q.    What about the next one?

23          A.    Again, that's -- I wasn't there.  I

24     don't know who said what or if she -- she

25     actually investigated --
```

189

```
1                     B. Pierce - by Mr. Eddy
2           Q.     That's actually not a fair question
3      for you.
4           A.     Yeah, it's not.
5           Q.     Let's look at Exhibit P.
6                     (Pierce Exhibit P was marked
7      for identification.)
8                     MR. EDDY:  Do you want to keep
9      going?
10                    (Discussion was held off the
11     record.)
12     BY MR. EDDY:
13          Q.     P, this is a document dated
14     April 16, 2002?
15          A.     Uh-huh.  Yes.
16          Q.     It references essentially a
17     fact-finding on 4/15 of '02?
18          A.     Yes.
19          Q.     Now, this one's a little different.
20     Is it Ms. Raun?
21          A.     Sharalee Raun.
22          Q.     She was present with you at this
23     meeting, also?
24          A.     Yes.
25          Q.     This would appear to be transcribed,
```

1              B. Pierce - by Mr. Eddy

2    your understanding.

3         A.    Yes, I believe that's correct.

4         Q.    So we agree the subject matter of

5    this document is not only the April of 2002

6    incidences, but also the March of 2002

7    incidences as well?

8         A.    Yes.

9         Q.    Now, in this statement -- again, you

10   can see that on Page 2, alleged incidences

11   include reports of the following, you can see

12   there's a little synopsis there.  There aren't

13   really very many statements in here that are in

14   quotes, but let's look at them separately.

15   This one's not very long.

16              But can you tell me if any of those

17   statements in there you disagree with as being

18   made by you?

19        A.    In that first paragraph, as I

20   previously testified, just jumping down to the

21   bottom of that, the quote in quotes states,

22   "They came late, fault doesn't matter."  I

23   never made that statement.

24        Q.    As quoted or --

25        A.    At all.  Even in context, there's no

B. Pierce - by Mr. Eddy

1

2    way that -- I mean, I never made anything like

3    that kind of statement to anybody.  That's --

4    those are not my words.  Those were added in.

5    It's a fabrication.

6        Q.    I think you testified a little bit

7    earlier that you agreed that they came late and

8    fault didn't matter, and that's why you didn't

9    open the window.  Are you disputing that now

10   or --

11       A.    Those aren't the exact words.

12       Q.    Okay.

13       A.    We were not in dispute of them

14   coming late, which is correct.  They did come

15   late, but I did not make the statement they

16   came late, fault doesn't matter, and I never

17   agreed to or said that fault doesn't matter.

18       Q.    Well, your decision to not give them

19   medication then, was it only based on the fact

20   that in your opinion there was no

21   life-sustaining drugs that needed to be

22   dispensed to any of those three inmates?

23       A.    That was the initial conversation

24   that I had with Nurse Eldred, Lil Eldred, about

25   that.  When she said, just go get them the

1              B. Pierce - by Mr. Eddy

2   medication, I said, fine, I'll do it.  I went

3   in and I did it.  So they got their medication.

4        Q.    Anything else -- second paragraph,

5   anything you disagree with in there?

6        A.    No.

7        Q.    Next paragraph, beginning with "on

8   April 1, 2002"?

9              MR. SANDERS:  There's two of

10  those --

11             MR. EDDY:  I'm sorry, the

12  second one.

13             MR. SANDERS:  The one that

14  goes on to say you ordered a 60-day supply?

15             MR. EDDY:  Right.  Right.

16       A.    No, this is -- again, the incidences

17  stated in here are only based partially in

18  fact.  The rest of it is fabrication.

19       Q.    What portion of it is a fabrication?

20       A.    Speaking through hush tones.

21       Q.    It says -- the last sentence is the

22  one you really dispute?

23       A.    Yes.

24       Q.    The hush tone part of it or the

25  passing of a note, period?

208

1          B. Pierce - by Mr. Eddy

2     A.    The passing of a note, period.  I

3     don't recall ever doing that with her.

4     Q.    When you say her, who do you mean

5     her?

6     A.    Inmate DiGiovanno.

7     Q.    You think that's a reference to

8     DiGiovanno?

9     A.    Yes.

10    Q.    All right.  So the last sentence you

11    dispute?

12              MR. SANDERS:  Just so Tom and

13    I understand, why are you saying that?  I'm

14    going to point to it.  I don't want to say it

15    on the record.  Because of that

16    characterization of her, the inmate?  Is that

17    how you know it is --

18              THE WITNESS:  We --

19              MR. SANDERS:  Because of those

20    words?

21              THE WITNESS:  Yes, those three

22    letters.

23              MR. SANDERS:  That are in --

24              MR. EDDY:  Yes, I understand

25    what you are saying.

209

1            B. Pierce - by Mr. Eddy

2                    MR. SANDERS:  I don't have the

3    guts to repeat that.

4    BY MR. EDDY:

5        Q.    Are we on the April 5 paragraph now?

6    Is that what you are reviewing?

7        A.    Yes.  And, again, this is, as I

8    testified earlier, this is just a complete

9    bogus retaliatory strike against me.  It's a

10   bogus complaint.  There is no proof that I did

11   these things, and they were just false

12   allocations across the board.

13       Q.    So you categorically deny the entire

14   paragraph?

15       A.    Yes.

16       Q.    You deny the last sentence, the

17   correct procedures for delivering medications

18   to the RHU were specifically addressed with you

19   on March 11, 2002?

20       A.    No.

21       Q.    You don't dispute that?

22       A.    No.  Because those procedures were

23   discussed regardless of my testimony to

24   Ms. Giroux about the allegations presented to

25   me or about me and taking the stuff to the RHU.

210

B. Pierce - by Mr. Eddy

1

2    Q.    What about the sentence right above

3    that, the shift commander questioned you about

4    the procedures for delivering medications to

5    the RHU, you called the RHU officer and became

6    confrontational and questioned her about this

7    issue?

8            Without maybe the confrontational

9    part, would you otherwise agree with that

10   sentence?

11   A.    Yes.

12   Q.    How about Page 3?  Beginning with

13   April 9.

14   A.    Fabrication.

15   Q.    Okay.

16   A.    No basis in fact.

17   Q.    Next paragraph?

18   A.    Again, fabrication, retaliation for

19   my EEOC Complaint and reporting other female

20   nurses for actually doing these things.

21   Q.    The entire paragraph?

22   A.    The entire paragraph.

23   Q.    What about borrowing medications

24   from other inmates' cards?  Didn't you

25   acknowledge that you had done that?

1           B. Pierce - by Mr. Eddy

2                MR. SANDERS:  I appreciate the

3      clarity.

4                MR. EDDY:  We will go to the

5      next exhibit, if you -- sorry.

6                MR. SANDERS:  No, I have

7      nothing else.

8      BY MR. EDDY:

9           Q.    Do you have it?

10          A.    Exhibit R?

11          Q.    To the next.  In Q, to the next

12     letter, which is the one your attorney just

13     referred to.  It's dated April 30 of 2002.  Do

14     you see that?

15          A.    Yes.

16          Q.    Hold on a second here.  That's -- is

17     that to Marilyn Brooks from Nancy Wirth?  Yes.

18          A.    Yes.

19          Q.    Okay.  I need you to read this and

20     basically go through this the same way we've

21     been going through the other documents with

22     respect to characterizations of your conduct or

23     statements.

24                Before you answer that, first of

25     all, this is a -- purports to be a synopsis

214

1              B. Pierce - by Mr. Eddy

2    from the actual PDC that was held on April 23

3    of 2002; right?

4         A.    Correct.

5         Q.    For the record, the first time you

6    saw Dr. Mercatoris was on 4/16 of '02; is that

7    right?  Do you remember?

8         A.    I believe that's correct.

9         Q.    Exhibit A, to verify that if you

10   want here, he was initially seen on April 16 of

11   2002.

12        A.    Yes.

13        Q.    So you would agree that the first

14   time you saw him was April 16 of '02?

15        A.    Yes.

16        Q.    All right.  Go ahead.  I didn't mean

17   to interrupt.

18        A.    That's okay.  In the second

19   paragraph, the line stating, "The officer then

20   relayed to Mr. Pierce that the area sergeant

21   had questioned if the medication had in fact

22   been prepoured" -- strike that.  I am sorry, I

23   was reading that sideways.

24              MR. SANDERS:  This doesn't

25   have any quotes of yours, Brian.  What are you

1          B. Pierce - by Mr. Eddy

2     asking him, Tom?

3               MR. EDDY:  It's been

4     paraphrased, and I'm asking him to comment on

5     its accuracy.

6               MR. SANDERS:  Okay.

7     BY MR. EDDY:

8          Q.   We have, of course, been through

9     this before with the investigation that I think

10    did contain actual quotes.

11         A.   The statement in that paragraph, "He

12    advised the team leader that his integrity and

13    character was on the line and that he would do

14    what he had to do," I never said those words.

15         Q.   Okay.

16         A.   That's a fabrication.

17         Q.   It states in the next sentence that

18    "He then told the building three officer that

19    he wanted one unit/floor at a time called which

20    was not a normal practice."

21         A.   Did not tell the officer to do that.

22    That was a recommendation by the officer to do

23    that, cleared through Nurse Eldred,

24    Mrs. Eldred.

25         Q.   Even though I read you your own

216

1              B. Pierce - by Mr. Eddy

2    statement that said you did instruct him to do

3    that?

4         A.    Right.  The statement that I had

5    written down was at the direction of Lieutenant

6    Bossard based on paraphrasing what had been

7    said throughout the conversation.  Let me

8    rephrase that.

9              The statement that I told the

10   officer to do this implied that I directed the

11   officer to do that.  It was my decision.  I

12   told the officer that we were going to do it

13   that way, yes, but it was from the approval and

14   direction of Nurse Eldred, who did not

15   physically speak to the officer.

16             So, semantically, I told the officer

17   that that's what we were going to do, but it

18   was the officer's suggestion through Nurse

19   Eldred through me back to the officer.

20        Q.    Right.  You testified to that.

21        A.    Okay.  Next page.  The entire

22   paragraph top of Page 2 is fabrication.  It's

23   false.

24        Q.    You dispute there you acknowledged

25   that you were upset by security questioning

1               B. Pierce - by Mr. Eddy

2    your integrity and character by checking on the

3    short duration of the medication line and

4    questioning you about prepouring medications?

5          A.    Yes.

6          Q.    That didn't upset you?

7          A.    It didn't upset me, it didn't

8    happen.

9          Q.    You weren't questioned?

10          A.    I don't recall ever being questioned

11    about that.  I know that they have asked about,

12    you know, the line going so long, but it had

13    nothing to do with the retaliation against

14    Sergeant Sittig as alleged in the -- in one of

15    the previous exhibits that we have.

16          Q.    Yes, I'm not asking -- again, just

17    to be clear, I'm not asking you to comment on

18    any conclusions that are reached in here.  For

19    example, when it says, "It is evident that he

20    directed," I'm not asking you to comment on

21    that.  Just the characterization of your

22    statements and your conduct is what we're

23    talking about here.

24               It wouldn't be fair for me to ask

25    you a question about whether or not it was

218

B. Pierce - by Mr. Eddy

1
2    evident or it's some legal conclusion that's

3    been drawn in here.  I think that's where most

4    of your concern comes from, and I just want to

5    make sure you understand I'm not -- I'm not

6    trying to get you to admit any ultimate

7    conclusions in here.  Okay?

8        A.    So you are just asking me if the

9    paragraph itself --

10       Q.    Did you make the statements, is it a

11   proper characterization of statements you made

12   and conduct?  Not any conclusion that somebody

13   drew from that.

14       A.    Okay.

15       Q.    Okay?

16       A.    I said no.  This --

17       Q.    I'm not trying to be the fact finder

18   here in terms of whether you violated a policy

19   or something like that.

20       A.    All right.  So in response to that,

21   my -- your question and your statement about

22   how I should read these, I do not agree with

23   that paragraph.  We've discussed that.

24       Q.    Right.

25       A.    I just wanted to clarify what we

219

1                    B. Pierce - by Mr. Eddy

2    were talking about.

3            Q.    But that's why I just asked you

4    whether or not you acknowledged and you were

5    upset by being questioned about the short

6    medication lines and about whether or not

7    somebody accused you of prepouring medicine,

8    and you are stating that that's a lie, that you

9    weren't upset and you didn't acknowledge that?

10           A.    Right.

11           Q.    All right.  Just to make sure we are

12   both on the same page.

13           A.    The very long paragraph on Page 2,

14   I -- overall, in general, I do not agree with

15   the characterization of my statements and what

16   happened.

17           Q.    So that would be the statement that

18   "Mr. Pierce admitted during the statement

19   provided prior to the PDC that he was surprised

20   to see an inmate standing at the medication

21   line window five to ten minutes after the

22   medication line was closed"?

23           A.    No.  That's true.

24           Q.    How about the next one, "He stated

25   he explained to her the medication line had

B. Pierce - by Mr. Eddy

1

2    closed and instructed her to leave but she

3    refused"?

4          A.    That's correct.

5          Q.    "During that time, two other inmates

6    arrived waiting their medications and he

7    instructed the officer to have the inmates

8    leave"?

9          A.    That's correct.

10         Q.    "He states that he was asked by the

11   team leader why there were inmates waiting for

12   medication, and that his response was that the

13   medication line had been closed for almost ten

14   minutes before they had arrived and that none

15   of them were on mandatory or life-sustaining

16   medications"?

17         A.    That's correct.

18         Q.    Okay.  Did you state that the team

19   leader then directed him to open -- you to open

20   the medication line and you did so under

21   protest?

22         A.    Yes.

23         Q.    During the PDC, you responded when

24   questioned that you were "pretty sure the

25   anti-epileptic drug in question was not

1              B. Pierce - by Mr. Eddy

2    life-sustaining"?

3         A.    I didn't say that.

4         Q.    Do you think it was life-sustaining?

5    You said it was Phenobarbital earlier when I

6    asked you about seizures.

7         A.    This was not a life-sustaining

8    medication for this inmate.

9         Q.    In your opinion?

10        A.    Mine and the pharmacy.

11        Q.    Is that a doctor's opinion?

12        A.    The doctor agreed with the pharmacy.

13        Q.    What doctor?

14        A.    I believe it was Dr. Sellaro that

15   was on at the time.

16        Q.    When did he agree with the pharmacy?

17        A.    It was --

18        Q.    After or before?

19        A.    After or before what?

20        Q.    After or before you didn't give this

21   inmate her medication?

22        A.    That I don't recall.  At this time,

23   I don't remember what the time frame was that

24   he agreed or disagreed or agreed to that, the

25   pharmacy's determination.

222

1          B. Pierce - by Mr. Eddy

2       Q.    So when it goes on the next

3    sentence, "Although it was later established

4    that the drug in question was not considered

5    life sustaining for this inmate"; does that

6    answer that question?

7       A.    No.   This was something that was

8    investigated by Ms. Giroux, and she

9    concluded -- she basically verified the

10   information that I gave her, that the pharmacy

11   said that it was not a life-sustaining

12   medication, that I was correct in that

13   assessment of that.

14      Q.    So you dispute that you admitted

15   that you weren't sure at the time, and it was

16   not until a later date that you called the

17   pharmacy to verify?

18      A.    I do dispute that.   It was the same

19   day that I called them.

20      Q.    But would it have been before or

21   after the incident?

22      A.    It would have been after.

23   Immediately following.

24      Q.    All right.   Did you claim during the

25   PDC that there was only one inmate when you

1              B. Pierce - by Mr. Eddy

2    refused to open the window?

3          A.    No.

4          Q.    You agree there were three?

5          A.    Yes.

6          Q.    Next one are conclusions.  The next

7    page.

8                MR. SANDERS:  Start at the

9    very top because it's a continuation from the

10   prior page.

11         Q.    Well, first part of that is a

12   conclusion that you don't need to comment on.

13         A.    Which part of that?  I'm sorry.

14         Q.    The last sentence from the previous

15   paragraph on the top of Page 3.

16               MR. SANDERS:  The one you do

17   need to comment on, the one that starts

18   "Mr. Pierce failed to follow."  Do you agree

19   with that statement?

20               MR. EDDY:  I don't think he

21   needs to comment on that because that's a

22   conclusion.

23         Q.    But the second part, were you

24   directed three times before you finally did it

25   under protest?

224

B. Pierce - by Mr. Eddy

1

2    A.    Yes.

3    Q.    All right.  Now, we're going to move

4    on to the April incidences.

5           MR. SANDERS:  Isn't it just a

6    rehashing of the --

7           MR. EDDY:  Yes.  That's why I

8    thought this would go pretty quickly because

9    we've pretty much been through these.

10   A.    Well, as a question, not to sound

11   hostile or anything, but as a question, why go

12   back through something we've already testified

13   to?  I don't see the purpose of it?

14   Q.    Well, I haven't examined it, you

15   know, line for line to see if there is anything

16   in there that's additional or different.  It

17   will probably take another ten minutes or so to

18   go through these.

19   A.    The last half of the first paragraph

20   starting "The PDC committee found statements

21   substantiated," there were no statements

22   substantiated.

23   Q.    Again, it's something they found.

24   I'm not really asking you to comment on that.

25   A.    But it's not right.

                    B. Pierce - by Mr. Eddy

1

2      Q.    That's a matter of record.  But up

3  until that where it says "the PDC," do you have

4  any problem with anything above that?

5      A.    No.

6      Q.    Starting with "On April 1, 2002,"

7  and ending with "this was verified by the

8  CHCA"?

9      A.    Correct.

10      Q.    The bottom part is a conclusion.

11  Okay.  Let's go to the next paragraph.

12           Any statements in that paragraph?

13      A.    Down at the bottom, it states --

14  starts with "The staff member present at the

15  time," the she that they refer to in there was

16  Yvonne McGuire.

17      Q.    Okay.

18      A.    The day shift LPN.

19      Q.    Okay.

20      A.    The date that she claims that this

21  happened, she was off, and, in fact, the date

22  that the medication was ordered was on the day

23  that she was off.

24      Q.    Okay.

25      A.    And she wrote her statements up

B. Pierce - by Mr. Eddy

1    several days after this whole sending the

2    medication back, so on and so forth, occurred.

4        Q.    So you have a problem with that is

5    it sentence?

6        A.    Yes.  Because she's -- she's

7    known -- she's known to have been hostile

8    against me, making false allegations from day

9    one that I walked into Cambridge Springs.

10       Q.    How about it starts with, "He

11   responded to," and then we go to the next page?

12           MR. SANDERS:  He's already

13   responded about this hush tones.

14           MR. EDDY:  True.

15           MR. SANDERS:  The rest of that

16   paragraph is the conclusion.

17   BY MR. EDDY:

18       Q.    This is a little different because

19   here it's saying that if you engaged in hush

20   tone speech, it was something about for the

21   privacy about the inmate's personal health

22   concerns versus not making them at all.  So I

23   guess what I'm asking you is did you make --

24           MR. SANDERS:  Let him ask the

25   question.

B. Pierce - by Mr. Eddy

1

2       A.      Go ahead.

3       Q.      Did you make the comments in hush

4  tone, but your position is that they would have

5  been about some health -- private health matter

6  about the inmate as opposed to the RSAT program

7  or something like that?

8       A.      That's correct.  If I made any

9  statements at all to her in hush tones, it

10  would have been in regards to that three letter

11  word that we talked about.

12      Q.      Right, right.

13      A.      Because that's confidential.

14      Q.      Do you recall actually having that

15  conversation?

16      A.      No, I don't.

17      Q.      Do you know what they are talking

18  about here?  Is that possible that's what is

19  going on?  You might have been talking to her

20  about the three-letter word that we haven't

21  mentioned?

22      A.      If -- I don't have any recollection

23  of that at this time.

24      Q.      Would you do that?  Does that sound

25  like you?

228

1            B. Pierce - by Mr. Eddy

2        A.    Oh, yes.  It's confidential

3    information.

4        Q.    Right.  I understand.

5        A.    You don't want to blurt that out

6    over the top of everything.

7        Q.    All right.  The next is, "The

8    committee found," we don't need to worry about

9    that.

10            How about down there after inmate,

11    he would "hook her up," his response that it

12    was an error -- no, no.  That's another

13    conclusion.  Okay.

14            Well, did you respond that it was an

15    error?

16        A.    In response to that it was an error

17    is disputed by the fact that he was clearly

18    told that the medication --

19            MR. SANDERS:  Don't read it

20    out loud.  These judges are just human beings.

21        Q.    We are talking about a 60-day supply

22    versus --

23            MR. SANDERS:  The question you

24    didn't answer, you didn't withdraw it.  Did you

25    say this stuff or didn't you?  That's the

1                    B. Pierce - by Mr. Eddy

2    question.

3                    THE WITNESS:  At this time, I

4    don't recall that, but it's possible that I did

5    say that.

6    BY MR. EDDY:

7        Q.    That it was an error?  You've

8    already acknowledged that you ordered the

9    60-day supply; correct?

10                   MR. SANDERS:  Let's get an

11   answer before the lawyer asks the next

12   question.

13                   THE WITNESS:  Okay.

14                   MR. SANDERS:  Is it possible

15   that you said those words, that it was an

16   error, or is that a fabrication that you said

17   that?

18                   THE WITNESS:  No, it's

19   possible.

20   BY MR. EDDY:

21       Q.    Okay.  The rest look like

22   conclusions.

23                   Let's go down to April 5.  The first

24   sentence is a conclusion.  How about after DOC

25   policy 13.4.1, during the PDC Mr. Pierce

230

                    B. Pierce - by Mr. Eddy

1

2    admitted he did not follow procedures for

3    distribution of medication in the RHU, did you

4    make that admission?

5          A.    No, I did not.

6          Q.    Did you acknowledge that you

7    prepoured the medications and put them in cups

8    and carried them to the RHU?

9          A.    No, I did not.

10         Q.    Did you claim you were confused

11   about these procedures?

12         A.    No.

13         Q.    Do you remember having discussions

14   about RHU procedures on August 28, 2001, and

15   again on March 11, 2002?

16         A.    Yes.  Those were false allegations

17   brought forward by the female staff in

18   retaliation for the write-ups.

19         Q.    It says that you acknowledged that

20   to the CHCA.  Who is that?  What's CHCA?

21         A.    Chief Health Care Administrator.

22         Q.    And that he understood and would

23   abide by the policy.  Do you remember that?

24         A.    Yes.

25         Q.    The rest looks like you go down

231

1                      B. Pierce - by Mr. Eddy

2     almost to about two-thirds of the way down, it

3     says, "During the fact-finding, Mr. Pierce

4     denied these allegations stating that other

5     staff members failed to crush the medications."

6     Do you remember that?

7          A.    Yes.

8          Q.    Denying that?

9          A.    I remember denying allegations, yes,

10    and stating the statement there, yes.

11         Q.    The rest looks like conclusions to

12    me.  How about starting with April 9?

13                      MR. SANDERS:  You mean denying

14    your allegations or denying their allegations

15    about you?

16                      THE WITNESS:  Denying their

17    allegations about me.

18                      MR. SANDERS:  Thank you.

19    BY MR. EDDY:

20         Q.    Do you deny on April 9 making any

21    conversation -- or comments, negative comments,

22    regarding the RSAT program?

23         A.    Yes.  I have already previously

24    testified to that.

25         Q.    You deny, then, obviously a

1              B. Pierce - by Mr. Eddy

2    statement that "it was set up for them to fail

3    so that they would return," and that the DOC

4    programs were "a joke"?

5         A.    Yes.

6         Q.    You deny that?

7         A.    Yes, I do.

8         Q.    During the PDC then obviously you

9    would have to deny that you responded that that

10   was taken out of context, is that your

11   position, or are you denying that they were

12   made, period?

13        A.    I am denying that what they are

14   talking about here, that I made these comments

15   to the inmates.  These comments were group

16   comments, not in particular by me, with Nurse

17   Pietrzak, Nurse Heffern, and Nurse Zuber.

18        Q.    You don't deny making the

19   statements, you are just saying they weren't

20   made in the presence of inmates; is that your

21   testimony?

22        A.    No.  My testimony is that the

23   context of which the statements, the

24   allegations against me were taken out of

25   context of somebody said this section, somebody

B. Pierce - by Mr. Eddy

1

2  said this section.  There was general comments.

3  They took it and said that I said these things,

4  all of those things, to the inmates.

5      Q.    Right.  That's what was said at the

6  PDC.  Here it says that you responded that that

7  was taken out of context, that it was actually

8  a conversation that you had with other staff,

9  not inmates.

10     A.    Right.

11     Q.    You were simply critiquing the

12 program; is that accurate?  That was your

13 position, that you didn't do it in front of

14 inmates, you did it in front of staff, and that

15 you were only critiquing the program?

16     A.    I personally was not critiquing the

17 program.  It was a group discussion.  We all

18 had opinions on it.

19     Q.    The bottom line is the statements

20 were made, but they were made not to inmates,

21 you are saying they were made to other staff

22 members?

23     A.    And they were made by other staff

24 members, not myself.

25     Q.    You mean you didn't make them?

1          B. Pierce - by Mr. Eddy

2    That's my question.  Are you denying that you

3    made the statements?

4          A.    Yes.

5          Q.    Period?

6          A.    Yes.

7          Q.    So then this next statement that you

8    responded that that was taken out of context

9    and it was actually a conversation you had with

10   others --

11              MR. SANDERS:  He's saying --

12         Q.    -- you are saying that's a lie?

13              MR. SANDERS:  Yes.

14         A.    Yes.

15              MR. SANDERS:  It took 20

16   minutes, but we got there.

17   BY MR. EDDY:

18         Q.    It looks like that would be it for

19   that document.

20              The next document is, I don't know,

21   it looks like about an eight or nine-page --

22              MR. SANDERS:  Are you talking

23   about Exhibit R?

24              MR. EDDY:  No, still Q.

25         Q.    Is that Ms. McGuire that we've

1              B. Pierce - by Mr. Eddy

2     referred to earlier, this employee witness

3     statement dated 4/4/02?

4          A.    Yes.

5          Q.    Does it look like her signature?

6          A.    That's her.

7          Q.    Is that who we are talking about?

8          A.    Yes.

9          Q.    Then after that, there's a couple of

10    other statements that are attached.  I just

11    want to see if you can identify the first one

12    dated 4/2/06.  It looks like Kelly Winckler?

13         A.    Yes.

14         Q.    And who is Kelly Winckler?

15         A.    She was the --

16              MR. SANDERS:  2006, we haven't

17    lived that long.

18              MR. EDDY:  4/2/02.

19              MR. SANDERS:  4/2/02.

20              MR. EDDY:  I was being

21    optimistic.  I might not live that long.

22         A.    She was the ten to six LPN.

23         Q.    The next one it looks like a

24    Caroline Hargenrater?

25         A.    Yes.

1          B. Pierce - by Mr. Eddy

2      Q.    Who is she?

3      A.    She was the night shift, essentially

4  the RN in charge.  Not supervisor by title, but

5  that's what she functioned as.

6      Q.    The third one looks like it's from

7  an S. Kidd?

8      A.    Yes.

9      Q.    Who is that?

10     A.    She was a female corrections officer

11  on the two to ten shift, I believe.

12     Q.    I would assume that you would

13  disagree with these statements by Ms. McGuire,

14  Ms. Winckler, Ms. Hargenrater, and is it Ms.

15  or -- Kidd is male or female?

16     A.    Female.

17     Q.    And Ms. Kidd?

18     A.    Yes.  I vehemently deny those

19  things, object to them.

20              MR. EDDY:  All right.  The

21  last document is Exhibit R.

22              (Pierce Exhibit R was marked

23  for identification.)

24     Q.    Is this essentially your termination

25  letter from Marilyn Brooks on behalf of Jeffrey

1              B. Pierce - by Mr. Eddy

2    Beard to you dated May 10, 2002?

3         A.    Yes, it is.

4         Q.    This would be the actual letter you

5    would receive where you were first notified

6    that your employment was terminated?

7         A.    Yes.

8         Q.    I'm not going to ask you to go

9    through this like the other documents, but does

10   it reiterate the ethics sections for which you

11   were charged violating?

12        A.    It represents their standpoint, yes.

13        Q.    That would be in connection with the

14   March 9, 10 incident, March 20 incident,

15   April 1, 5, and 9 of 2002 incidences that we've

16   been discussing here?

17        A.    Yes.

18        Q.    Did you appeal this decision to the

19   state Civil Service Commission?

20        A.    No, I did not.

21        Q.    Did you file a grievance?

22        A.    No, I did not.

23        Q.    In the Exhibit A to the doctor,

24   under the progress notes of 5/7/02, it says,

25   "Has grievance in for termination without just

B. Pierce - by Mr. Eddy

2    cause."  What is that in reference to?

3         A.    That's correct.  I was mistaken when

4    I spoke that.  Yes, we did file a grievance.

5    My senior union representative is Zollie,

6    Z-O-L-L-I-E, R-A-I-N-E-R.

7         Q.    What was the result of that

8    grievance?  Do you know?

9         A.    It never went anywhere.

10        Q.    Is it still pending?

11        A.    No.

12        Q.    You lost?

13        A.    The union refused to pursue it.

14        Q.    You were not granted any kind of

15   relief?

16        A.    Correct.

17        Q.    Do you have a copy of that opinion?

18        A.    I don't believe so.

19        Q.    Who would?

20        A.    The union should.

21        Q.    Can you obtain a copy?

22        A.    I can try.

23             MR. SANDERS:  Your client is a

24   lot better able to get it than we are.  It

25   would have been served on management, as you

                    B. Pierce - by Mr. Eddy

1

2   well know.

3   BY MR. EDDY:

4        Q.    Did you seek unemployment?

5        A.    Yes, I did.

6        Q.    What was the result of that?

7        A.    It was denied.

8        Q.    Do you have any records from that

9   hearing?

10       A.    I believe I do.

11       Q.    Do you have an ultimate conclusion

12  or finding of fact rendered in that case?

13       A.    I believe I do.

14       Q.    The decision, essentially?

15       A.    I believe I do.  I'm not 100 percent

16  certain at this time.

17       Q.    Can you see if you have that and

18  supply that?

19       A.    Yes.

20       Q.    Do you know a Clifford Van Tassell?

21       A.    Yes, I do.

22       Q.    How do you know Cliff?

23       A.    And I worked at SCI-Cambridge

24  Springs together.  He was in maintenance, I was

25  in medical.

244

1          B. Pierce - by Mr. Eddy

2    statements that eventually led to his

3    dismissal.  She actively pursued his dismissal

4    because he raised -- he blew the whistle on

5    her.

6          Q.    Am I to take it now that you are

7    alleging that Marilyn Brooks is the one who is

8    involved in your termination and not all these

9    other people we've been talking about all day?

10          A.    She's one of many.  She's the one

11   who authored --

12          Q.    Do you think that she masterminded

13   somehow your termination?

14          A.    I think she played a tremendous role

15   in it.

16          Q.    You think it's because of --

17          A.    A lot of it is because of the Mike

18   White case and the association that I had with

19   him when I was at SCI-Albion.  I was his

20   primary Defendant.

21          Q.    That was back in what year?

22          A.    2000, September of 2000 when he was

23   terminated, and I was his vocal support.

24          Q.    You've mentioned Michael White a

25   number of times and, again, I think he's not