245

              B. Pierce - by Mr. Eddy
1
2   related to you; right?
3        A.    Correct.
4        Q.    You were, what?  You participated
5   somehow on his case against Albion?
6        A.    Correct.
7        Q.    Do you remember what that case was
8   about?
9        A.    It was about gender discrimination
10  and retaliation.
11       Q.    And Mr. Sanders is your attorney now
12  I think has indicated that he represented
13  Mr. White in that case?
14       A.    That's correct.
15       Q.    Do you remember what the result was
16  in that case?  Do you know?
17       A.    I believe the end result was that
18  the state won that case.
19       Q.    What was your role?  What did you do
20  for Mr. White?
21       A.    I testified on his behalf.
22       Q.    At what level?
23       A.    I'm not sure I understand the
24  question.
25       Q.    In a --

246

1              B. Pierce - by Mr. Eddy

2                   MR. SANDERS:  How many times

3       did you --

4          Q.    In a court of law, administratively?

5          A.    Both.

6          Q.    Where?

7          A.    Both.  During the investigation of

8       the Complaints, alleged charges against him, I

9       was brought in and interviewed by one of the

10      senior corrections staff, one of the deputies

11      or one of the security captains.

12                   They took statements from me, and I

13      let them know at that time that what had

14      happened with him was flat out wrong.  I was

15      there, I personally witnessed, so on and so

16      forth.  When I went to trial, then I was there

17      in the jury boxes, or in the -- what do they

18      call that?

19                   MR. SANDERS:  Witness.

20         A.    Witness box.  Witness stand.

21         Q.    Do you know who terminated

22      Mr. White?

23         A.    Who officially signed off on the

24      document?

25         Q.    Yes.

247

```
 1              B. Pierce - by Mr. Eddy
 2        A.    No, I don't.
 3        Q.    Do you think it was Marilyn Brooks?
 4        A.    She had a lot to do with it, yes.
 5        Q.    Do you have any sort of criminal
 6   record, Brian?
 7        A.    I'm not sure I understand what you
 8   are asking.
 9        Q.    Do you have a criminal record?
10        A.    In regards to?
11        Q.    Have you ever been convicted of any
12   crime?
13        A.    Outside of speeding, no.
14        Q.    I wouldn't consider that criminal.
15        A.    The only reason why I say that is
16   because on my application, I checked no.  They
17   saw I had a speeding ticket, and they are like,
18   ooh, you know, you should have said yes.
19        Q.    In some jurisdictions they call that
20   quasicriminal, but I don't think Neal or I
21   would have an issue with somebody saying no to
22   that.
23              Never been arrested for anything
24   else?
25        A.    Never.
```

248

            B. Pierce - by Mr. Eddy

1

2       Q.      No DUIs?

3       A.      Never.

4       Q.      Anything like that?  You are

5   currently married; right?

6       A.      Yes.

7       Q.      Have you ever been married before

8   Julia?

9       A.      No.

10      Q.      Did she have any children of her own

11  before you got married?

12      A.      No.

13      Q.      Have you discussed this case with

14  anybody other than your attorney?

15      A.      My spouse.  My psychiatrist.

16      Q.      Okay.  Anybody else?

17      A.      My pastor.

18      Q.      Okay.

19      A.      That's it.

20      Q.      At a church?

21      A.      In his office in a confidential

22  setting.

23      Q.      So Mr. Sanders, your wife, your

24  pastor, and who is your pastor?

25      A.      David Janz.

B. Pierce - by Mr. Eddy

Q. Does your wife have an issue with you doing that?

A. No.

Q. On a number of occasions you've told me, or at least there's been statements that other nurses, other LPNs, other staff people do things that you've been accused of doing; right?

A. Yes.

Q. Are you willing to give me some names of persons that you claim prepoured meds, did any of the things that you were accused of that you --

A. Yes.

Q. -- said the staff did?

A. Yes, I will.

Q. Go ahead.

A. Yvonne McGuire, Cheryl Heffern.

Q. What did Yvonne McGuire do?

A. She prepoured medication, she made transcription errors.

Q. When did she prepour meds?

A. Frequently.

Q. Can you give me a specific example?

251

1              B. Pierce - by Mr. Eddy

2        A.    For the medication lines.  I'm not

3    quite sure what you are looking for.

4        Q.    When?

5        A.    During my tenure at SCI-Cambridge

6    Springs.

7        Q.    But you can't recall any specific

8    time or date?

9        A.    I can't recall an exact date and

10   time, no, at this time.

11       Q.    Or whether or not it was witnessed

12   by anybody else or by whom it may have been

13   witnessed?  Other than yourself, did you

14   personally observe this or --

15       A.    I personally --

16       Q.    -- did you hear about it?

17       A.    No.  I personally observed her doing

18   it and other staff had also personally observed

19   her doing it.

20       Q.    Did you write up an incident report

21   on her?

22       A.    Yes, I did.

23       Q.    Anybody else?  You said -- hold on.

24   You said transcription errors.  Did you write

25   up an incident report on that?

252

1               B. Pierce - by Mr. Eddy

2       A.      Yes, I did.

3       Q.      Anybody else?

4       A.      Cheryl Heffern, H-E-F-F-E-R-N.

5       Q.      All right.  What did she do?

6       A.      She was prepouring medications on

7    the evening shift during my tenure at

8    SCI-Cambridge Springs.  She would take

9    medications to the RHU in the manner and

10   fashion that it was alleged that I did.

11      Q.      Meaning in a bag or in cups in your

12   pocket?

13      A.      Correct.  Outside of the prescribed

14   policy.

15      Q.      Okay.  Any specific times or dates

16   there?

17      A.      Regular basis.

18      Q.      A regular basis?

19      A.      Regular basis.  It was a common

20   practice.

21      Q.      If it was common practice, then you

22   should have other persons that would have seen

23   it, also?

24      A.      Yes.

25      Q.      Who would that be?

1                B. Pierce - by Mr. Eddy

2       A.    Sandy Pietrzak, who verbally

3  chastised Cheryl Heffern for taking those

4  medications improperly to the RHU.

5       Q.    So she did get at least a verbal

6  reprimand?

7       A.    No.  It was more of a tongue lashing

8  in the hallway.

9       Q.    How do you distinguish that from a

10  verbal reprimand?

11       A.    Verbal reprimands are transcribed on

12  a piece of paper and put into the file as a

13  verbal reprimand.  This never occurred.

14       Q.    You are saying she never got a piece

15  of paper to put in the file?

16       A.    Correct.

17       Q.    Anybody else?

18       A.    Sandy Pietrzak prepouring

19  medications, borrowing stock medications,

20  borrowing medications from other inmates, which

21  also happened with the other two nurses that I

22  aforementioned.

23       Q.    Any incident reports on her?

24       A.    Yes.

25       Q.    If you filled out incident reports

259

1              B. Pierce - by Mr. Sanders

2     BY MR. SANDERS:

3        Q.    Who was your Health Care

4     Administrator when you were terminated as

5     opposed to the prior year?

6        A.    Nancy Giroux.

7        Q.    Are you accusing Nancy Giroux as

8     being part of the conspiracy to discriminate

9     against you?

10       A.    Yes, I am.

11       Q.    You did not quit employment with the

12    department, you were terminated; is that

13    correct?

14       A.    That's correct.

15       Q.    Now, you testified in this case that

16    in deposition here earlier today that you had

17    come to the aid of a male nurse by the name of

18    Michael White; correct?

19       A.    That's correct.

20       Q.    All right.  A number of times

21    Attorney Eddy has asked you about whether you

22    have any relationship with Michael White.  The

23    relationship is not between you and Michael

24    White, it's between Michael White and Dominic

25    White; isn't it?

260

1              B. Pierce - by Mr. Sanders

2        A.    That's correct.

3        Q.    Dominic White was related to Michael

4    White; isn't he?

5        A.    Yes.  He was a cousin.

6        Q.    All right.  Is Dominic White not the

7    individual who EEOC had assigned to investigate

8    some of the allegations against you?

9        A.    Yes.

10       Q.    Now, at some point, you let Michael

11   White know that you wanted to testify on his

12   behalf; is that correct?

13       A.    Yes.

14       Q.    All right.  Let me show you this

15   exhibit, apparently Exhibit 9 from a prior

16   deposition.  If not, we will identify it as the

17   Rule 26 disclosure list that I filed in the

18   Michael White case in the month of March of

19   2001.

20             Do you see this in front of you?

21       A.    Yes, I do.

22       Q.    All right.  The attorney at that

23   time, Tom Eddy's colleague, Tom Halloran was

24   the attorney that was representing the state in

25   that case; is that clear from this document?

261

1              B. Pierce - by Mr. Sanders

2         A.    Yes.

3         Q.    All right.  Now, are you listed in

4    this document anywhere as a witness?

5         A.    Yes, I am.

6         Q.    What number?

7         A.    Number four.

8         Q.    And how many days after March 15 of

9    '01 did you get notified that you were

10   receiving suspension discipline for what you

11   were alleged to have done at Albion in

12   September of 2000?

13        A.    About four days.

14        Q.    All right.  Now, you told Mr. Eddy

15   that you had written up a number of your

16   colleagues, your female colleagues, when you

17   were at Cambridge Springs; is that correct?

18        A.    That's correct.

19        Q.    All right.  Let me do this this way

20   so it's more official.  I'm going to show you

21   the transcript of Nancy Giroux's testimony, and

22   during that deposition, she was shown a certain

23   amount of exhibits.

24             Exhibit 2 from Nancy Giroux's

25   deposition, is this a document that you are

300

1              B. Pierce - by Mr. Eddy

2      A.    Yes, I did.

3      Q.    I would ask that they be produced?

4      A.    It's in --

5      Q.    You don't have to do it right now.

6  I would ask that those be produced.  If you

7  want to save time here, I would ask that you

8  produce any other statements relating to any of

9  these claims that other persons engaged in this

10  conduct that were filed at the time.

11      A.    Yes.

12      Q.    Not a list later submitted at or

13  around your termination.

14              MR. SANDERS:  We heard the

15  question.  We have them.  We will produce them.

16              MR. EDDY:  I want to make sure

17  you understand.

18              MR. SANDERS:  Okay.

19  BY MR. EDDY:

20      Q.    You were shown a document that was a

21  Rule 26 disclosure in the Michael White case.

22  I think your attorney pointed out that you were

23  listed as a witness.  I don't have that

24  document.  Can I see it for a second?

25              MR. SANDERS:  Sure.  Exhibit 9

301

1              B. Pierce - by Mr. Eddy

2    to the Giroux deposition.

3         Q.    For the record, this document is

4    dated March 15 of 2001.  Brian Pierce is listed

5    as witness number four.  That really doesn't

6    tell us when you in fact testified on behalf of

7    Mr. White.  When was that?

8         A.    When was the jury trial?

9              MR. SANDERS:  You testified

10   twice.  You already told him about both times.

11   One was the summer of 2000 and the other one

12   was the trial in September of 2002.

13             THE WITNESS:  Yes.

14   BY MR. EDDY:

15        Q.    Well, September of 2000, this is

16   dated March 15 of 2001, so you couldn't

17   possibly be relying on this document as some

18   notice of your participation for retaliatory

19   purposes; right?

20        A.    Yes, I can, because --

21        Q.    Oh, you can?

22        A.    Yes.  By the time I transferred over

23   to Cambridge Springs, this document had come

24   out.  I did not know about this.

25        Q.    You are saying if you testified for

302

1               B. Pierce - by Mr. Eddy
2      Michael White in the year 2000, that a document
3      dated March 15, 2001, could serve as notice to
4      somebody to retaliate against you?
5            A.    Yes.
6            Q.    You mentioned that Marilyn Brooks
7      never discussed with you your EEOC Complaint
8      that you filed; correct?
9            A.    Correct.
10           Q.    How do you know that?  I'm sorry,
11     that you never -- you also said that she didn't
12     talk to anybody about it.  How do you know
13     that?
14           A.    If she had spoken to anybody about
15     it, that Complaint would have been validated
16     and sent forward.
17           Q.    That's your logic?  Because it
18     wasn't validated, therefore, she never talked
19     to anybody; is that what you are saying?
20                 MR. SANDERS:  She admitted
21     that in the deposition.
22                 MR. EDDY:  I'm asking your
23     client.
24                 MR. SANDERS:  Oh.
25           Q.    Is that the way you figured that

312

1              B. Pierce - by Mr. Sanders

2      them.  It was just joining in that

3      conversation.

4          Q.    So did they know by March 15 of '01

5      about your helping Mike White?

6          A.    Oh, yes.

7          Q.    Now, Marilyn Brooks didn't come onto

8      the scene at Cambridge Springs until September

9      of '01?

10         A.    Correct.

11         Q.    Prior to that, she testified that

12     she had been the Superintendent at --

13               MR. EDDY:  I object on the

14     leading questions.  You are going to have to

15     ask him questions.  I'm not going to let you

16     put words in his mouth.

17     BY MR. SANDERS:

18         Q.    Prior to September of '01, you had

19     had a history with Marilyn Brooks, or not?

20         A.    Yes.

21         Q.    Does that date back to Albion?

22         A.    Yes, it does.

23         Q.    Now, from what I can see from the

24     record they have established regarding your

25     case, you did not have any episodes of any

313

1              B. Pierce - by Mr. Sanders

2    disciplinary actions brought against you

3    between '95 when you left off with Brooks at

4    Albion and the September 2000 incident; is that

5    correct?

6          A.    That's correct.

7          Q.    So in that five and a half years,

8    had there been any times when you were written

9    up or disciplined either at Albion or -- at

10   Albion?

11         A.    No.

12         Q.    All right.  The last time you were

13   written up at Albion was September 2000?

14         A.    That's correct.

15         Q.    Then you were written up a number of

16   times we've discussed at Cambridge Springs?

17         A.    Yes.

18         Q.    All right.  Had you worked at any

19   other DOC facility other than Albion and

20   Cambridge Springs?

21         A.    No.

22              MR. SANDERS:  That's all I

23   have.

24              MR. EDDY:  That's all.

25              MR. SANDERS:  We will read

# EXHIBIT E

EQUAL EMPLOYMENT OPPORTUNITY DISCRIMINATION COMPLAINT

OCT 2 6 2001

PERSONNEL OFFICE

COMMONWEALTH OF PENNSYLVANIA
STD-444      REV. 2/97

**Equal Employment Opportunity**
# DISCRIMINATION COMPLAINT

The information on this form should be completed for all alleged discrimination and sexual harassment complaints. The completed complaint form should be signed by the complainant. Upon completion, please forward to the Equal Opportunity Manager/Specialist or the individual responsible for EEO in your agency.

DOCKET NO. 2001-04

DEPARTMENT NAME AND ADDRESS
SCI-Cambridge Springs
451 Fullerton Ave.
Cambridge Springs, PA 16403

1. COMPLAINANT'S NAME
Brian Pierce

HOME TELEPHONE NO.
(814) 398-2574

2. ARE YOU CURRENTLY EMPLOYED BY THE ABOVE DEPARTMENT?
☒ YES   ☐ NO

HOME ADDRESS
313 S. Main St. Cambridge Springs PA 16403

3. PRESENT JOB TITLE
LPN

STATUS
Permanent Full Time

WORK UNIT
Medical

LOCATION
SCI-CBS

WORK TELEPHONE NO.
(814) 398-5549

LENGTH OF SERVICE IN CLASSIFICATION
7 years

4. DATE OF THE ALLEGED DISCRIMINATORY PRACTICE
10-15-01

5. BASIS OF THE ALLEGED DISCRIMINATORY PRACTICE
☐ RACE            ☐ AGE
☐ SEX             ☐ DISABILITY
☐ NATIONAL ORIGIN ☒ RETALIATION
☐ ANCESTRY        ☒ OTHER (SPECIFY)
☐ RELIGION        Hostile Working Environment

6. THE DISCRIMINATION OCCURRED IN CONNECTION WITH
☐ INTERVIEW        ☐ DISCIPLINARY ACTION
☐ HIRING SELECTION ☐ COMPENSATION
☐ PROMOTION        ☐ TRAINING OPPORTUNITY
☐ LAYOFF           ☒ OTHER (SPECIFY)
☐ TRANSFER         N/A

7. THE FACTS OF THE ALLEGED DISCRIMINATORY EMPLOYMENT PRACTICE ARE:

— See Attached —

S. Pietrzak and I have had numerous confrontations in the last 9 months in regards to my wanting to change a few policies and procedures in order to help make the department more efficient. She has also stated her distates for my ability to take the initiative without requiring her guidance or direction. As a result of these confrontations, this incident occured. During the 15 OCT incident, other staff members took the initiative to begin mobilizing the department for the drill, and they were not berated in front of their peers, or inmates for their forethought, I was. I later found out that PA Stybrooki witnessed the initial outburst by Ms. Pietrzak, and that Inmate Strawbridge OF 8376 was in her wheelchair in the hall outside the door when Ms. Pietrzak first addressed me.

(OVER)




## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On 10-15-01 I entered the institution at about 1:50 pm. I saw inmates going back to their housing units and I was told that there was a drill going on. As I got to building 3, PA Styborski met me on the walk and told me about the drill going on. I entered building 3 and into medical at about 1:55 pm and all the staff were talking about the drill. I talked briefly with Y. McGuire LPN about a few issues and then went into the pharmacy to count with P. Smith.

After we finished counting, Y. McGuire and I exited medical and went on the walk in front of building 3. SGT. DeCoursey was coming down the walk from building 1. Y. McGuire asked if she knew what was going on. SGT. DeCoursey said she did and that she had "found out by accident." I followed SGT. DeCoursey into building 3 and I asked her if she knew how long the drill was going to last. She told me that she did not know. I asked her if she knew if we were going to have to pass medications on the housing units. She said she didn't know. I said that we would need to know as soon as possible because it might take an hour to prepare to do that. She then radioed Lt. Nadel + he called her back on the phone. She related the information to him and she told me that he would have to find out.

| _10-16-01_ | _Brian Pry_ |
| Date | Signature |

| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I then went into medical and was talking to M. kelly RN and T. Zuber RN. A few minutes passed and the building 3 officer came to us and told us that Lt. Wadel told him to tell us that we were to prepare to pass meds on the housing units. I went and told S. Pietr... about what Lt. Wadel had said. She then began to organize the staff and had S. Cooper RN try to get a list of inmates by housing unit. M. ke... T. Zuber and I went into the medication room and began to prepare the medication pass. I asked S. Pietrzak RN what meds needed to be pas... out. She told me "All of them." I told her that I had been told th... only life-sustaining meds needed to go. She then called C. Massing CH... for confirmation and we were directed to give only life sustaining meds and Antibiotics. I passed this information along to M. kelly T. Zuber and we completed our assigned tasks.

| 10-16-01 | Brian ... |
|----------|-----------|
| Date | Signature |
| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

2 of 6

# COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

Not long after we had prepared to pass medications on the units, SGT. Decan entered medical and went into the room where S. Pietreak was sitting. A few minutes later SGT. Decoursey came out of the room with S. Pietreak right behind her. At that time, in the presence of SGT. Decoursey, M. Kelly, and T. Zuber, S. Pietreak used a loud, hostile and demeaning tone and language to belittle me in front of my peers. She then went to C. Massung's office. T. Zub came to me and asked "What was that all about?" About 5 minutes la S. Pietreak reentered the nurse's station and began to harrass me again in the presence of staff. AT that time I told her that if she had a problem with me, she needed to address it to me in private or in C. Massung's office and that I did not appreciate the demeaning way I had been treated earlier as well as now. She agreed to go to C. Massung's office, but C. Ma arrived in the nurse's station. S. Pietreak then took an agressive posi, and began to "stare me down" with a hateful, angry stare. She th began to belittle me in the presence of my employer. We both began to exchange words in a loud manner.

10-16-01
Date

_Signature_

Date

Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

# COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

● C. Massung stood by and observed, but did not intervene. At one point she walked away from us and entered S. Cooper's office. S. Pietrzak and I continued to exchange words, and as I was trying to explain what had happened to her, she began yelling "stop pointing at me!" "I consider that a threat!" At which point C. Massung came out and S. Pietrzak asked her "Did you see that? He threatened me!" C. Massung covered her eyes and stated" I didn't see anything. I have a bad

● headache." At which point S. Pietrzak began verbally attacking me and my character. C. Massung then said we needed to go to her office. We agreed, and began to go to her office. S. Pietrzak stopped and said she was going to bring someone in with her. I said that I wanted union representation as well, and since no one was on site at that time, we would have to wait and do it another day. At that, S. Pietrzak became angry and went into medical.

| 10-16-01 | Bill Pierce |
|---|---|
| Date | Signature |
| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I was so shaken by the confontation, that I had fear of retaliation and the possibility of having insubordination charges put on me by S. Pietrzak, I stayed, that I went to C. Massing and told her that I was leaving. S. Cooper was in the room for the conversation and was a witness to the folk I told C. Massing that "I am afraid of retaliation by Sandy, and that I can work in this hostile environment." I told her that I was very upset and stressed out by what happened and that I did not appreciate being treated like that by S. Pietrzak, especially in front of my peers. C. Massing asked when I would like to have the meeting to resolve the issues, and I said tomorrow (10-16-01). She told me that she was not going to be here, and I said, "Then how about wednesday?" She told me that she was going to be out all week and she wanted it to be handled by the Deputy. I told her that I would like to "keep it in-house", if possible and try to resolve it first. C. Massing then said "well who's going to make the decision? who going to handle this?" I simply said to her "you." She then told me the she will be back on Monday and we could do it then.

| | |
|---|---|
| 10-16-01 | Brian Revie |
| Date | Signature |
| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I said that that would be fine. C. Massing told me that she was not sure I could take sick time for this, but that she would call personnel to clarify. S. Cooper told me that I should count off with someone before I left, so I did. While I Zuber and I were counting, C. Massu. told me that I could go, but I needed a doctor's excuse to justify my leaving. I told her that it was no problem and then thanked her.

Shortly after that I left the institution at 4:45 pm.

nothing else follows

10-16-01
Date

Signature

Date

Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

# COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

10-16-01  I came into work. upon entering medical, I was told by P. Smith RN and A. Chapman RN that the night shift nurse L. Mallard had told them in shift report that S. Pietrzak and I had an arguement and that I walked off property. They told me that I was "bad mouthed" by S. Pietrzak on shift change with L. Mallard.

Later on, S. Cooper called me into her office and told me that S. Pietrzak was telling as many staff as she could "a very slanted" side of the picture and that she was making it look like she did nothing wrong. Also, S. Coop told me that C. Massung had come into her office this morning and was saying terrible things about me and that I was a "cold, calculating indiv. and it was part of his Agenda." S. Cooper also observed C. Massung talking to several of the staff on 10-15-01 and 10-16-01 about this incident. I feel this only further encourages a hostile working environment and that by making slanderous comments about me to other staff, my peers is wrong

_____
10-16-01
Date

_____
Signature

_____
Date

_____
Typist's Signature

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth.  If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

**EXHIBIT H**

COMMONWEALTH OF PENNSYLVANIA
**Department of Corrections**
**SCI-Cambridge Springs**
**(814) 398-5400**
November 28, 2001

SUBJECT:    Brian Pierce/ RHU Med Delivery

TO:         File

FROM:       Nancy A Giroux
            **Nursing Supervisor**

Meet with Mr. Pierce at 1400 on 8/28/01 regarding delivering medication up to the RHU pre-poured into cups over the weekend. The medications were Psych meds that he had actually crushed prior to his trip to the RHU.

Mr. Pierce stated that he did crush the meds in the med room and then transported them to the RHU in the appropriate bag. He stated that he only had one or two inmates that were requiring medication and that at Albion it is an acceptable practice to prepare the medication prior to going to the RHU. He also stated that at Albion that this issue had been resolved with Management, Pharmacy and the Union. As long as the person preparing the medication did not allow the medication out of their sight once they prepared it, and it remained in their sight until dispensed. He stated it was determined that it was not pre-pouring.

I spoke with the nursing supervisor regarding their technique of dispensing medications to the RHU under another pretext and she stated the same.

I reviewed SCICBS's procedure for delivering medications to the RHU with MR. Pierce. The nurse is to bring the bag to the RHU with the individual's blister pack and the MAR. They are to review the MAR and then dispense the medication to the inmate. They are not to prepare the medication in the med room. I stated that we have our system and that the BHCS agrees with our procedure on dispensing medication. That this had been an issue a few years back and this was how it was resolved between Management and the Union.

Mr. Pierce verbalized understanding and stated that he would abide by our policy. He voiced what the procedure was and agreed it would not happen again.

Will monitor.

NG/ng

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

# EXHIBIT J

COMMONWEALTH PENNSYLVANIA
**Department of Corrections**
**SCI-Cambridge Springs**
**(814) 398-5400**
November 20, 2001

SUBJECT:    Written Reprimand

TO:        Brian Pierce

FROM:      Nancy A Giroux
           Nursing Supervisor

Mr. Pierce, it has been determined that you will receive a written reprimand for the incident that occurred on 10/15/01 involving Ms. Pietrzak.

Specifically relating to the altercation between Ms Pietrzak and yourself that occurred on 10/15/01 on the 2-10 shift during an emergency drill.

This is a violation of the Department of Corrections Code of Ethics, Section B, Number 10 which states '**Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.**'

As we have discussed, in situations like this you should remove yourself from the general medical area to continue the conversation. It should not be conducted in a public area that can be overheard by other staff and inmates that can cause embarrassment to both parties involved. If the issue cannot be resolved between the two parties then the conversation should be terminated at that time by mutual agreement and continued/resolved with a mediator (supervisor) at a future time and date. You antagonized the situation by speaking in a loud tone, pointing your finger at Ms Pietrzak repeatedly when she requested you not to and making derogatory statements about her character. This situation was not handled in a professional manner as is expected of DOC employees.

You are advised that continuation of such unacceptable actions will result in further disciplinary action, which may include suspension and/or termination. This written reprimand will be placed in your Personnel file and can remain there for up to one year.

NG/ng

CC    N Wirth Human Resource Director
      C. Massung CHCA
      Supervisor's File

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

# EXHIBIT K

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 2, 2002

*recieved 4\9*

SUBJECT:   Investigation of LPN Pierce

TO:   J. Wilkes
      D.S.F.M

FROM: LT. Berk Bossard
      2-10 Shift Commander

On 3-11-2002, I spoke with CHCA Giroux. She reported to me that LPN Pierce had
spoken to her earlier concerning his actions on 3-10-2002. He relayed to her that he
had decided to run the medication line "by the book" due to Sgt Sittig questioning his
procedures on 3-10-2002. Also Lt. Raun reported to me that Officer Phillips had told him
during there ride home together on 3-10-02 that LPN Pierce wanted medication line run
by the book. I reported this information to Captain Colvin and was directed by him to
conduct an investigation.  On 3-22-2002 I was directed by Captain Colvin to also
investigate an incident that occurred on 3-20-2002 (6-2 shift) concerning LPN Pierce.

## INVESTIGATIVE ACTION

I had CHCA Giroux, Lt. Raun and Officer Phillips complete a witness statement
concerning their involvement (Attachment 1,2 and 3).

**3-12-2002**, I questioned Sgt Sittig and had her complete a witness statement form
(Attachment 4).
On 3-10-2002 the medication line was completed at approximately 2025. Sgt Sittig
(Training Sgt) called the building 3 Officer (COT Willey) and questioned if all the units
had been called. COT Willey responded yes. Sgt Sittig questioned COT Willey if the
medication had been pre-poured. COT Willey responded she didn't know.

**3-25-2002**, I questioned COT Willey and had her complete a witness statement form
(Attachment 5).

Q. On 3-9-02 were you working in building 3?

A. Yes

*"Our mission is to protect the public by confining persons committed to our custody in safe,
secure facilities, and to provide opportunities for inmates to acquire the skills and values
necessary to become productive law-abiding citizens; while respecting the rights of crime
victims."*

Q. Did you receive a call from Sgt Sittig inquiring as to why medication line went so quickly?

A. Yes

Q. Did she ask you if the medication was being pre-poured?

A. Yes, I told her I didn't know.

Q. Did you tell LPN Pierce about this conversation?

A. Yes, He explained pre-pouring to me.

**3-26-2002** With union representation present I questioned LPN Pierce and had him write a witness statement (Attachment 6 and 7).

Q. On March 9, 2002 did COT Willey state to you that Sgt Sittig had inquired about medication line procedures?

A. Yes

Q. On March 10, 2002 did you have a conversation with Officer Phillips concerning running medication line "by the book" and calling one unit at a time?

A. Yes

Q. What time did you complete medication line on Sunday 3-10-02?

A. Approximately 2215

Q. What time did you complete medication line on Saturday and Monday?

A. 2025/2045

Q. Why was it so much latter on Sunday?

A. We ran it by the book a controlled environment.

Q. Did you purposely run the medication line slow to show Sgt Sittig?

A. No. Two days in a row Sgt Sittig questioned my procedures on closing so quickly so I decided to run it by the book.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

Q. On 3-20-02 after you closed medication line three other inmates arrived late. Did you refuse to give them their prescribed medication?

A. Yes, medication line had been closed.

Q. Did nurse Eldred tell you that this was no fault of the inmates and they must receive them?

A. Yes, Under protest I gave the inmates their medication.

**4-2-02** I interviewed RN Eldred and had her write witness statements for March 10 and 20 (Attachment 8 and 9).

Q. On March 10, 2002 you worked 2-10 shift with LPN Pierce. Did he make any comments to you about running the medication line "by the book"?

A. Yes, He said his integrity had been questioned for completed medication line so quickly the night before. He said, "I know how to take care of this. When my integrity and character is on the line I'll do what I have to do". He told Officer Phillips he wanted one unit called at a time.

Q. As the RN on shift did you question this?

A. No, 2-10 is his normal shift. I told him I would get blamed for it running so slowly as I am normally on 6-2. I told him I thought he was wrong but allowed it to occur.

Q. On 3-20-02 (6-2 shift) after medication line closed did three inmates came in and LPN Pierced refused to give them their medication?

A. I called the unit officer the inmates where late for medication line due to no fault of their own. At a minimum of three times he refused to open the window. Each time I told him he had to do it. He finally complied. One of these inmates was on an anti-epileptic life-sustaining medication. He continued to state they came late fault doesn't matter.

## FINDINGS

On March 9, 2002 the medication line was completed at approximately 2025. Sgt Sittig called COT Willey to insure that all units had been called. While speaking to her she inquired if the nurses had pre-poured the medication. COT Willey did not know if they had or had not been. After the conversation with Sgt Sittig she relayed to LPN Pierce that Sgt Sittig had questioned if the medication had been pre-poured.

On March 10, 2002 RN Eldred worked overtime with LPN Pierce. He told her his integrity and character was on the line I'll do what I have to do. He then told the building 3 Officer he wanted one unit/floor at a time called. RN Eldred told LPN Pierce that he was wrong, she would get blamed for it, but she allowed it to continue. The medication line was not completed until approximately 2210.

On March 20, 2002 6-2 shift after the medication line was closed three inmates arrived for their medication. RN Eldred called the unit officer inquiring to their tardiness. She was told due to no fault of their own the inmates were late returning from the meal and reporting to the medication line. RN Eldred told LPN Pierce three times to give them their medication before he finally complied. One of these inmates is on an ant-epileptic life-sustaining medication. During this entire period he continue to state "They came late fault doesn't matter".

## CONCLUSION

Sgt Sittig was acting within her duties to question the medication procedures. COT Willey relayed information to LPN Pierce that should not have been given. LPN Pierce took offense that Sgt Sittig questioning his procedures. On 3-10-2002, LPN decided upon his own to slow the medication line to prove a point to Sgt Sittig. He had Officer Phillips call units by single floors. RN Eldred knowing allowed him to do this, as it was his shift. Officer Phillps per Building 3 Post Orders page 4C "it is the officer's responsibility and duty to seek supervisory direction for clarification when doubt exists concerning procedures, situations, incidents, rules, regulations, directives or orders received" (Attachment 10) should have reported this irregularity, but waited until traveling home with Lt. Raun.

On March 20, 2002 LPN Pierce refused to give three inmates required medication as the medication line was closed. One of these inmates is on ant-epileptic life-sustaining medication. RN Eldred had to tell him 3 times to give them their required medication. During this investigation he stated "I gave it to them under protest".

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

## RECOMMENDATIONS

Disciplinary action is warranted for LPN Pierce under The Department of Corrections Code of Ethics section A.

Consistent with the responsibilities of all correctional employees in the Commonwealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions.

Disciplinary action is warranted for RN Eldred and Officer Phillips.

B14. Employee will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employee or an inmate.

Cc: Captain Colvin
    file

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely, and without coercion for official Commonwealth business, and will be considered for all purposes, including actions under the Statutes of the Commonwealth, just as though it had been sworn of affirmed before a court of formal law or formal arbitration panel.

On 3/11/02 at 1420 Brian Pierce came to my office to do his pre-select. Mr Pierce stated that he needed to talk to me about three things that occured over the weekend. He stated you probably already heard about it I stated I heard about one thing and then asked him to tell me what happened.

Mr Pierce stated that he delivered meds to the RHU, it was raining outside and I put the meds in my pocket for the units and the RHU. The officer went with him during his rounds in the RHU. (I told Mr Pierce thats their job. He also stated that Karen (Gardner) was upset because the RHU officer was looking over her shoulder when she was delivering meds to the inmates. He also made reference that the following night (3/10/02) the officer did the same thing to Ellie (Eldred) when she passed meds in the RHU. Mr Pierce stated that Lt Bossard came to Medical and asked him if it was policy to pre-pour Meds and have them in his pocket. Mr Pierce stated he told Lt Bossard that it was no different than pre-pouring the Med. and delivering it to the Infirmary patients. Mr Pierce stated Lt Bossard agreed. Lt Bossard then spoke with Nurse Gardner according to Pierce.

Mr Pierce goes on to state that Medline finished about 8:45 to 8:50 and he didn't want to tell them that the Trainee in Medical did an excellent job keeping the Med line flowing. According to Pierce Sgt. Cittig called the Trainee and asked her how come the med line completed so quickly: Did the Nurses run the Med line properly? Did they pre-pour Meds? Mr. states the Trainee was upset over the conversation and told him about it. He went on to that Sgt Cittig was questioning his ability to run the med line and was an insult to him in "In all my time here I have never gone into count, why was it an issue now". Mr Pierce felt it was related to the RHU Incident

3/11/02 ___ A. Mirra CHCA ___ Cont.
_____Date_____          _____Signature_____


_____Date_____          _____Typist's Signature_____


Note: This form is to be completed and signed by an employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other that the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

1

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely, and without coercion for official Commonwealth business, and will be considered for all purposes, including actions under the Statutes of the Commonwealth, just as though it had been sworn of affirmed before a court of law or formal arbitration panel.

Mr Pierce stated on Sunday he decided to run the medline ebg the Book. He states they had an overcount and he to call 2 units down after count cleared (on 3/10/02). I asked Pierce what he meant "by the book" and what did he do differently this time that he usually doesn't do, that would cause the med line to go over count. Pierce stated he signed out narcotics as he gave them and the Inmates had to get out their ID's. When questioned regarding the policy of inmates snawing ID's @ the line he stated they do present their ID's. I stated to Mr Pierce that this doesn't sound like it should have extended the medline and that I had heard he had been upset about something said to him and had purposely slowed down the line. He stated that was not True. I then stated to Mr Pierce that it appeared that he did slow the line down on purpose. Pierce stated "that's perception, not mine". "I was going by the Book". Mr Pierce stated they called one unit down at a time I stated this is not normally procedure at the 4th line, why would you do that. Pierce stated it was the who decided to call down the units one at a time so that there would not be so many inm. in Medical at one time. I asked Pierce several times regarding this issue - His response, I talked to the officer and it was the officers decisions. I asked if they had times when no inm. would be at one window or another and he stated yes, his line was busy at the beginning, + was busier at the end. Mr Pierce made other statements such as I told the inmates when I went to Rttu that it would be a long Medline, and the inmates were glaring at Ellie and he told then "It's me" implying that it was his fault the line was running late. Lastly he stated he checked to if Sgt Cittig was on duty that night. When asked if it made a difference, what if Cittig was of Pierce stated, the medline would have run as usual."

**3/14/02** _____     **J Murune** _____ **CHCA**     cont.
Date                            Signature

Several times I stated to Mr Pierce that by his statements it appears that he intentior caused the Med line to run over count. He stated repeatedly that "your perception". I to him that he made statements to officers and that it will be the perception of the Insid that he ran the Medline over on purpose to anuin a night. Again I said would

_____     "_____     _____
Date                            Typist's Signature

be their perception" I ran it by the book. I asked Pierce why he didn't go to Bossard about Sat Night. He stated Sat it was busy and on Sunday I just decide to run the medline by the book, I had already decided what I was going to do.

**3/14/02** _____     **J Murune**

Note: This form is to be completed and signed by an employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other that the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely, and without coercion for official Commonwealth business, and will be considered for all purposes, including actions under the Statutes of the Commonwealth, just as though it had been sworn of affirmed before a court of law or formal arbitration panel. On 3-10-02 while proceeding home from work officer Phillips informed me that nurse Peirce told officer Phillips while running medline the he wanted the units to be called down one floor at a time. He also stated that he didn't want alot of inmates waiting in medline. On 3-11-02 nurse Peirce stated that he ran medline casually and by the Book. Medline did not clear until 2210 hrs.

DATE   3-13-02

SIGNATURE   John a Ren

TYPISTS SIGNATURE_____   DATE_____

Note: This form is to be completed and signed by an employee who is a witness to incident involving employees of the Commonwealth.  I f the text is typed by someone other that the employee giving the statement, it must be read and signed by the employee.  In the event the statement is typed, the party typing the statement must sign and date the document.

2

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely, and without coercion for official Commonwealth business, and will be considered for all purposes, including actions under the Statutes of the Commonwealth, just as though it had been sworn of affirmed before a court of law or formal arbitration panel.

While serving as the Building 3 Officer on 3-10 I was told By Nurse Brian Pierce that he didn't want A lot of inmates at one time. Faimed-Line. I asked how he wanted them Called one unit, one Floor AT A time? He Said yes, & don't call the next till the line was down too to 10 inmate's. He was going to Run it By the Book. I asked several time's During med-L if it was Being Done like he wanted the gave me A thumbs up signal. I was asked about howmed-Line was Being Run on 3-11-02 By Lt. Rauw. I Explained the Above to him.

_____
3-11-02
Date

_____
C.P. Phillip  CO
Signature

_____
3-11-02
Date

_____
Typist's Signature

**Note:** This form is to be completed and signed by an employee who is a witness to incident involving employees of the Commonwealth. I f the text is typed by someone other that the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

3

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

On March 9. 2002 Med·Line Was closed at 2030. CT Willey Worked Bed 3 that Date. Being the area Sergt, I found it very peculiar Med·line was closed So Early. — It rarely closes before 2055 — So I called COT Willey to ensure She had Called all soused lines — The units to med line — She Stated "yes" — I then asked Who Ran med line — She Stated B Barone it LPN Pierce. — I then Stated TO COT Willey "Did he Crush or Pre-pour the meds — Her Response was "I dont know" The next Day March 10.2002, Med line Ran Until

__3·11·02__
Date

__CO KS S (S.Hq)__
Signature

_____
Date

_____
Signature

Well after 2200 hrs — LPN Pierce + RN Marterer Ettsed Ran med line.

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth.  If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee.  In the event the statement is typed, the party typing the statement must sign and date the document.

4

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

On March 9, 2002, while working in Bld. 3, med-line #4 went rather quickly. When med-line was over Sgt. Littig called me and asked, "How did med-line get done so quick?" I responded, "I don't know, Brian is good at med-line." She then asked, "Did he (Nurse Pierce) pre-pour meds?" I said I didnt know. I later told Pierce and he defined pre-pouring meds as one would pour the meds and another would distribute them.

| 3-25-02 | DMJ Illy COT |
|---------|--------------|
| Date | Signature |

| | |
|---------|--------------|
| Date | Signature |

Note: This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

5

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

ON MARCH 10, 2002 MEDICATION LINE WAS TERMINATED AT APX. 2215. I had instructed OFFICER Phillips to CALL THE HOUSING UNITS ONE AT A TIME IN ORDER TO PROVIDE FOR A SAFE, CONTROLLED AND QUIET ENVIRONMENT. I TOLD HIM THAT I WANTED TO RUN MEDICATION LINE "BY THE BOOK." NURSE ELDRED AGREED TO ALSO PARTICIPATE.

ON THE TWO (2) PRECEDING NIGHTS MEDICATION LINE RAN FROM 1930 UNTIL 2015 + 2025 RESPECTIVELY. ON THE FIRST OF THESE EVENINGS, THERE WERE 3 (THREE) NURSES RUNNING MEDICATION LINE — NURSE JAMIESON, NURSE HEFFERN, AND MY SELF. THAT MEDICATION LINE RAN APX. 42 MINUTES. THE FOLLOWING EVENING, NURSE BARONE D I RAN MEDICATION LINE AND it took APX. 50-55 MINUTES, THIS IS THE "NOR LENGTH OF TIME FOR MEDICATION LINE #4 TO RUN, DEPENDING ON THE PERSONNEL RUNNING IT.    (CONTINUED)

_3-26-02_
Date

_R.Green_
Signature

_____
Date

_____
Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

1 of 3

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

ON BOTH OF THESE OCCASIONS, THE WORD GOT BACK TO THE NURSES THAT THERE WAS SOME CONCERN AS TO HOW WE ACCOMPLISHED MEDICATION LINE SO QUICKLY SINCE ON A FEW PRECEDING NIGHTS THERE WERE OUT COUNTS OF 50 - 70. SPECIFICALLY - ON SAT. MARCH 9th, OFFICER WILLIE (FEMALE) RECEIV A PHONE CALL FROM SGT. SITTIG IMMEDIATELY FOLLOWING MEDICATION LINE. SGT SITTIG HAD QUESTIONED HER AS TO IF THE NURSES HAD "PREPOURED" TH MEDICATIONS OR FOLLOWED PROPER PROCEDURES FOR MEDICATION LINE. OFFICER WILLI WAS VERY UPSET BY SGT SITTIG'S QUESTIONS, THAT I ASKED HER WHAT U WRONG, AND SHE TOLD ME WHAT SGT. SITTIG HAD SAID.

(CONTINUED )

| | |
|---|---|
| 3/26/02 | B.B. |
| Date | Signature |
| | |
| Date | Signature |

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

2 of 3

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

THERE HAVE BEEN at LEAST 2 (TWO) TIMES in THE LAST 6 (SIX) MONTHS THAT MEDICATION LINE HAS RUN PAST 10 pm (2200). THE LATEST WAS 2210, ON ONE OF THE FIRST WEEKENDS NURSE KING WORKED.

AT NO TIME WAS IT EVEN A CONSIDERATION TO "RETALIATE" AGAINST SGT. SITTIG OR THE SECURITY STAFF IN GENERAL.

THIS CONCLUDES MY STATEMENT ABOUT THIS INCIDENT

3/26/02
Date

_____
Date

_____
Signature

_____
Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

3 of 3

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

ON MARCH 20, 2002, MEDICATION LINE WAS OFFICIALLY TERMINATED AND ANNOUNCED OVER THE RADIO by CONTROL. APPX. 5-10 MINUTES LATER, I OPENED THE WINDOW TO ASK THE OFFICER A QUESTION, AND WAS SURPRISED TO SEE AN INMATE STANDING AT THE WINDOW. I ASKED THE INMATE WHY SHE WAS AT THE WINDOW, AND SHE SAID THAT SHE WANTED HER MEDICATIONS. I EXPLAINED TO HER THAT MEDICATION LINE HAD CLOSED SEVERAL MINUTES EARLIER, BUT SHE REFUSED TO LEAVE. DURING THIS TIME TWO(2) OTHER INMATES ARRIVED ALSO WANTING THEIR MEDICATIONS. I INSTRUCTED THE OFFICER TO HAVE THE INMATES LEAVE, AND I CLOSED THE WINDOW.

(CONTINUED)

3/26/02
_____
Date

_____
Signature

_____
Date

_____
Signature

Note: This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

184

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

THE MEDICATION LINE OPENED AT 1100 AM AND CLOSED AT 1230 PM. NURSE CHAPMAN AND I WERE IN CHARGE OF THAT LINE. FROM 1130 UNTIL ALMOST 1200, THERE HAD BEEN NO (0) INMATES AT THE WINDOWS. AND WE HAD SEEN ALMOST 60 (SIXTY) INMATES AT THAT TIME. AT APPX 1200 THERE WAS A GROUP OF INMATES THAT CAME DOWN, AND OVER THE COURSE OF THE NEXT 15 MINUTES, WE WERE "BUSY." AT APPX 1215, THE LAST INMATE LEFT AND WE DID NOT HAVE ANOTHER INMATE SHOW UP 1230. AT THAT POINT WE DECIDED TO CLOSE THE WINDOWS AND HAD THE OFFICER TERMINATE THE LINE. I DO NOT RECALL THE EXACT COUNT, BUT IT WAS CLOSE TO WHAT IS SEEN EVERY DAY. (CONTINUED)

_____3/26/02_____     _____
Date               Signature

_____     _____
Date               Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

28 4

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official
Commonwealth business and will be considered for all purposes, including actions
under the Statutes of this Commonwealth, just as though it had been sworn or affirmed
before a court of law of formal arbitration panel.

AS STATED ON PG.#1 OF THIS STATEMENT, IT WAS 5-10 MINUTES LATER

THAT 1(ONE) INMATE ARRIVED AT THE WINDOW, AND A FEW MINUTES LATER 2(TWO)

MORE ARRIVED.

I FINNISHED SIGNING OFF MY MEDICATIONS (NARCOTICS) AND WENT OUT TO

THE NURSES STATION, NURSE ELDRED APPROACHED ME AND ASKED WHY THERE

WERE INMATES WAITING FOR MEDICATION. I EXPLAINED IT TO HER — AS STATED

BRIEFLY ABOVE — AND SHE TOLD ME THAT THE INMATES SAID THEIR UNIT

WAS CALLED LAST TO LUNCH AND THAT WAS WHY THEY WERE LATE. I EXPLAIN

HER THAT MEDICATION LINE HAD BEEN CLOSED FOR ALMOST 10 MINUTES BE

THEY ARRIVED AND THAT NONE OF THEM WERE ON MANDATORY OR "LIFE-SUSTA

| 3/26/01 | (CONTINUED) | _____ |
| Date | | Signature |

| _____ | | _____ |
| Date | | Signature |

**Note:** This form is to be completed and signed by the employee who is a witness to an
incident involving employees of the Commonwealth.  If the text is typed by someone
other than the employee giving the statement, it must be read and signed by the
employee.  In the event the statement is typed, the party typing the statement must sign
and date the document.

3 of 4

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

MEDICATIONS. SHE THEN DIRECTED ME TO OPEN THE MEDICATION LINE. I DID SO UNDER STATED PROTEST. OF THE 3 (THREE) INMATES I SERVED AT THE WINDOW, 2 (TWO) WERE ON NARCOTICS, AND THE OTHER ONE REFUSED HER MEDICATION BECAUSE I HAD CRUSHED IT AND PUT IT IN WATER — WHICH IS THE CURRENT POLICY FOR ALL MEDS —

UPON COMPLETION OF THAT DUTY, I NOTIFIED NURSE ELDRED OF THE ABOVE CIRCUMSTANCES, AND SHE GAVE A SHORT, DISBELIEVING LAUGH AND SAID SOMETHING TO THE EFFECT OF "UNBELIEVABLE."

THIS CONCLUDES MY STATEMENT ABOUT THIS INCIDENT.

_____3/26/12_____          _____
Date                                   Signature

_____          _____
Date                                   Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

4 of 4

*1 of 2*

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

On March 10 I worked with LPN Pierce. Prior to the no. 2 medline, he told me that he had recieved a call from someone in Security who questioned the duration of his medline the prior evening. He said "I know how to take care of this. When my integrity & character is on the line I'll do what I have to do." (He explained that he felt he was being accused of prepouring meds.) Prior to the medline he told the Cellhouse officer to call the housing units one at a time

_____4/2/02_____          _____Maree Eldred_____
        Date                          Signature

_____          _____
        Date                          Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.



*2 of 2*

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

*The officer complied and med line was called in the requested manner. We did not finish the line until approximately 2210.*

4/2/02
---
Date

*Marie Eldred*
---
Signature

_____
Date

_____
Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.