1 of 2

# COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

On March 20, I was working in the capa of team leader on the GAM - 2³⁰pm Shift I was returning from RHU to Alliance and when I entered the building there were approx 3 inmates in the hall. Who stated they were denied their meds by Lt Pierce. Initially I questioned LPN Pierce who said - "They don't need the meds there not life sustaining & will

___4/2/02___
Date

___Marco Elord___
Signature

_____
Date

_____
Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

2 of 2

## COMMONWEALTH EMPLOYEE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statutes of this Commonwealth, just as though it had been sworn or affirmed before a court of law of formal arbitration panel.

*do you draw the line? I croaked, with*
*the Gllance Officer & the unit & was*
*assured that the unit bt went to lunc*
*late & therefore arrived at Medline*
*after Nurse Pierce announced that*
*medline was over. At a minimum*
*3 times he refused to open the windo*
*and each time I told him he had to do*
*He finally complied. One of the 3 men*
*was on an anti Epileptic life-susta*
*med. 4/2/02*                                   *Maree Eldos*

_____                    _____
Date                                            Signature

_____                    _____
Date                                            Signature

**Note:** This form is to be completed and signed by the employee who is a witness to an incident involving employees of the Commonwealth. If the text is typed by someone other than the employee giving the statement, it must be read and signed by the employee. In the event the statement is typed, the party typing the statement must sign and date the document.

B.   Officers shall maintain a thorough knowledge of all Department and
     Institution directives, policies, rule and regulations, and ensure
     compliance thereof.  It is the duty of the officer to report any non-
     compliance to their supervisor.

C.   It is the officer's responsibility and duty to seek supervisory direction for
     clarification when doubt exists concerning procedures, situations,
     incidents, rules, regulations, directives or orders received,  This is not to
     impair however, the need for flexibility in the decision making process.
     Chain of Command will be used at all times when concerns arise outside
     specific situations.

D.   One of the most important functions of this post is public relations.

     The Corrections Officers assigned to this post must at all times maintain a
     neat well groomed appearance and adhere to the "Standards of Courtesy
     and Grooming for uniformed Personnel" in accordance with Administrative
     Directives.  All people encountered are to be treated with dignity and
     respect.  Maintain a professional rapport with supervisors, peers, other
     staff, inmates, visitors and public officials.  Never refer to anyone,
     including inmates in a derogatory or negative tone.  Receive and carry out
     orders in a professional manner.  Courtesy, professional demeanor and
     appearance must be maintained at all times.

     Remember, you are a representative of your fellow corrections officers,
     the institution, the Department of Corrections and finally the
     Commonwealth of Pennsylvania.

E.   Officers shall use reasonable judgment, tact, and careful attention to
     detail in the execution of duties, whether referenced in the Post Order or
     not.

F.   Officers shall be accountable and responsible for their actions, or the lack
     thereof, in the performance of their duties.

G.   Officers shall, upon assignment or rotation to a new post, read, sign and
     fully comply with all post orders.  Compliance shall be verified by the Shift
     Commander through periodic review and initialization of all post order
     sign-off sheets.

H.   Officers shall be familiar with the procedures of the institutional
     emergency plans.

I.   Officers shall ensure that any and all 'Confidential" material will not be
     viewed by an inmate or visitor.

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
4/12/02

SUBJECT:      FACT-FINDING SESSION with Brian Pierce, LPN
DATE:         April 11, 2002
TIME:         1450 hrs
LOCATION:     Medical: CHCA, Nancy Giroux's Office

TO:       Deputy Good
          Deputy for Centralized Services

This afternoon, April 11, 2002, at 1450 hrs a fact-finding session took place in Nancy Giroux's office. Present were Brian Pierce, LPN, Nancy Giroux, CHCA, Sharalee Raun, Union Representation, Robin Weidner, CT II (recorder).

Ms. Giroux stated Ms. Raun's presence was to assure that Mr. Pierce's rights were adhered to. She also went on to state this is an official fact-finding and the topic we are to discuss is not to be discussed out of this office, and if you do discuss this you are in violation of the code of ethics.

The topic of this discussion was DOC Medication Room Procedure. Brian was asked if he knows the policy on medications, and where the policy is kept. He stated, "yes I have one in my mailbox, there is one in the medication room and probably at the nurses station."

Brian was then asked some simple questions about the medication policy. Do you check inmate identifications when they come to the medication window. Brian stated, "generally so, yes." After you check their I.D.'s do you check the MAR's, he stated, "yes always." Are you crushing and putting psych medications in water, he stated, "generally so, yes." So this past week you have been crushing and putting all psych medications in water, he stated, "generally so, yes, same as what his counter parts do." He stated that there was some confusion as what Dr. Lindenmuth has been writing on the prescription and what the policy states concerning crushing of psych medications. Nancy clarified physicians can write do not crush even though this is against DOC policy and that Dr. Lindenmuth has written a minimal amount of orders regarding this. Nancy again asked Brian, are you crushing and putting psych medications in water, he stated a "good portion, 75% to 80% of the time." I always place in water and stir." Nancy asked him if he understands the policy on pre-pouring of medications, he stated, "yes." She then asked him if he pre-pours medications, he stated, "no I'm not pre-pouring." She then ask him to define pre-pouring medications, he stated, "pre-pouring is before the inmate is in line and I have checked their I.D.'s." Nancy again asked Brian, by this definition of pre-pouring medications, are you pre-pouring medications, he stated, "yes equally to my counter parts." Are you leaving the medication room after you have pre-poured these medications, "no I never leave the medication room." Do you understand the policy on stock medications, "yes." Are you

borrowing medications from other inmates, "yes." Do you use stock medications, "yes." If stock medications are not available are you borrowing from inmates medications, "yes as equally as my counter parts are doing." He also stated, "I borrow from other inmates medications because this breeds all new paper work if we don't have the inmates medications, its easier to just borrow." Do you feel this causes problems, "yes it shorts inmates their medications, we are always short a vast amount of medications." Brian are you punching out individual stock cards and putting them into cups, "no just CTM, Benadryl 75mg: What about stock cards of CTM 12mg stain release, are they punched and put into cups, "yes just like my counter parts are doing." Do you also punch cards and put Benadryl 50mg in cups, "yes just like I told you earlier about the 25mg." He clarified and stated, "if the meds come in stock bottles we do, if in blister packs then no."

The topic of the next discussion was RHU policy. Do you know and understand the policy on taking medications to the RHU, "yes." Brian please tell me what happened the night of April 5, 2002 when you went to the RHU. "I pulled the inmates names and PRN medications out of the RHU book, checked to see who was due medications. I pre-poured medications in cups in the medications room, 3 cups, 3 separate cups taken, no book, about 6 pills were taken to RHU to be dispensed. When I got to the RHU an inmate asked about their MOM, why they weren't getting it when they received it the night before. I told her I'd check and get back to the officer if she was due the medication, all this was said in the presents of the RHU Officer, C.O. Kidd. The inmate seemed to understand what I told her. I was then called by an inmate from the opposite end of the RHU, as I was at the other end I overheard the inmate who asked about the medication and C.O. Kidd discussing what I had said. When I returned to the medical department, R.N. Zuber had been in the medication room, took the RHU medication bag out of the medication room and set it by the copier. Then R.N. Zuber left the area. While R.N. Zuber was gone I checked the RHU inmates record to see if they were to receive the medication, she was not to get that medication every night, just every third night. The inmates statement of receiving this medication the night before was correct. I then called C.O. Kidd and told her this inmate was not due that medication, C.O. Kidd said she would tell the inmate. Then R.N. Zuber returned and stated he had talked to C.O. Kidd and, "best to give it to avoid a problem then not give it." I stated, "the book said every 3rd night and she wasn't due the medication tonight. R.N. Zuber stated he gave the inmate some the previous night, opened the medication book and initialed the book that it was given the previous night by him. I then called C.O. Kidd back and asked why she called another nurse to bring this medication over when I told you I'd take care of it. She had no response. I then asked a second question, why did you do a end around, go around me, the C.O. had no response. I then asked a third question that resembled the first two I asked, the C.O. still had no response. I stated to the C.O. that I did not appreciate her letting the inmate split staff, the C.O. stated that's not what she did, I said yes you did, the C.O. stated she wasn't going to get into it with me. The C.O. then stated she had to call the Lt. I said good tell the Lt. I'd like to talk to him also. Then during medication line Lt. Raun came and said to call him back after medication line. I called him and explained everything that had happened and that the only time this officer has a problem with me is when I don't bring the black bag, book and meds. When I take just the cups then the officer has a problem. Lt. Raun had no



response. Nancy stated to Brian that on the 11th of March we had a problem similar to this and discussed this in length, and you were to take the bag, MAR's and book when you take medications to RHU. Brian stated he didn't recall the discussion on the 11th. Nancy said she took notes and Brian said he was under a lot of stress and emotions maybe that's why he can't clarify on this issue.

The next topic of discussion was about medication room count that was wrong on April 1, 2002. Brian explains, "on April 1, 2002 inmate Houck came to the window and he gave her 2 Xanax from a brand new card that had 28. He stated inmate Houck always watches him very closely and he knows he gave her 2 but he didn't know what happened to the card. When we did the count, I was doing the meds and Nurse Winkler was doing the book. I said 28 for Houck's and she did not say there was a discrepancy. When we completed the count there was not a discrepancy and we both signed the book. Why did they not tell us that the count was wrong until 6:00am? When I left the count was correct." Nancy stated what are insinuating. Brian stated, "someone disposed of the card of 28 tablets." Nancy said, are you saying that possibly someone disposed of the 28 tablets? Brian stated, "I feel there was no error in count, the card counts were okay, we both signed the book, the problem with count should have been caught at the time 10-6 shift."

The next topic of discussion was a discussion Brain had on April 9, 2002 with inmates about the RSAT program. Brian on April 9, 2002 did you have a discussion with inmates about the RSAT program? "Yes, about a bunch of topics." Did you tell the inmates you were going to quit and become a counselor? "Yes, after the inmates asked what was wrong that I hadn't been myself lately. I told them I was really stressed out and had a lot of health problems from this place and that I was looking for another job, I had also told staff I was looking. You know there are no secrets in jail." What about your conversation concerning the RSAT program, and did you state RSAT program was set up for inmates to fail so they can return to jail? "I spoke about programs in general, I didn't mention RSAT the inmates brought up that issue, and no I didn't say that. The inmates brought up the subject of RSAT and really no specific program in general. I told the inmates I was seeking a job as counselor but not at this institution. It will probably be 1-2 years at length prior to leaving. They expressed sorrow at my leaving because I am the only one who cares. They also said I would make a good counselor. I can better help them, better equip them and give them the tools to succeed in life." Brian then commented about the programming, "It was a joke. I have been told it was a joke by the inmates." Nancy said, Brian are you saying that you told the inmates the programming was a joke? Brian said, "I was commentating on the highlights of the conversation. That's a negative reference. I was engaging the inmates in a conversation which is a commonly held belief by the inmates and then we transition that into a conversation about RSAT . I spoke to Nurse Pietrzak and Nurse Zuber about problems in the RSAT program only. Its evidence from the recidivism rate, this is generally based on my conversation with Nurse Pietrzak. We talked about a lot of different programs and how I wanted to be a counselor to teach them the skills they need so they don't make more mistakes on the outside." Brian then went on to say he had a conversation with Nurse Zuber, Nurse Pietrzak, and Nurse Heffern about the subject of RSAT not giving inmates the correct tools necessary to succeed in society. He said Nurse Pietrzak used inmate

Morales as an example of recent RSAT graduate returning to jail after 4 months. "We all had a good laugh." Did Nurse Pietrzak tell inmates this, "no. Nancy asked Brian when did the conversation with the inmates take place, was it before or after his conversation with staff? "I had my conversation with the inmates before the conversation with the nurses." Do you feel this conversation with the inmates was appropriate, he repeated, "I simply told them what I was told them what I've been told its simply just one hoop to parole. In talking with the inmates it's a commonly held belief that has been spoken to me by inmates." Nancy said, do you see the different between inmates having a conversation with inmates and a staff member having a conversation with inmates, Brian response was, "the truth is the truth." Did you make the statement that DOC programming is for inmates not to succeed, "No just to the nurses." He couldn't recall the whole conversation with the inmates because they talked about many subjects. "I did tell them I want to leave but not yet." He also stated that the inmates expressed sorrow to hear he is leaving, they said he is the only one that cares.

Nancy reminded everyone this conversation is not to be taken out of this office and if you speak to anyone about this conversation you are in violation of the code of ethics. Brian went on to say, "my counter parts are crushing meds on a routine basis," Nancy asked for names and he refused. Prior to making a decision all his counter parts will be called in and asked the same questions. Due to this fact-finding he is to be removed from the medication room for 30 days. Brian asked about weekend, Nancy stated according to institutional needs he may need to work in the medication room. He also stated, "after my counter parts have been questioned I will provide you with a list of those that are violating the policy, I won't lie."

Nancy Giroux, CHCA – *Interviewer*    Date 4/15/02

Robin L. Weidner, Clerk Typist II – *Recorder*    Date 4/15/02

EXHIBIT 6

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 12, 2002

**SUBJECT:** Brian Pierce LPN
Fact finding 4/11/02 at 1415

**TO:** Nancy Wirth
Human Resource Director

**FROM:** Nancy A Giroux
Correctional Health
Care Administrator

It was brought to my attention by fellow co-workers that over the last two weeks Mr. Pierce is not following medication room procedures and his behavior has been inappropriate. Y. McGuire, C. Heffern, T. Zuber, S. Cooper, and S. Pietrzak have provided statements (attached) to substantiate these complaints.

Overall synopses of these complaints are:
- Pre-pouring medication prior to the med line starting
- Leaving the pre-poured medications unattended prior to the med line
- Not crushing psychiatric medications nor placing them in water
- Borrowing medication from other inmates instead of utilizing stock meds
- Not signing out stock medications
- Not checking inmate ID's during the med line
- Not following procedures regarding dispensing of medication in the RHU
- Inappropriate conversations with inmates regarding DOC programming
- And informing inmates that he is "in a bit of trouble" and leaving
- Providing misinformation to LT regarding med room procedures and supervisors expectations.

During the fact finding with Mr. Pierce we covered many areas of concern. Mr. Pierce was asked if he is aware of the medication room procedures and where it is located. He stated he was and that there was a copy in the med room and one in his mailbox. Mr. Pierce stated that he "generally checks ID's and "always checks the MAR's. He also stated that he is crushing at least 75-80% of all psych meds and places them in water. He states that he is not pre-pouring medications and that he does not leave the medication unattended. He states that he is utilizing the stock medication and signs out the stock meds. He admits to borrowing medications from other inmates on a regular basis and then clarifies that he borrows only when not available in stock and it's a medication the inmate requires. He also admits to placing medication (Benadryl and CTM) in individual cups but clarifies that it is from the stock bottles not from the blister

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

packs. Mr. Pierce states that his counterparts all do the same thing, he does not do it any more frequently then they do. Mr. Pierce was questioned about the RHU practice of how medication is dispensed to the inmates in the RHU and in particular the incident that occurred on 4/7/02. Mr. Pierce stated that he did deliver the medication to the RHU in cups in his pocket and he did not have the MAR or the RHU bag. He stated that he now knows what is expected of him after our conversation on Monday (4/8/02) but states he must have been confused about this issue prior to that. When I questioned him about the conversation we had on 3/11/02 regarding this issue, he stated he didn't remember having a conversation with me and then later stated that we talked about so many different things that he couldn't remember what we talked about. Mr. Pierce verbalized throughout the conversation that he understood the procedures regarding checking inmates ID's, crushing psych meds, borrowing medications and the usage of stock medications. Again Mr. Pierce stated that all his counterparts do the same thing that he does and if "they were honest they would tell you". Requested that Mr. Pierce provide me with the names of staff members that were violating med room procedures and he stated that he would not do that. At the end of the conversation he stated that he would provide me with the names if the nurses are not honest and tell me myself. "Call me in after you speak with them".

I also discussed with Mr. Pierce the issue of count being off on 4/1/02. The narcotic sheet read that we had 28 tablets of xanax 1mg and the blister pack contained 29. When count had been completed on the 2-10 shift the discrepancy was not picked up and was not discovered until the 600-hour count. Refer to the EO's attached. Mr. Pierce's explanation was that the count was correct at 2200 hrs and that he distinctly remembers giving inmate Houck two tablets. Therefore "someone disposed of the whole card of 28 xanax. I repeated his accusations and he stated count was correct at 2200 and was off at 600. Winkler didn't state that the count was incorrect at 2200 hrs so it wasn't. Again I asked are you insinuating that someone, meaning Winkler took a whole card of a narcotic? Pierce stated, it was a full card and I punched out two tablets that left 28 tablets. At 600 hrs the card had 29 tablets.

We then discussed his conversation with the inmates regarding the DOC programs and in particular the RSAT program. Mr. Pierce states that he did talk to the inmates about the programming. The conversation started out about the inmates questioning him about leaving and that he acknowledges that he is leaving within the next year or two. That he is looking for a counseling job within the DOC because he believes that he can provide the inmates with the skills needed to succeed out in the world. Mr. Pierce states that the inmates expressed sorrow over his leaving and that they told him he is the only one who cares. He talked about being able to better help them, equip them, and provide them with the tools to succeed. The inmates were commenting about programming and he stated, "It was a joke". When questioned about this Mr. Pierce stated that the inmates tell him it's a joke. I questioned Mr. Pierce about the differences between one inmate talking to another and a staff member talking to an inmate. Don't you think that

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime

Brian Pierce Fact finding 4/11/02
Page three
Continued

the inmates will place more weight on a statement made by a staff member? Pierce's response -"Truth is truth". "I was only telling them what the inmates have been telling me".

The majority of the nurses who dispensed medication in the med room were called into this office one at a time and informed that it was an official investigation and a breach in the code of ethics if they discussed this with other staff members. They were all asked the same questions pertaining to medication room policy and procedures and their interpretation of the policies. The last questioned asked was if they were aware of any nurse violating these procedures, if so who and how? All response from the 2-10 shift were that Mr. Pierce was violating multiple procedures in the med room, on 6-2 Ms McGuire stated Pierce and Ms Coopers statement collaborates this premise also.

Conclusion

There is a medication room procedure book housed in the med room, multiple memos posted in the med room, signs posted outside the med room windows and all staff questioned have been able to voice what the departments and /or SCI CBS expectations regarding procedures in the med room. Mr. Pierce was able to verbalize when questioned the proper procedures required regarding inmates ID's, psych meds, stock meds, borrowing medications and pre-pouring medications. He states he was confused on the issue of the delivery of RHU medications and stated that he doesn't agree with our interpretation of pre-pouring but was able to state clearly what our expectations were.

The collections of statements from other staff members who have been working in the med room with Mr. Pierce clearly show that Mr. Pierce is not following medication room procedures. He has consistently over the last several weeks not checked the inmates ID's, is not crushing the psych medications nor placing them in water. He is not utilizing the stock supply of medications and instead is borrowing medications from other inmate's blister packs. This is creating problems when we attempt to re-order the inmates medications that have been borrowed due to it being an early refill. He is taking blister pack cards of stock medications and punching them out into cups i.e. CTM and Benadryl 50mg both, which are prescription medications. He is not signing the medications out and the stock inventory sheet is disappearing. It has been witnessed that he is pre-pouring inmates medications prior to the med line opening and then dispensing them. It has also been witnessed that he pre-poured the medications and then left the area, that goes against his theory or definition of pre-pouring medications. He was spoken to on 3/11/02 when he had dispensed medications to the RHU inappropriately and the proper procedures were reviewed with him. Therefore I do not believe that Mr. Pierce was "confused" regarding our expectations and procedures for the delivery of RHU medications. Several witnesses have written statements regarding Mr. Pierce's conversations with the inmates and have found them to be inappropriate.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

Brian Pierce Fact Finding 4/11/02
Page four
Continued

Ms Heffern witnessed the conversation between Mr. Pierce and the inmates out in the hallway on 4/5/02 and Mr. Pierce recounted his conversation with the inmates to Mr. Zuber, Ms Pietrzak and Ms Heffern later that evening. The statements demonstrate that Mr. Pierce was promoting himself and indicating that the programs and the RSAT program were a joke and designed to set the inmates up for failure.

Mr. Pierce avoided all responsibility regarding the incident with the count being incorrect. All information points to the fact that that the count was incorrect at 2200 hrs and that Mr. Pierce dispensed one tablet instead of two as ordered. Ms Winkler should have noted the error during count at 2200 hrs but did not for whatever reason. Ms Winkler states that count was a little confusing because Mr. Pierce was signing out some of his narcotics that he dispensed that evening during count. Mr. Pierce indicates that he believes that another staff member took a whole card of the xanax and disposed of it, which in his opinion accounts for the narcotic count being off. His scenario doesn't make any sense and the allegations he is making are extremely serious. I researched the narcotic issue personally and had Ms Cooper RNII research the issue independently to confirm my findings. Our conclusion is that the xanax is accounted for and that there are no medications missing, never mind a whole card. See the attached copies of the narcotic sheets and the copy of the blister pack which states the date the medication was filled by the pharmacy and how many tablets they sent. Also attached is Ms Cooper's statement confirming these findings.

These allegations constitute a violation of the code of ethics, specifically **Section B. Specific Rules and Regulations-Department of Corrections; section 9.** Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employee may question the wisdom of such an order. **Section 10;** Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professional at all times; unacceptable conduct or insolence will not be tolerated. **Section 14;** employees will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employee or an inmate, and will maintain reasonable familiarity with the provisions of this directives. And **section 29;** All employees shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedures in cases that may result in criminal prosecution will include those rights according to all citizens of the commonwealth.

NG/ng

CC    Superintendent Brooks
      Deputy Good
      Deputy Wilkes

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

# EXHIBIT Q



FREY A. BEARD, Ph. D
SECRETARY
TMENT OF CORRECTIONS

WILLIAM J. LOVE
DEPUTY SECRETARY
FOR
SPECIALIZED FACILITIES &
PROGRAMS

# COMMONWEALTH OF PENNSYLVANIA

## STATE CORRECTIONAL INSTITUTION

## AT CAMBRIDGE SPRINGS

*451 Fullerton Avenue*
*Cambridge Springs, PA 16403-1229*
*Telephone 814-398-5400*

April 17, 2002

MARILYN S. BROOKS
SUPERINTENDENT

Address All Replies
To Superintendent

Brian Pierce
313 Main Street
Cambridge Springs, PA 16403

Dear Mr. Pierce:                                         Employe#456590

This is to advise you that a Pre-Disciplinary Conference has been scheduled for Tuesday, April 23, 2002 at 2:00 pm in the Conference Room of Building One (Administration Building). At the Pre-Disciplinary Conference, you will be offered the opportunity to respond to reports of incidents that may have occurred while you were a Licensed Practical Nurse, Permanent Civil Service Status, with the Department of Corrections at the State Correctional Institution at Cambridge Springs. Allegations involve violation of the following sections of the Department of Corrections Code of Ethics:

Section A, General Responsibility of Department of Corrections Employees: Consistent with the responsibility of all correctional employes in the Commonwealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions, the following code is being promulgated.

Section B, #1: Specific Rules and Regulations – Department of Corrections: Each employe in the correctional system is expected to subscribe to the principle that something positive can be done for each inmate. This principle is to be applied without exception.

This involves an intelligent, humane and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated. Corporal punishment shall not be utilized under any circumstances.

Section B, #9: Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employe may question the wisdom of such order. The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil service appeal, or the grievance machinery.

Section B, #10: Employes are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

Section B, #14: Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

Section B, #29: All employes shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

Alleged incidents include reports of the following:

On March 9, 2002, medication line was completed early and you may have pre-poured certain medications in violation of policy. After being questioned by an officer on duty about whether you pre-poured medications on March 9, 2002, you decided to change procedure and called one unit at a time on March 10, 2002, thereby significantly delaying completion of medication line. On March 20, 2002, on the 0600 to 1400 shift, after the medication line was closed, three inmates arrived for their medication. The RN on duty (team leader) contacted the unit officer and was advised that the inmates were late returning from meal and reporting to medication line through no fault of their own. You nonetheless refused to open the medication window, even though one of the inmates was on an anti-epileptic life-sustaining medication, stating that "they came late, fault doesn't matter". You were ordered by the team leader three times to open the window before complying.

On April 1, 2002, there was an error in count on a card of Xanax. The narcotic sheet you completed and signed indicated that we had 28 tablets of Xanax 1mg and the blister pack contained 29. You signed that you had given the inmate 2 tablets, yet the card for that inmate was found to still have 29 tablets remaining. When questioned, you stated that someone disposed of the card with 28 tablets, and that when you left the card was correct.

On April 1, 2002 you ordered a 60-day supply of medication for an HIV inmate being paroled to a Community Corrections Center. This was done without required pre-release notification from the Records Department. It was reported that you stated to the inmate that you would "hook her up". Policy specifically indicates that a 30 day supply is issued to inmates being paroled. In addition, HIV medications are only ordered for 30 days regardless of their destination. You were also observed passing a note you had written to this inmate through the medication window, while speaking in hushed tones to her.

On April 5, 2002, it is reported that you went to the RHU without the medication bag and the Medication Administration Record. You also admitted when questioned that you pulled the inmates' names and PRN medications from the RHU book, checked to see who was due medications, and pre-poured medications into cups that you took in your pocket to the RHU. After the shift commander questioned you about the procedures for delivering medications to the RHU, you called the RHU officer and became confrontational and questioned her about this issue. The correct procedures for

PIERCE, BRIAN                                                                    PAGE 3

delivering medications to the RHU were specifically addressed with you on March 11, 2002.

On April 9, 2002, it was reported that you had a conversation in the hallway with inmates about the RSAT program and DOC programming in general, stating that the programming "was a joke". It was further reported that you made negative comments about the RSAT program to the inmates.

Several staff statements report that you have pre-poured medications prior to the start of medication line, and that you have walked away and left the medications unattended during the last three week period. You admitted to borrowing medications from other inmates' blister cards rather than using stock medication. It was also reported that you are not crushing psychiatric medications as required. This is in direct violation of our procedures as well as DOC policy 13.4.1.

You have the right to have Union Representation during this conference if you so choose. It will be your responsibility to arrange such representation with an AFSCME A-1 designated representative.

Based upon the information established during the conference appropriate action shall be initiated up to and including possible dismissal. If you elect not to attend this conference, a decision will be made based upon the facts at hand.

Sincerely,

Marilyn S. Brooks
Superintendent
For
Jeffrey A. Beard, Ph.D.
Secretary

MSB/NW

CC:  Deputy Wilkes
     Deputy Good
     BHR/Labor Relations Division
     Sharalee Raun, AFSCME

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 17, 2002

This is to acknowledge that I, Brian Pierce, have received a copy of my PDC
Notification dated 4/17/02.

_____
Employee Signature

_____
Date

"Our mission is to protect the public by confining persons committed to our custody in safe,
secure facilities, and to provide opportunities for inmates to acquire the skills and values
necessary to become productive law-abiding citizens; while respecting the rights of crime

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 30, 2002

SUBJECT:    Pre-Disciplinary Conference Synopsis
            Re: Brian Pierce

TO:         Marilyn S. Brooks
            Superintendent

FROM:       Nancy I. Wirth    *Nancy I. Wirth*
            Field Human Resource Officer

        Per your direction, a Pre-Disciplinary Conference was held on Licensed Practical Nurse Brian Pierce, on Tuesday April 23, 2002 regarding allegations that he violated several sections of the Department of Corrections Code of Ethics, including Section A, General Responsibility, Section B, Number 1, Number 9, Number 10, Number 14, and Number 29.  The Committee Members were Deputy Good and myself as chairperson. Lt. Bossard and CHCA Nancy Giroux co-presented as charges resulted from separate fact-findings. Zollie Rayner attended as AFSCME union representation.  Sheralee Raun, AFSCME Local Executive Board, was present to observe the procedure.  A copy of the notice of charges, the PDC notes, and the fact-findings including related documentation is attached.

        Lt. Bossard presented charges that on March 9, 2002, Mr. Pierce completed the medication line at 2025.  The area sergeant questioned the officer on duty in Building 3 about the early completion of the medication line, specifically about whether the medications had been pre-poured.  The officer then relayed to Mr. Pierce that the area sergeant had questioned if the medication had in fact been pre-poured.  The following day, Mr. Pierce was assigned to work with an RN, who was working overtime as the team leader, outside of her normal shift.  He advised the team leader that his integrity and character was on the line, and that he would do what he had to do.  He then told the Building 3 officer that he wanted one unit/floor at a time called, which was not a normal practice.  His actions delayed completion of the medication line to 2210 on March 10, 2002.  On March 20, 2002, after the medication line was closed, three inmates arrived for medication.  Mr. Pierce advised the inmates that medication line had closed.  The RN on duty as team leader called the unit officer and determined that the inmates were late reporting to medication line through no fault of their own, and at a minimum of three times directed Mr. Pierce to open the medication line window before he complied.  One of the inmates was believed to be on a life-sustaining, anti-epileptic medication.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

Brian Pierce                                                                                    Page 2

During the PDC, it was established that charges of violation of the Code of Ethics, Section A, General Responsibility, and Section B, Number 10, were substantiated. Regarding the March 9 and 10, 2002 incidents, Mr. Pierce acknowledged, and statements from staff support, that he was upset by security questioning his integrity and character by checking on the short duration of the medication line and questioning him about pre-pouring medications. When challenged by the CHCA that his procedures weren't normal operations and evidence that he did slow the line, he stated that it was the officer who decided to call the line one unit at a time, not him. Staff statements refute this and indicate that Mr. Pierce directed it be done this way. It is evident that he directed and chose to alter the operation of 4th medication line on March 10, 2002. Staff statements and events indicate he did so in a response to the security staffs' questioning of his procedures on March 9, 2002. Also, Mr. Pierce told the CHCA that had the officer who had challenged him on March 9 not been on duty on March 10, the line would have run as usual. This alone demonstrates his action was retaliatory. His actions were in clear violation of Section A, which requires Corrections employees to perform their duties with integrity and impartiality and Section B, Number 10. His actions were considered unprofessional and unacceptable conduct.

In reference to the incident on March 20, 2002, the Committee found evidence to substantiate charges that Mr. Pierce violated Section A, General Responsibility, and Section B, Number 1 and Number 9. The RN assigned as Team Leader on March 20, 2002 provided a statement verifying that three inmates were denied medication by Mr. Pierce and one of the inmates was on life-sustaining anti-epileptic medication. Mr. Pierce admitted, during a statement provided prior to the PDC, that he was surprised to see an inmate standing at the medication line window 5-10 minutes after medication line was closed. He stated that he explained to her that the medication line had closed, and instructed her to leave but she refused. During that time, two other inmates arrived wanting their medications, and he instructed the officer to have the inmates leave. He states that he was asked by the team leader why there were inmates waiting for medication, and that his response was that medication line had been closed for almost 10 minutes before they arrived, and that none of them were on mandatory or "life-sustaining" medications. He states that the team leader then directed him to open the medication line and that he did so under stated protest. During the PDC, Mr. Pierce responded when questioned, that he was "pretty sure" the anti-epileptic drug in question was not "life-sustaining". Although, it was later established that the drug in question was not considered "life-sustaining" for this inmate, it was a critical medication, and the fact remains that Mr. Pierce admitted he was not sure at the time, and it was not until a later date that he called the pharmacist to verify. Mr. Pierce claimed during the PDC that there was only one inmate when he refused to open the window. This was refuted by his own written statement. Mr. Pierce failed to perform his duties with integrity and impartiality, and failed to provide humane and impartial treatment to inmates. Further, Mr. Pierce did not comply with the first two direct orders to open the medication line and provide these inmates medication, until the supervisor persisted and gave a third direct

Brian Pierce                                                                                    Page 3

order. Mr. Pierce failed to follow lawful orders promptly, and had to be directed at minimum three times before complying.

Nancy Giroux, CHCA, presented charges relating to incidents occurring on and around April 1, 5, and 9, 2002.

On April 1, 2002, there was an error in count on a card of the narcotic drug Xanax. Mr. Pierce completed a narcotic sheet indicating that he had administered two tablets of Xanax to an inmate, and indicating that 28 tablets remained. During count at shift change at 2200, Mr. Pierce admittedly read the blister card, identified the number of meds at 28, and the oncoming staff member read the narcotic sheet, that Mr. Pierce had documented as 28. During count at 0600, the nurse on duty noted that there were actually 29 tablets in the blister pack. This was verified by the CHCA. The PDC Committee found statements substantiated that Mr. Pierce failed to accurately log the medication remaining in the blister pack, not only when initially recording the narcotic sheet, but again when performing count at shift change, and found his carelessness an indication that he is not performing his duties with integrity as required by Section A, General Responsibility of Corrections Employees. It should be noted that Mr. Pierce was given a one-day suspension on March 21, 2001 for medication count discrepancies, that occurred at SCI Albion, in violation of DOC Code of Ethics B-8, B-14, and B-22.

On April 1, 2002, Mr. Pierce ordered a 60-day supply of medication for an HIV inmate. This was done without required pre-release notification from the Records Department and was in conflict with policy that mandates a 30-day supply of HIV medication be provided. Staff statements indicate that Mr. Pierce was overheard telling the inmate that he would "hook her up" and observed passing a note to her while she was at the med line window. It was further stated that he was talking to her in "hushed tones". Mr. Pierce acknowledged during the PDC, that he had ordered the 60-day supply of medication and should have known that only a 30-day supply was allowed by policy. He states that this was an error, along with acknowledging he had acted on an inmate's word that she was leaving for a center, rather than checking for written notice of her release from inmate records per procedures. Staff discovered the error and the extra 30-day supply, which would have been a windfall to the inmate, and an approximate $1500 cost to the vendor, was returned to the pharmacy. During the PDC, Mr. Pierce denied doing this as a favor to the inmate and claimed it was an error. He admitted he may have passed the inmate a note, but states it was probably just information, i.e., a staff name for reference or something of that nature, which he claims he often does. He admits to making a statement that he would "hook her up" but only meant he would see she got her medications upon release. The staff member present at the time, who gave the statement regarding this, also includes that she advised Mr. Pierce, in the inmate's presence, that we were not to order medications until notified by inmate records of the inmate's release. Yet he still made the statement to the inmate that he would "hook her up", and still ordered the medications. He responded to

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime*

Brian Pierce                                                                    Page 4

questioning about speaking to the inmate in hushed tones, indicating that it was for
privacy about the inmates personal health concerns. The Committee found the
evidence substantiates violation of Section A, General Responsibility, as staff
statements document that, even though he had been advised by another nurse in the
inmate's presence that medications were not to be ordered until notified by inmate
records of the inmate's release, he proceeded to make the order and then told the
inmate he would "hook her up". His response that it was an error is disputed by the fact
that he was clearly told that the medications could not be ordered without release
notification. The HIV 30-day medication policy was clearly posted in the medication
room, yet Mr. Pierce proceeded to order a 60-day supply. The Committee members
believe his actions show clear disregard for established policy and indicate that he
allowed his personal feelings and opinions to compromise his integrity and impartiality.

On April 5, 2002, Mr. Pierce went to the RHU without the medication bag and the
Medication Administration Record (MAR) in violation of established policy/procedure. In
addition, charges were made that Mr. Pierce pre-poured medications prior to the start of
medication line, borrowed medications from other inmates' blister cards rather than
using stock medication or initiate reorder, when the need arose, and that he failed to
crush psychiatric medications as required, in violation of DOC Policy 13.4.1. During the
PDC, Mr. Pierce admitted he did not follow procedures for distribution of medication in
the RHU. He acknowledged he pre-poured the medications and then put them in cups
and carried them to the RHU. He claimed that he was confused about these
procedures. During the PDC, it was established that the procedure regarding RHU
medications was previously discussed with Mr. Pierce on August 28, 2001 and again on
March 11, 2002, and that he acknowledged to the CHCA that he understood and would
abide by the policy. Additionally, numerous statements from nursing staff indicate Mr.
Pierce both pre-poured medications at the start of medication line, then walked away
from them, and "borrowed" medications from other inmates' blister cards rather than
using stock medications according to policy/procedure. Staff statements also
substantiate that he has failed to crush psychiatric medications as required. During the
fact-finding, Mr. Pierce denied these allegations, stating that other staff members fail to
crush the medications, but a subsequent fact-finding proved to further substantiate the
initial reports that he was violating policy/procedure. The Committee found supporting
documentation in staff statements, as well as Mr. Pierce's admission regarding the RHU
medications, to substantiate violation of the DOC Code of Ethics, Section B, Number 10
and Number 14. Mr. Pierce failed to act in accordance with Policy with which he was
required to maintain familiarity, regarding medication room policy/procedure, and failed
to conduct himself properly and professionally, as established by staff statements that
indicate that he was aware of the violations, yet chose to disregard policy and
procedure.

On April 9, 2002, staff reported overhearing conversations between Mr. Pierce
and inmates in the hallway outside the medical treatment area, during which he made
negative comments regarding the Residential Substance Abuse Treatment (RSAT)

*"Our mission is to protect the public by confining persons committed to our custody in safe,
secure facilities, and to provide opportunities for inmates to acquire the skills and values
necessary to become productive law-abiding citizens; while respecting the rights of crime*

Brian Pierce                                                                    Page 5

program, in particular stating that "it was set up for them to fail, and so they would return", and the DOC programs "were a joke". During the PDC, Mr. Pierce responded that this "was taken out of context", and that it was actually a conversation he had with other staff, not inmates, and he was simply "critiquing" programs. Staff statements document that not only was the conversation with the inmates overheard, but that he admitted to having the conversation with the inmates during a subsequent conversation with two other staff. The Committee established his actions as further violation of Section B, Number 10, in that he failed to conduct himself properly and professionally and found his actions, particularly in front of inmates, unacceptable.

The Committee also established that Mr. Pierce violated Section B, Number 29, by failing to cooperate during a fact-finding. Mr. Pierce alleged during the fact-finding that other nurses were violating policies and procedures regarding pre-pouring medications, stock medications, and borrowing medications, but refused to provide names, stating that "I don't play that game". During the PDC, he again referred to other staff, and was given a direct order to provide the names, and has only now agreed to comply. Subsequently, these charges were found to be unsubstantiated.

It is the opinion of the PDC Committee that these violations represent a pervasive negative attitude toward any direction in which Mr. Pierce is in disagreement, and they are evidence of a pattern indicating he chooses to act independently, often without consideration for direction, procedure, or policy. Furthermore, the frequency and repetitiveness of these actions suggests he is unlikely to correct these behaviors.

Prior discipline for Mr. Pierce includes a one-day suspension on March 21, 2001 for an incident that occurred at SCI Albion prior to his transfer to SCI Cambridge Springs, for violation of B-8, B-14, and B-22 regarding medication count policy/procedure. He was issued a verbal reprimand on September 28, 2001, for violation of B-10, for unprofessional conduct, and a written reprimand for violation of B-10 on November 20, 2001 for failure to treat peers and supervisors with respect, and for conducting himself unprofessionally.

Enclosures
NW

CC:    Deputy Good

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime

# EXHIBIT R



JEFFREY A. BEARD, Ph. D
SECRETARY
DEPARTMENT OF CORRECTIONS

WILLIAM J. LOVE
DEPUTY SECRETARY
FOR
SPECIALIZED FACILITIES &
PROGRAMS

**COMMONWEALTH OF PENNSYLVANIA**

**STATE CORRECTIONAL INSTITUTION**

**AT CAMBRIDGE SPRINGS**

*451 Fullerton Avenue*
*Cambridge Springs, PA 16403-1229*
*Telephone 814-398-5400*

May 10, 2002

MARILYN S. BROOKS
SUPERINTENDENT

Address All Replies
To Superintendent

Brian Pierce
313 Main Street
Cambridge Springs, PA  16403

Dear Mr. Pierce:                                            Employe#456590

This is to advise you that effective May 13, 2002, you are terminated from your position as a Licensed Practical Nurse, Permanent Civil Service Status, with the Department of Corrections at the State Correctional Institution at Cambridge Springs.

A Pre-Disciplinary Conference was held on April 23, 2002, to offer you the opportunity to respond to charges of violation of the following sections of the Department of Corrections Code of Ethics:

> Section A, General Responsibility of Department of Corrections Employees: Consistent with the responsibility of all correctional employes in the Common-wealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions, the following code is being promulgated.

> Section B, #1:  Specific Rules and Regulations – Department of Corrections: Each employe in the correctional system is expected to subscribe to the principle that something positive can be done for each inmate.  This principle is to be applied without exception.

> This involves an intelligent, humane and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated.  Corporal punishment shall not be utilized under any circumstances.

> Section B, #9:  Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employe may question the wisdom of such order.  The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil service appeal, or the grievance machinery.

> Section B, #10:  Employes are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

PIERCE, BRIAN                                                                                          PAGE 2

Section B, #14:  Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

Section B, #29:  All employes shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully.  Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

The Pre-Disciplinary Committee substantiated violations of Sections A, General Responsibility, Section B, Number 1, Section B, Number 9, Section B, Number 10, Section B, Number 14, and Section B, Number 29.

It was established by the Pre-Disciplinary Committee, regarding incidents that occurred on March 9 and 10, 2002, that you directed and chose to alter the operation of the 4th medication line on March 10, 2002.  You acknowledged, and statements from staff support, that you were upset by security questioning your integrity and character by checking on the short duration of the medication line and questioning you about the pre-pouring of medications on March 9, 2002.  You admitted, during the fact-finding, that had the officer who had challenged you on March 9 not been on duty on March 10, the line would have run as usual. Your actions were clearly retaliatory and in violation of Section A, General Responsibility, and Section B, Number 10.  You failed to show impartiality and integrity in the performance of your duties, and your actions were unprofessional and unacceptable conduct.

The Pre-Disciplinary Committee also found evidence to substantiate charges that you violated Section A, General Responsibility, and Section B, Number 1 and 9. On March 20, 2002, you refused to open the medication line window to inmates who arrived after medication line had closed, though you had been advised, by the team leader, that one of the inmates was on a life-sustaining anti-epileptic medication.  You did not comply with the first two direct orders, and it was not until you were given a third direct order, that you opened the medication line window and provided the inmates their medications. It was further established that you had been informed that the inmates were late through no fault of their own.  During the PDC, you  stated that you were "pretty sure" that the anti-epileptic drug in question was not "life-sustaining".  Although it was later established that the drug was not considered "life-sustaining" for the inmate in question, it was a critical medication, and you admitted that you were not sure at the time.  It was not until a later date that you called the pharmacist to verify.  You failed to perform your duties with integrity and impartiality, failed to provide humane and impartial treatment to inmates, and failed to follow lawful orders promptly.

Regarding an incident that occurred on April 1, 2002, the Pre-Disciplinary Committee found statements and evidence provided by a review of the narcotics sheets and blister cards, substantiated that you failed to accurately log the medication remaining in a blister pack of narcotics.  This occurred not only when initially recording the narcotic sheet, but again when performing count at shift change. The Committee found that, by your carelessness, you failed to perform your duties with integrity as required by Section A, General Responsibility of Corrections Employees. You were previous issued a one-

PIERCE, BRIAN                                                                                    PAGE 3

day suspension on March 21, 2001 for medication count discrepancies, relating to an incident that occurred at SCI Albion prior to your transfer to SCI Cambridge Springs.

On April 1, 2002, you ordered a 60-day supply of HIV medications for an HIV inmate without required pre-release notification from the Records Department, in conflict with policy that mandates a 30-day supply of HIV medication be provided. You were overheard advising the inmate that you would "hook her up" and observed passing a note to her. During the PDC, you admitted to making this statement to the inmate, and ordering the 60-day supply, stating that you should have known that only a 30-day supply was allowed by policy. Your response that this was an error, and acknowledgment during the PDC that you had acted on the inmate's word that she was leaving for a center rather than checking for written notice of her release per procedures, does not excuse your actions. The Committee found the evidence substantiates violation of Section A, General Responsibility. Documentation indicates that you were advised in the inmate's presence that medications were not to be ordered until notification by Inmate Records of the release, yet you proceeded to order the 60-day supply. Your actions showed clear disregard for established policy and demonstrate that you allowed your personal feelings and opinions to compromise your integrity and impartiality.

On April 5, 2002, you violated established policy/procedure, when you went to the RHU without the medication bag and the Medication Administration Record (MAR). Proper procedure was discussed with you on August 28, 2001 and again on March 11, 2002, and you acknowledged your understanding to the Corrections Health Care Administrator. In addition, you were found to have pre-poured medications, borrowed medications from other inmates' blister cards, and you failed to crush psychiatric medications, as required by DOC Policy 13.4.1. Your actions were in violation of Section B, Number 10 and Number 14. You failed to act in accordance with policy with which you were required to maintain familiarity, regarding medication room policy/procedure, and failed to conduct yourself properly and professionally. Evidence presented in the form of staff statements verifies that you were aware of the violations, yet chose to disregard policy and procedure.

You also violated Section B, Number 10, by failing to conduct yourself properly and professionally during an incident that occurred on April 9, 2002. You engaged in a conversation with inmates, during which you made negative comments about the Residential Substance Abuse Treatment (RSAT) program. You commented that "it was set up for them to fail, and so they would return", and stated that the DOC programs "were a joke". Your actions, particularly in front of inmates, were unacceptable.

During the fact-finding regarding violations of medication policy and procedure, you alleged that other nurses were violating policy and procedure regarding pre-pouring medications, stock medications, and borrowing medications, but refused to provide names, stating "I don't play that game". During the PDC, you again referred to other staff and were given a direct order to provide names, and only then agreed to comply. Your failure to cooperate during the fact-finding was in violation of Section B, Number 29.

You were suspended on March 21, 2001 for an incident that occurred at SCI Albion prior to your transfer to SCI Cambridge Springs for violations of Code of Ethics sections B-8, B-14, and B-22 regarding medication count. You were issued a verbal reprimand on

PIERCE, BRIAN                                                              PAGE 4

September 28, 2001, for unprofessional conduct, and issued a written reprimand on November 20, 2001, for failure to treat peers and supervisors with respect, and unprofessional conduct.

Please return any state property including, but not limited to the following items: identification cards, keys, tools, equipment, books, reports, or uniforms to your supervisor before close of business on May 13, 2002.

Your Group Life Insurance Policy ends on your last day of work. Contact Prudential Life Insurance Customer Service at 1-800-893-7316 regarding continuation of life insurance on a self-paid basis.

The PA Employee Benefits Trust Fund will contact you directly concerning continuation of policies on a direct pay basis. You are to return your Prescription Drug Card to the Supplemental Benefits Division of the PEBTF, 150 South 43rd Street, Suite 3, Harrisburg, PA 17111-5700. After May 13, 2002, you are no longer permitted to use this or any other employee benefit. It will be necessary to contact the Regional State Employees' Retirement System at PO Box 01561, Seneca, Pennsylvania, 16346 regarding your retirement account. You will be paid by supplemental check for any accrued, unused leave balances.

Your appeal rights in this matter under the Civil Service Act are explained in the instructions and information section on the attached Civil Service Appeal Form, (SCSC-4112).

Your rights in this Personnel Action are explained in the Grievance and Arbitration Section of the AFSCME Master Agreement.

A copy of this letter has been placed in your Official Personnel File.

Sincerely,

Marilyn S. Brooks
Superintendent
For
Jeffrey A. Beard, Ph.D.
Secretary
Department of Corrections

MSB/NW

cc:     Deputy Good, Deputy Wilkes, N. Wirth, HR Officer, BHR/Labor Relations, SCSC, AFSCME, Z. Rayner