# ATTACHMENT  C

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA
 2
                        -  -  -  -
 3
    BRIAN D. PIERCE,                )
 4                                  )
              Plaintiff,            )
 5                                  )
                 -vs-               )      Civil Action
 6                                  )      No. 03-173E
    PENNSYLVANIA DEPARTMENT         )
 7  OF CORRECTIONS,                 )
                                    )
 8            Defendant.            )

 9
                        -  -  -  -
10
              DEPOSITION OF:  NANCY GIROUX
11
                        -  -  -  -
12

13            DATE:     January 20, 2005
                        Thursday, 1:05 p.m.
14

15            LOCATION:  Law Offices of Neal Sanders
                         1924 North Main Street Ext.
16                       Butler, PA 16001
                         724-282-7771
17

18            TAKEN BY:  Plaintiff

19

20            REPORTED BY:  Toni Rennebeck, RPR
                            Notary Public
21                          NMR Reference No. 30738

22

23
                    CERTIFIED COPY
24

25
```

1           DEPOSITION OF NANCY GIROUX,
    a witness, called by the Plaintiff for examination,
2   in accordance with the Federal Rules of Civil
    Procedure, taken by and before Toni Rennebeck, RPR, a
3   Court Reporter and Notary Public in and for the
    Commonwealth of Pennsylvania, at the Law Offices of
4   Neal A. Sanders, 1924 North Main Street Extension,
    Butler, Pennsylvania, on Thursday, January 20, 2005,
5   commencing at 1:05 p.m.

6                        - - - -

7

    APPEARANCES:
8
          FOR THE PLAINTIFF:
9   Neal A. Sanders, Esq.
    LAW OFFICES OF NEAL A. SANDERS
10  1924 North Main Street Extension
    Butler, PA 16001
11  74-282-7771

12
          FOR THE DEFENDANT:
13  Thomas G. Eddy, Esq.
    Senior Deputy Attorney General
14  Office of Attorney General
    Commonwealth of Pennsylvania
15  Litigation Section
    6th Floor, Manor Complex
16  564 Forbes Avenue
    Pittsburgh, PA 15219
17  412-565-3578

18

19

20

21

22

23

24

25

1                          - - - -

2                       NANCY GIROUX,

3                  being first duly sworn,

4             was examined and testified as follows:

5                          - - - -

6                       EXAMINATION

7                          - - - -

8    BY MR. SANDERS:

9    Q.    Would you state your full name for the record.

10   A.    Nancy Ann Giroux.

11   Q.    Ms. Giroux, that is G-I-R-O-U-X?

12   A.    Yes; that's correct.

13   Q.    My name is Neal Sanders and I'm an attorney here

14         in the Commonwealth of Pennsylvania.  And in

15         particular we're here today in a civil case

16         involving Brian Pierce and the Pennsylvania

17         Department of Corrections and it is pending at

18         Civil Action No. 03-173 Erie.  And it's been

19         assigned to the Honorable Magistrate Judge Susan

20         Baxter and Federal District Judge Sean

21         McLaughlin.

22              I want to thank you for coming to my

23         office in Butler, Pennsylvania this afternoon

24         for your deposition.  You were not the first

25         witness to be deposed this afternoon but we're

1   Q.   A male LPN that had worked at SCI Cambridge

2        Springs from January of '01 until May of '02.

3        Does that refresh your recollection?

4   A.   Yes.

5   Q.   Now, do you recall the vacancy that he filled in

6        January of '01?  The name of the employee who

7        had left SCI Cambridge Springs where Brian then

8        filled that position when he came over from

9        Albion?

10               Does Peggy Sue Haight --

11  A.   I was going to say would that be Peggy Haight?

12  Q.   Okay.  Do you remember Peggy Haight?

13  A.   Yes.

14  Q.   Now, was Peggy Haight an LPN?

15  A.   Yes.

16  Q.   And would you agree with me that she quit or

17       resigned as opposed to being terminated?

18  A.   Yes.

19  Q.   Now, I'm going to throw some names out at you

20       and see if you can recall any of these people.

21       You mentioned you knew Judy Weyers.

22  A.   Uh-huh.

23  Q.   Is that one of those verbal yeses?

24  A.   Yes.

25  Q.   Okay.  Do you recall that Judy Weyers was a

1    Q.    Okay.  Now, other than Brian Pierce, can you

2          think of any other male RN or LPN that was

3          terminated under your watch at Cambridge?

4    A.    I believe that Brian Pierce is the only one

5          that's been terminated.

6    Q.    Okay.  At Cambridge Springs.

7    A.    Yes.  I'm sorry.

8    Q.    I imagine you've heard the name Michael White,

9          Dominic White's cousin, who was terminated at

10         Albion?

11   A.    Yes.

12   Q.    It went to jury trial in Erie in the year 2002?

13   A.    Yes.

14   Q.    How did you come to know about Michael White or

15         his case?

16   A.    Through Brian Pierce.

17   Q.    Is it possible that you also had a discussion

18         from time to time, or at least one time, with

19         Maxine Overton about the Michael White case?

20   A.    I don't recall any conversations with Maxine

21         Overton about that case in particular.

22              I believe that most of my information

23         that I did have, which was minimal, came from

24         Brian Pierce.

25   Q.    Okay.  Now, a name has come up in this case by

1          correctional officer at?

2     A.   I don't believe any institution.

3     Q.   Do you know why he might be listed as a

4          correctional officer for the state?

5     A.   No, I don't.

6     Q.   What became of Mr. Kelley that he's not employed

7          at Cambridge Springs any longer?

8     A.   He resigned, or retired I should say.  Retired.

9     Q.   He was a male individual; correct?

10    A.   Yes, sir.

11    Q.   Was he an RN or an LPN?

12    A.   He was an RN.

13    Q.   And you mentioned you knew about Michael White

14         you mentioned you thought through Brian Pierce;

15         is that correct?

16    A.   That's correct.

17    Q.   All right.  You knew Peggy Sue Haight.

18              Let's talk about Yvonne McGuire.  Is

19         Ms. McGuire employed at Cambridge any longer?

20    A.   Yes, she is.

21    Q.   What is her current position?

22    A.   An LPN.

23    Q.   When you were at Cambridge Springs and Brian

24         Pierce was working as an LPN from January of '01

25         to May of '02, did Yvonne McGuire's name ever

1      come up concerning anything that Brian Pierce

2      was being investigated for?

3  A.  Yes.

4  Q.  Can you give me the names of my female LPN's

5      that you know first-hand have been terminated

6      from SCI Cambridge Springs between June of 2000

7      and May of '02 as opposed to resigning?

8      Actually being terminated for cause?

9  A.  No.  We've had one person that resigned in lieu

10     of termination.

11 Q.  But in terms of actual terminations you have

12     none?  No females?  No female RN's, no female

13     LPN's that have been terminated for cause?

14 A.  No.  As I stated, Brian Pierce is the only one

15     that I know that was terminated, male or female.

16 Q.  You know from whatever your sources are that

17     Michael White was terminated.  He was a male LPN

18     or RN.  You know that; right?

19 A.  Correct.

20 Q.  Do you know of any other females that were

21     terminated from SCI Albion during the time that

22     you had interaction with the supervisors and

23     health care administrators at Albion?

24 A.  No.  I don't know either way.

25 Q.  Sandy -- if I don't pronounce it right you'll

26

1       become, what did you say, the superintendent?

2   A.  Yes.  May.  I believe it was May of 2004.

3   Q.  Do you know Millie Eldred?

4   A.  Yes.

5   Q.  Who's that?

6   A.  Elly Eldred.  She's an RN.

7   Q.  Is she still employed at SCI Cambridge Springs?

8   A.  No, she's not.

9   Q.  Is she employed at any SCI?

10  A.  She's -- well, I'm sorry, I take that back.  She

11      was just retired as an annuitant at SCI

12      Cambridge Springs.

13  Q.  In other words, she retired and was hired back?

14  A.  Yeah, on a temporary basis.  I believe it's 90

15      days.

16  Q.  Okay.  What month of what year did she leave

17      initially as a retiree?

18  A.  I believe that she retired in November of '04.

19      Or October of '04.  I'm not really quite sure.

20  Q.  When Peggy Sue Haight quit in 2000, how was it

21      that that vacancy was let to be known over to

22      the folks at Albion?

23  A.  It's posted statewide that we have a vacancy.

24  Q.  Were there any other individuals who had applied

25      for that vacancy other than Brian Pierce?

27

| 1 | A. | There was multiple. |
| 2 | Q. | Did you have anything to do or any contact with |
| 3 | | the SCI Albion people before Brian Pierce was |
| 4 | | approved for transfer about him coming over and |
| 5 | | what his background was? |
| 6 | A. | As far as a conversation? |
| 7 | Q. | Yes. |
| 8 | A. | Yes. |
| 9 | Q. | With whom would you have talked at SCI Albion? |
| 10 | A. | Maxine Overton. |
| 11 | Q. | Anyone else? |
| 12 | A. | No. |
| 13 | Q. | What do you recall Maxine Overton telling you |
| 14 | | about Brian Pierce? |
| 15 | A. | That he was a good nurse. |
| 16 | Q. | Did she tell you that he was under investigation |
| 17 | | for an alleged incident in 2000? |
| 18 | A. | No.  I didn't know about that until after he |
| 19 | | already came. |
| 20 | Q. | How did you find out about it after he came? |
| 21 | A. | Administration had set up a PDC, it's a |
| 22 | | predisciplinary conference, for him at our |
| 23 | | institution. |
| 24 | Q. | This Yvonne McGuire, do you know her to be |
| 25 | | involved as a union steward or a union rep from |

28

```
 1        time to time?

 2   A.   She is a union rep for AFSCME.

 3   Q.   And you're familiar with the fact that there was

 4        problems that were existing between Ms. McGuire

 5        and Mr. Pierce at SCI Cambridge Springs?

 6   A.   Yes, there was.  At times we would meet to

 7        resolve them.

 8   Q.   From what you know, was Ms. McGuire ever

 9        disciplined for any of the complaints that

10        Mr. Pierce had made about Ms. McGuire?

11   A.   What complaints?

12   Q.   Do you not know of any complaints that

13        Mr. Pierce made about Ms. McGuire in the way

14        that she was treating him when he came over from

15        SCI Albion in the first 30 to 60 days?

16   A.   I can't really.  I don't know.  I'd have to look

17        at the file on McGuire.

18   Q.   Isn't it true that you knew or came to know in

19        early '01 that Mr. Pierce was in and out of

20        Christine Massung's office repeatedly in

21        February of '01 concerning what he perceived as

22        problems that he was getting from Ms. McGuire

23        who was a union rep at the time?

24   A.   I believe that Yvonne McGuire and Mr. Pierce had

25        personality conflicts.
```

1  Q.  That wasn't my question.

2          My question was did you know about

3      the fact that Mr. Pierce was in and out of

4      Christine Massung's office in February of '01

5      concerning Ms. McGuire?

6  A.  Offhand I don't recall that.  I just recall my

7      dealings with Mr. Pierce and Ms. McGuire.

8  Q.  Do you know of any discipline that Ms. McGuire

9      has received, any written discipline that

10     Ms. McGuire has received since January of '01?

11 A.  Not without looking at a file.

12 Q.  Do you know whether she was ever suspended since

13     January of '01 to the present?

14 A.  No, she has not been suspended.

15 Q.  Do you know whether she's ever been the subject

16     of any kind of an investigation since January of

17     '01?

18 A.  Yes.

19 Q.  What were some of the issues that were being

20     investigated about Ms. McGuire?

21 A.  Since '01?

22 Q.  Since January of '01.  Since Brian came over to

23     you from SCI Albion.

24 A.  I believe that there was some comments that she

25     had made to another staff member and there was

1    an investigation on that.

2 Q.   What were the comments alleged to have been?

3 A.   She had made a comment to a staff member that

4      was calling off frequently that she didn't

5      appreciate -- and I don't remember -- I can't

6      quote her, but that she didn't appreciate all

7      the calls because the other LPN's were getting

8      stuck doing her overtime.

9 Q.   Anything else?

10 A.  There's an investigation now about several staff

11     members that had made inappropriate comments to

12     another staff member.

13 Q.  Was she one of them?

14 A.  She's one of them, yes.

15 Q.  Okay.

16 A.  And that investigation is ongoing.

17 Q.  Were any of those other individuals being

18     investigated female?

19 A.  Can you clarify?

20 Q.  Is Yvonne McGuire female?

21 A.  Yes.

22 Q.  Are any of the other individuals under

23     investigation currently now, along with

24     Ms. McGuire, female?

25 A.  Yes.

1        to mention her name, Nancy, but this inmate is a

2        female; correct?

3    A.  Correct.

4    Q.  And the fact that this is addressed to you and

5        ended up in Mr. Pierce's personnel file, would

6        that indicate that this would have come across

7        your desk or to your attention at some point in

8        time after it was directed to you?

9    A.  Yes.

10   Q.  Do you have an independent recollection of

11       interviewing Yvonne McGuire with regards to

12       this?

13   A.  To be honest, I don't.  Either way I don't

14       remember.

15   Q.  Do you have an independent recollection after

16       reading it, as you sit here today, of having

17       done anything after you got this?

18   A.  With this one, no, not in particular.  I'd like

19       to state that when these did come across my desk

20       I looked into all of them.

21   Q.  But you don't have any independent recollection

22       as you sit here today --

23   A.  No.

24   Q.  -- as to what, if anything, you did?

25   A.  No, I do not.

1              (The witness reviewed the document.)

2                       - - - -

3    A.    I'm reading it.

4    BY MR. SANDERS:

5    Q.    Take your time.

6    A.    It should not be on here.

7    Q.    Okay.  But there's no mention of his name not

8          withstanding; is that correct?

9    A.    Correct.

10   Q.    And your recollection as you sit here today is

11         that you did not issue any type of verbal

12         warning or any kind of reprimand to

13         Ms. Pietrzak, only to Mr. Pierce?

14   A.    No, Ms. Pietrzak received a written reprimand as

15         well.

16   Q.    Have you issued anymore than that one to her in

17         the time that she's worked for you?

18   A.    Yes.

19   Q.    And is she still employed with you?

20   A.    No, she's not.

21   Q.    I think you mentioned earlier she's since left

22         for disability?

23   A.    Correct.

24   Q.    Did you ever recommend prior to her leaving for

25         disability, did you ever recommend to anyone

41

1    senior to you at SCI Cambridge, or at Camp Hill,

2    or any other location in the system for the

3    Department of Corrections any stiffer penalty

4    for Ms. Pietrzak other than a written warning or

5    written reprimand?  In other words, a

6    termination or a suspension?

7    A.   Ms. Pietrzak was facing a PDC prior to her going

8    on disability.

9    Q.   Was the PDC something that involved conduct at

10   SCI Cambridge Springs?

11   A.   Yes, it does.  The particulars I really don't

12   remember at this point in time, but I'd have to

13   go back and look at her file.  But, yes, I

14   remember that it was a PDC that she was facing

15   prior to her resigning.

16   Q.   But she wasn't -- again this is the one we

17   talked about earlier.  She did not get

18   terminated.

19   A.   No.  She had been off for several months I

20   believe on disability prior to retiring.

21   Q.   Do you know any other female professionals, RN's

22   or LPN's, facing termination that left on a

23   disability other than her since you've been at

24   SCI Cambridge Springs?

25   A.   No, I don't think so.

1          Mrs. Purvis?  Is that what you said,

2          Mrs. Purvis?

3    A.    Who's Mrs. Purvis?  No, I don't know --

4    Q.    Who was it?  Mrs. Verga you said?

5    A.    Mrs. Verga.  There's a gentleman by the name of

6          Mr. Verga who is an RN II at Albion.  His wife

7          worked at our institution for a short period of

8          time.

9    Q.    Okay.  Do you remember her first name?

10   A.    No, I don't.

11   Q.    So the individuals on this report of incident on

12         June 15 of '00 that you are familiar with would

13         be Ms. Weyers, Mr. Pierce, Mr. Verga; correct?

14   A.    Correct.  Again I may have met other ones but I

15         wouldn't recognize their names when I did their

16         management review.

17   Q.    Is it possible you did a management review for

18         Michael White?

19   A.    No.  A management review is when you sit down in

20         a room and you review all of the medical charts

21         from that area.  Each staff member would have to

22         go to another institution to do a management

23         review.

24   Q.    So you've gone to Albion to do that?

25   A.    I went once, yes.

1  A.  They had had some problems.

2  Q.  Can you think of the name of any male union

3      stewards at that time?  April of 2002.

4  A.  I know.  I'm thinking.

5  Q.  Oh, I'm sorry.

6  A.  I know that the head was a gentleman by the name

7      of Mr. Zolie.

8  Q.  Is it your testimony that Mr. Zolie was on site

9      in Cambridge Springs in April of '02?

10  A.  No.  You're asking about a union rep and

11      Mr. Zolie was the head for this region.  For our

12      region.

13  Q.  All right.  But he was not on site as Sharalee

14      was?

15  A.  No.

16  Q.  Sharalee actually worked at SCI Cambridge

17      Springs at the time, didn't she?

18  A.  Yes.

19  Q.  Just like Yvonne McGuire did.

20  A.  Yes.

21  Q.  All right.

22  A.  I'd like to state that it would be AFSCME

23      representatives.  They represented the clerk

24      typists and also the LPN's.

25              - - - -

79

1   Q.   Is it your claim that you investigated this

2        matter as well?

3   A.   Yes, I did.

4   Q.   Did anybody help you with the investigation?

5   A.   No, I don't believe so.

6   Q.   What was the result of your investigation?  Did

7        any of the individuals on this list receive any

8        discipline?

9   A.   Again I can't recall.  I'd need to check my

10       records.

11  Q.   But we know which ones are still employed and

12       which ones are not; correct?

13  A.   Yes.

14  Q.   You've already told me about all of them.

15  A.   Yes.

16  Q.   All right.

17            Do you remember my client being

18       terminated on or about May 13 of '02?

19  A.   Yes.

20                        -  -  -

21            (Deposition Exhibit No. 16 marked for

22       identification.)

23                        -  -  -

24            (The witness reviewed the document.)

25                        -  -  -

1        the one that was initiated against Mr. Pierce?

2   A.   That would be superintendent Brooks.  Or the

3        superintendent determines whether or not a PDC

4        will occur.

5   Q.   Are you aware of the fact that Mr. Pierce sought

6        to get unemployment compensation?

7   A.   Yes.

8   Q.   Do you know the outcome of that proceeding?

9   A.   It was denied.

10  Q.   Do you know if the same allegations or defenses

11       to him obtaining unemployment were used in that

12       proceeding as it served as the basis for his

13       termination from the Department of Corrections?

14            MR. SANDERS:  I'm going to object on

15       the grounds of speculation.

16  BY MR. EDDY:

17  Q.   Well, you've seen Exhibit 18 I believe it is.

18            MR. EDDY:  Off the record.

19                 - - - -

20       (There was a discussion off the record.)

21                 - - - -

22  BY MR. EDDY:

23  Q.   You were shown a copy of Exhibit 18.

24                 - - - -

25       (The witness reviewed the document.)

1                        - - - -

2    A.    Yes.

3    BY MR. EDDY:

4    Q.    And that is essentially the letter that notifies

5          Mr. Pierce that he's been terminated; is that

6          right?

7    A.    Yes.

8    Q.    Are you familiar with the charges that have been

9          levied against Mr. Pierce in that termination?

10   A.    Yes.

11   Q.    In fact, you testified you were at that hearing.

12         The PDC hearing.

13   A.    Yes.

14   Q.    Do you know whether or not those same criteria

15         that were used for his termination were also

16         used in connection with his unemployment

17         hearing?

18   A.    Yes.  When Mr. Pierce had gone to the

19         unemployment hearing, I was also there as a

20         witness, and at that time Mr. Pierce had called

21         multiple nurses to that hearing and each one of

22         them --

23              The hearing examiner had asked if

24         they had done any of these things, and each one

25         of them had said at one time or another they had

1   done it, and each one had been disciplined for

2   it, and that each one of them had stopped doing

3   it.

4           And the basis of the unemployment

5   hearing, I believe, the denial was -- and this

6   is my thoughts -- was that when she questioned

7   Brian Pierce if he had done these things, and he

8   had said, yes, he had.  When she had asked if he

9   had been disciplined, he said, yes, he had.  And

10  when she asked him if he had stopped doing this,

11  he said, no, he had not because he felt that he

12  was in the right so he did not stop the

13  practice.

14  Q.  So if I understand what you're saying correctly,

15      he produced witnesses at his unemployment

16      hearing that he felt had done the same things

17      that he did for which he was terminated and

18      these individuals were not terminated?

19  A.  That's correct.

20  Q.  But Mr. Pierce stated that he either failed or

21      refused to correct those procedures whereas the

22      other witnesses said that they did comply with

23      the corrective behavior; is that what you're

24      saying?

25  A.  That's correct.

1   Q.   You said that you agreed with the decision to

2        terminate Mr. Pierce as contained in Exhibit 18.

3   A.   (The witness nods head up and down.)

4   Q.   I'll just ask you why do you agree with that

5        decision?

6   A.   I agree with the decision because even with

7        everything that was going on, Mr. Pierce was

8        showing no indication that he was going to

9        change his behavior.

10  Q.   When you stated I believe that you investigated

11       all of the various commonwealth employee witness

12       statements that were submitted by Mr. Pierce

13       that we've seen I think as Exhibits 12, 13 -- or

14       13, 14, 15, 16 and 17, you said that you

15       investigated all of those statements that he

16       made?

17  A.   Yes.  Each person was called in and interviewed.

18  Q.   Were you able to corroborate any of his

19       allegations in those statements?

20  A.   I believe that most of the statements that he

21       had claimed were not founded.

22  Q.   Did you find any to have any merit?

23  A.   Yes, I do believe that there was some that had

24       admitted to some of those accusations.

25  Q.   Do you remember what you did as to those

EQUAL EMPLOYMENT OPPORTUNITY DISCRIMINATION COMPLAINT

OCT 2 6 2001

PERSONNEL OFFICE

COMMONWEALTH OF PENNSYLVANIA
STD-486   REV. 2/97

**Equal Employment Opportunity**
## DISCRIMINATION COMPLAINT

DOCKET NO. 2001-04

The information on this form should be completed for all alleged discrimination and sexual harassment complaints. The completed complaint form should be signed by the complainant. Upon completion, please forward to the Equal Opportunity Manager/Specialist or the individual responsible for EEO in your agency.

DEPARTMENT NAME AND ADDRESS
SCI-Cambridge Springs
451 Fullerton Ave.
Cambridge Springs, PA 16403

| 1. COMPLAINANT'S NAME | HOME TELEPHONE NO. | 2. ARE YOU CURRENTLY EMPLOYED BY THE ABOVE DEPARTMENT? |
|---|---|---|
| Brian Pierce | (814) 398-2574 | ☒ YES  ☐ NO |

HOME ADDRESS
313 S. Main St. Cambridge Springs PA 16403

| 3. PRESENT JOB TITLE | STATUS | WORK UNIT |
|---|---|---|
| LPN | Permanent Full Time | Medical |

| LOCATION | WORK TELEPHONE NO. | LENGTH OF SERVICE IN CLASSIFICATION |
|---|---|---|
| SCI-CBS | (814) 398-5549 | 7 years |

4. DATE OF THE ALLEGED DISCRIMINATORY PRACTICE
10-15-01

5. BASIS OF THE ALLEGED DISCRIMINATORY PRACTICE
☐ RACE          ☐ AGE
☐ SEX           ☐ DISABILITY
☐ NATIONAL ORIGIN  ☒ RETALIATION
☐ ANCESTRY       ☒ OTHER (SPECIFY)
☐ RELIGION        Hostile Working Environment

6. THE DISCRIMINATION OCCURRED IN CONNECTION WITH
☐ INTERVIEW        ☐ DISCIPLINARY ACTION
☐ HIRING SELECTION  ☐ COMPENSATION
☐ PROMOTION        ☐ TRAINING OPPORTUNITY
☐ LAYOFF          ☒ OTHER (SPECIFY)
☐ TRANSFER          N/A

7. THE FACTS OF THE ALLEGED DISCRIMINATORY EMPLOYMENT PRACTICE ARE:

— See Attached —

S. Pietrzak and I have had numerous confrontations in the last 9 months in regards to my wanting to change a few policies and procedures in order to help make the department more efficient. She has also stated her distaste for my ability to take the initiative without requiring her guidance or direction. As a result of these confrontations, this incident occurred. During the 15 OCT incident, other staff members took the initiative to begin mobilizing the department for the drill, and they were not berated in front of their peers or inmates for their forethought, I was. I later found out that PA Stybinski witnessed the initial outburst by Ms. Pietrzak, and that Inmate Strawbridge OF 8326 was in her wheelchair in the hall outside the door when Ms. Pietrzak first addressed me.

(OVER)

Enclosure 2 to Management Directive 410.10 Amended



EXHIBIT 10
Arraug
1-21-05

Page 1 of 2

32

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On 10-15-01 I entered the institution at about 1:50 pm. I saw inmates going back to their housing units and I was told that there was a drill going on. As I got to building 3, PA Styborski met me on the walk and told me about the drill going on. I entered building 3 and into medical at about 1:55 pm and all the staff were talking about the drill. I talked briefly with V. McGuire LPN about a few issues and then went into the pharmacy to count with P. Smith R.

After we finished counting, V. McGuire and I exited medical and went on the walk in front of building 3. SGT. DeCoursey was coming down the walk from building 1. V. McGuire asked if she knew what was going on. SGT. Decoursey said she did and that she had "found out by accident." I followed SGT. Decoursey into building 3 and I asked her if she knew how long the drill was going to last. She told me that she did not know. I asked her if she knew if we were going to have to pass medications on the housing units. She said she didn't know. I said that we would need to know as soon as possible because it might take an hour to prepare to do that. She then radioed Lt. Wadel + he called her back on the phone. She related the information to him and she told me that he would have to find out.

| 10-16-01 | _____ |
| Date | Signature |

| _____ | _____ |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I then went into medical and was talking to M. kelly RN and T. Zuber RN. A few minutes passed and the building 3 officer came to us and told us that Lt. wadel told him to tell us that we were to prepare to pass meds on the housing units. I went and told S. Pietrzak about what Lt. wadel had said. She then began to organize the staff and had S. Cooper RN try to get a list of inmates by housing unit. M. kel T. Zuber and I went into the medication room and began to prepare t the medication pass. I asked S. Pietrzak RN what meds needed to be pass out. She told me "All of them." I told her that I was been told the only life-sustaining med's needed to go. She then called C. Massung RN for confirmation and we were directed to give only life sustaining meds and Antibiotics. I passed this information along to M. kelly T. Zuber and we completed our assigned tasks.

| | |
|---|---|
| 10-16-01 | _____ |
| Date | Signature |
| | |
| _____ | _____ |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

Not long after we had prepared to pass medications on the units, SGT. Decans entered medical and went into The room where S. Pietrzak was sitting. A few minutes later SGT. Decoursey came out of the room with S. Pietrzak right behind her. At that time, in the presence of SGT. Decoursey, M. Kelly, and T. Zuber, S. Pietrzak used a loud, hostile and demeaning tone and language to belittle me in front of my peers. She then went to C. Massung's office. T. Zuber came to me and asked "What was that all about?" About 5 minutes later S. Pietrzak re-entered the nurse's station and began to harrass me again, in the presence of staff. AT that time I told her that, if she had a problem with me, she needed to address it to me in private or in C. Massung's office and that I did not appreciate the demeaning way I had been treated earlier as well as now. She agreed to go to C. Massung's office, but C. Mass arrived in the nurse's station. S. Pietrzak then took an agressive posture and began to "stare me down" with a hateful, angry stare. She then began to belittle me in the presence of my employer. We both began to exchange words in a loud manner.

| 10-16-01 | _Bim Pion_ |
|----------|------------|
| Date | Signature |

| | |
|--|--|
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

35

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

C. Massing stood by and observed, but did not intervene. At one point she walked away from us and entered S. Cooper's office. S. Pietrzak and I continued to exchange words, and as I was trying to explain what had happened to her, she began yelling "stop pointing at me!" "I consider that a threat!" At which point C. Massing came out and S. Pietrzak asked her "Did you see that? He threatened me!" C. Massing covered her eyes and stated "I didn't see anything, I have a bad headache." At which point S. Pietrzak began verbally attacking me and my character. C. Massing then said we needed to go to her office. We agreed, and began to go to her office. S. Pietrzak stopped and said she was going to bring someone in with her. I said that I wanted union representation as well, and since no one was on site at that time, we would have to wait and do it another day. At that, S. Pietrzak became angry and went into medical.

| | |
|---|---|
| 10-16-01 | [signature] |
| Date | Signature |
| | |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

I was so shaken by the confrontation, that I had fear of retaliation and the possibility of having insubordination charges put on me by S. Pietrzak if I stayed, that I went to C. Massing and told her that I was leaving. S. Cooper was in the room for the conversation and was a witness to the following I told C. Massing that "I am afraid of retaliation by Sandy, and that I can't work in this hostile environment." I told her that I was very upset and stressed out by what happened and that I did not appreciate being treated like that by S. Pietrzak, especially in front of my peers. C. Massing asked when I would like to have the meeting to resolve the issues, and I said tomorrow (10-16-01). She told me that she was not going to be here, and I said, "Then how about wednesday?" She told me that she was going to be out all week and she wanted it to be handled by the Deputy. I told her that I would like to "keep it in house", if possible and try to resolve it first. C. Massing then said "well who's going to make the decision? who's going to handle this?" I simply said to her "you." She then told me that she will be back on Monday and we could do it then.

| 10-16-01 | [signature] |
|----------|-------------|
| Date | Signature |

| | |
|------|------------------|
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

37

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.



I said that that would be fine. C. Massing told me that she was not sure I could take sick time for this, but that she would call personnel to clarify. S. Cooper told me that I should count off with someone before I left, so I did. While I Zuber and I were counting, C Massing told me that I could go, but I needed a doctor's excuse to justify my leaving. I told her that it was no problem and then thanked her.

Shortly after that I left the institution at 4:45 pm.

nothing else follows

| | |
|---|---|
| 10-16-01 | Signature |
| Date | Signature |
| Date | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employer of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

38

## COMMONWEALTH EMPLOYE WITNESS STATEMENT

The following statement is being given by me freely and without coercion for official Commonwealth business and will be considered for all purposes, including actions under the Statues of this Commonwealth, just as though it had been sworn or affirmed before a court of law or formal arbitration panel.

On 10-16-01 I came into work. upon entering medical, I was told by P. Smith RN and A. Chapman RN that the night shift nurse L. Mallard & had told them in shift report that S. Pietrzak and I had an argument and that I walked off property. They told me that I WAS "bad mouthed" by S. Pietrzak on shift change with L. Mallard.

Later on, S. Cooper called me into her office and told me that S. Pietrzak was telling As many staff As she could "a very slanted" side of the picture and that she was making it look like she did nothing wrong. Also, S. Cooper told me that C. Massung had come into her office this morning and was saying terrible things about me and that I was a "cold, calculating indivd and it was part of his Agenda." S. Cooper also observed C. Massung talking to several of the staff on 10-15-01 and 10-16-01 about this incident. I feel this only further encourages a hostile working environment and that by making slanderous comments about me to other staff/ my peers is wrong!

| 10-16-01 | (Signature) |
|----------|-------------|
| Date     | Signature   |
|          |             |
| Date     | Typist's Signature |

NOTE: This form is to be completed and signed by an employe who is a witness to an incident involving the employes of the Commonwealth. If the text is typed by someone other than the employe giving the statement, the party typing the statement must sign and date the document.

39

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 12, 2002

**SUBJECT:**   Brian Pierce LPN
Fact finding 4/11/02 at 1415

**TO:**   Nancy Wirth
Human Resource Director

**FROM:**   Nancy A Giroux
Correctional Health
Care Administrator



It was brought to my attention by fellow co-workers that over the last two weeks Mr. Pierce is not following medication room procedures and his behavior has been inappropriate. Y. McGuire, C. Heffern, T. Zuber, S. Cooper, and S. Pietrzak have provided statements (attached) to substantiate these complaints.

Overall synopses of these complaints are:
- Pre-pouring medication prior to the med line starting
- Leaving the pre-poured medications unattended prior to the med line
- Not crushing psychiatric medications nor placing them in water
- Borrowing medication from other inmates instead of utilizing stock meds
- Not signing out stock medications
- Not checking inmate ID's during the med line
- Not following procedures regarding dispensing of medication in the RHU
- Inappropriate conversations with inmates regarding DOC programming
- And informing inmates that he is "in a bit of trouble" and leaving
- Providing misinformation to LT regarding med room procedures and supervisors expectations.

During the fact finding with Mr. Pierce we covered many areas of concern. Mr. Pierce was asked if he is aware of the medication room procedures and where it is located. He stated he was and that there was a copy in the med room and one in his mailbox. Mr. Pierce stated that he "generally checks ID's and "always checks the MAR's. He also stated that he is crushing at least 75-80% of all psych meds and places them in water. He states that he is not pre-pouring medications and that he does not leave the medication unattended. He states that he is utilizing the stock medication and signs out the stock meds. He admits to borrowing medications from other inmates on a regular basis and then clarifies that he borrows only when not available in stock and it's a medication the inmate requires. He also admits to placing medication (Benadryl and CTM) in individual cups but clarifies that it is from the stock bottles not from the blister

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values ... while respecting the rights of crime*

packs. Mr. Pierce states that his counterparts all do the same thing, he does not do it any more frequently then they do. Mr. Pierce was questioned about the RHU practice of how medication is dispensed to the inmates in the RHU and in particular the incident that occurred on 4/7/02. Mr. Pierce stated that he did deliver the medication to the RHU in cups in his pocket and he did not have the MAR or the RHU bag. He stated that he now knows what is expected of him after our conversation on Monday (4/8/02) but states he must have been confused about this issue prior to that. When I questioned him about the conversation we had on 3/11/02 regarding this issue, he stated he didn't remember having a conversation with me and then later stated that we talked about so many different things that he couldn't remember what we talked about. Mr. Pierce verbalized throughout the conversation that he understood the procedures regarding checking inmates ID's, crushing psych meds, borrowing medications and the usage of stock medications. Again Mr. Pierce stated that all his counterparts do the same thing that he does and if "they were honest they would tell you". Requested that Mr. Pierce provide me with the names of staff members that were violating med room procedures and he stated that he would not do that. At the end of the conversation he stated that he would provide me with the names if the nurses are not honest and tell me myself. "Call me in after you speak with them".

I also discussed with Mr. Pierce the issue of count being off on 4/1/02. The narcotic sheet read that we had 28 tablets of xanax 1mg and the blister pack contained 29. When count had been completed on the 2-10 shift the discrepancy was not picked up and was not discovered until the 600-hour count. Refer to the EO's attached. Mr. Pierce's explanation was that the count was correct at 2200 hrs and that he distinctly remembers giving inmate Houck two tablets. Therefore "someone disposed of the whole card of 28 xanax. I repeated his accusations and he stated count was correct at 2200 and was off at 600. Winkler didn't state that the count was incorrect at 2200 hrs so it wasn't. Again I asked are you insinuating that someone, meaning Winkler took a whole card of a narcotic? Pierce stated, it was a full card and I punched out two tablets that left 28 tablets. At 600 hrs the card had 29 tablets.

We then discussed his conversation with the inmates regarding the DOC programs and in particular the RSAT program. Mr. Pierce states that he did talk to the inmates about the programming. The conversation started out about the inmates questioning him about leaving and that he acknowledges that he is leaving within the next year or two. That he is looking for a counseling job within the DOC because he believes that he can provide the inmates with the skills needed to succeed out in the world. Mr. Pierce states that the inmates expressed sorrow over his leaving and that they told him he is the only one who cares. He talked about being able to better help them, equip them, and provide them with the tools to succeed. The inmates were commenting about programming and he stated, "It was a joke". When questioned about this Mr. Pierce stated that the inmates tell him it's a joke. I questioned Mr. Pierce about the differences between one inmate talking to another and a staff member talking to an inmate. Don't you think that

the inmates will place more weight on a statement made by a staff member? Pierce's response -"Truth is truth". "I was only telling them what the inmates have been telling me".

The majority of the nurses who dispensed medication in the med room were called into this office one at a time and informed that it was an official investigation and a breach in the code of ethics if they discussed this with other staff members. They were all asked the same questions pertaining to medication room policy and procedures and their interpretation of the policies. The last questioned asked was if they were aware of any nurse violating these procedures, if so who and how? All response from the 2-10 shift were that Mr. Pierce was violating multiple procedures in the med room, on 6-2 Ms McGuire stated Pierce and Ms Coopers statement collaborates this premise also.

Conclusion

There is a medication room procedure book housed in the med room, multiple memos posted in the med room, signs posted outside the med room windows and all staff questioned have been able to voice what the departments : ̄ ' ' CO' CRS expectations regarding procedures in the med room. Mr. Pierce was able to verbalize when questioned the proper procedures required regarding inmates ID's, psych meds, stock meds, borrowing medications and pre-pouring medications. He states he was confused on the issue of the delivery of RHU medications and stated that he doesn't agree with our interpretation of pre-pouring but was able to state clearly what our expectations were.

The collections of statements from other staff members who have been working in the med room with Mr. Pierce clearly show that Mr. Pierce is not following medication room procedures. He has consistently over the last several weeks not checked the inmates ID's, is not crushing the psych medications nor placing them in water. He is not utilizing the stock supply of medications and instead is borrowing medications from other inmate's blister packs. This is creating problems when we attempt to re-order the inmates medications that have been borrowed due to it being an early refill. He is taking blister pack cards of stock medications and punching them out into cups i.e. CTM and Benadryl 50mg both, which are prescription medications. He is not signing the medications out and the stock inventory sheet is disappearing. It has been witnessed that he is pre-pouring inmates medications prior to the med line opening and then dispensing them. It has also been witnessed that he pre-poured the medications and then left the area, that goes against his theory or definition of pre-pouring medications. He was spoken to on 3/11/02 when he had dispensed medications to the RHU inappropriately and the proper procedures were reviewed with him. Therefore I do not believe that Mr. Pierce was "confused" regarding our expectations and procedures for the delivery of RHU medications. Several witnesses have written statements regarding Mr. Pierce's conversations with the inmates and have found them to be inappropriate.

"Our mission is to protect the public by confining persons committed to our custody in safe,
 ` ' ''''' and to provide opportunities for inmates to acquire the skills and values
                                                      the rights of crime

Ms Heffern witnessed the conversation between Mr. Pierce and the inmates out in the hallway on 4/5/02 and Mr. Pierce recounted his conversation with the inmates to Mr. Zuber, Ms Pietrzak and Ms Heffern later that evening. The statements demonstrate that Mr. Pierce was promoting himself and indicating that the programs and the RSAT program were a joke and designed to set the inmates up for failure.

Mr..Pierce avoided all responsibility regarding the incident with the count being incorrect. All information points to the fact that that the count was incorrect at 2200 hrs and that Mr. Pierce dispensed one tablet instead of two as ordered. Ms Winkler should have noted the error during count at 2200 hrs but did not for whatever reason. Ms Winkler states that count was a little confusing because Mr. Pierce was signing out some of his narcotics that he dispensed that evening during count. Mr. Pierce indicates that he believes that another staff member took a whole card of the xanax and disposed of it, which in his opinion accounts for the narcotic count being off. His scenario doesn't make any sense and the allegations he is making are extremely serious. I researched the narcotic issue personally and had Ms Cooper RNII research the issue independently to confirm my findings. Our conclusion is that the xanax is accounted for and that there are no medications missing, never mind a whole card. See the attached copies of the narcotic sheets and the copy of the blister pack which states the date the medication was filled by the pharmacy and how many tablets they sent. Also attached is Ms Cooper's statement confirming these findings.

These allegations constitute a violation of the code of ethics, specifically **Section B. Specific Rules and Regulations-Department of Corrections; section 9.** Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employee may question the wisdom of such an order. **Section 10;** Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professional at all times; unacceptable conduct or insolence will not be tolerated. **Section 14;** employees will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employee or an inmate, and will maintain reasonable familiarity with the provisions of this directives. And **section 29;** All employees shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedures in cases that may result in criminal prosecution will include those rights according to all citizens of the commonwealth.

NG/ng

CC    Superintendent Brooks
      Deputy Good
      Deputy Wilkes

*"Our mission is to protect the public by confining persons committed to our custody in safe,
secure facilities and to provide opportunities for inmates to acquire the skills and values
... ...ting the rights of crime*

COMMONWEALTH : PENNSYLVANIA
**Department of Corrections**
**SCI-Cambridge Springs**
**(814) 398-5400**
November 20, 2001

**SUBJECT:    Written Reprimand**

**TO:**          Brian Pierce

**FROM:**      Nancy A Giroux
              **Nursing Supervisor**

Mr. Pierce, it has been determined that you will receive a written reprimand for the incident that occurred on 10/15/01 involving Ms. Pietrzak.

Specifically relating to the altercation between Ms Pietrzak and yourself that occurred on 10/15/01 on the 2-10 shift during an emergency drill.

This is a violation of the Department of Corrections Code of Ethics, Section B, Number 10 which states 'Employees are **expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.'**

As we have discussed, in situations like this you should remove yourself from the general medical area to continue the conversation. It should not be conducted in a public area that can be overheard by other staff and inmates that can cause embarrassment to both parties involved. If the issue cannot be resolved between the two parties then the conversation should be terminated at that time by mutual agreement and continued/resolved with a mediator (supervisor) at a future time and date. You antagonized the situation by speaking in a loud tone, pointing your finger at Ms Pietrzak repeatedly when she requested you not to and making derogatory statements about her character. This situation was not handled in a professional manner as is expected of DOC employees.

You are advised that continuation of such unacceptable actions will result in further disciplinary action, which may include suspension and/or termination. This written reprimand will be placed in your Personnel file and can remain there for up to one year.

NG/ng

CC    N Wirth. Human Resource Director
       C. Massung CHCA
       Supervisor's File



EXHIBIT 4
1-20-05

**"Our mission is to protect the public by confining persons committed to our custody in safe,**
**facilities and to provide opportunities for inmates to acquire the skills and values**



FREY A. BEARD, Ph. D
SECRETARY
TMENT OF CORRECTIONS

WILLIAM J. LOVE
DEPUTY SECRETARY
FOR
SPECIALIZED FACILITIES &
PROGRAMS

COMMONWEALTH OF PENNSYLVANIA

STATE CORRECTIONAL INSTITUTION

AT CAMBRIDGE SPRINGS

451 Fullerton Avenue
Cambridge Springs, PA 15403-1229
Telephone 814-398-5400

April 17, 2002

MARILYN S. BROOKS
SUPERINTENDENT

Address All Replies
To Superintendent



Brian Pierce
313 Main Street
Cambridge Springs, PA 16403

Dear Mr. Pierce:                                               Employe#456590

This is to advise you that a Pre-Disciplinary Conference has been scheduled for Tuesday, April 23, 2002 at 2:00 pm in the Conference Room of Building One (Administration Building). At the Pre-Disciplinary Conference, you will be offered the opportunity to respond to reports of incidents that may have occurred while you were a Licensed Practical Nurse, Permanent Civil Service Status, with the Department of Corrections at the State Correctional Institution at Cambridge Springs. Allegations involve violation of the following sections of the Department of Corrections Code of Ethics:

Section A, General Responsibility of Department of Corrections Employees: Consistent with the responsibility of all correctional employes in the Commonwealth of Pennsylvania to perform their duties with integrity and impartiality and to avoid situations whereby bias, prejudice, or personal gain could influence official decisions, the following code is being promulgated.

Section B, #1: Specific Rules and Regulations – Department of Corrections: Each employe in the correctional system is expected to subscribe to the principle that something positive can be done for each inmate. This principle is to be applied without exception.

This involves an intelligent, humane and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated. Corporal punishment shall not be utilized under any circumstances.

Section B, #9: Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employe may question the wisdom of such order. The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil service appeal, or the grievance machinery.

Section B, #10: Employes are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."

45

Section B, #14:  Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

Section B, #29:  All employes shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully.  Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

Alleged incidents include reports of the following:

On March 9, 2002, medication line was completed early and you may have pre-poured certain medications in violation of policy.  After being questioned by an officer on duty about whether you pre-poured medications on March 9, 2002, you decided to change procedure and called one unit at a time on March 10, 2002, thereby significantly delaying completion of medication line.  On March 20, 2002, on the 0600 to 1400 shift, after the medication line was closed, three inmates arrived for their medication.  The RN on duty (team leader) contacted the unit officer and was advised that the inmates were late returning from meal and reporting to medication line through no fault of their own.  You nonetheless refused to open the medication window, even though one of the inmates was on an anti-epileptic life-sustaining medication, stating that "they came late, fault doesn't matter".  You were ordered by the team leader three times to open the window before complying.

On April 1, 2002, there was an error in count on a card of Xanax.  The narcotic sheet you completed and signed indicated that we had 28 tablets of Xanax 1mg and the blister pack contained 29.  You signed that you had given the inmate 2 tablets, yet the card for that inmate was found to still have 29 tablets remaining.  When questioned, you stated that someone disposed of the card with 28 tablets, and that when you left the card was correct.

On April 1, 2002 you ordered a 60-day supply of medication for an HIV inmate being paroled to a Community Corrections Center.  This was done without required pre-release notification from the Records Department.  It was reported that you stated to the inmate that you would "hook her up".  Policy specifically indicates that a 30 day supply is issued to inmates being paroled.  In addition, HIV medications are only ordered for 30 days regardless of their destination.  You were also observed passing a note you had written to this inmate through the medication window, while speaking in hushed tones to her.

On April 5, 2002, it is reported that you went to the RHU without the medication bag and the Medication Administration Record. You also admitted when questioned that you pulled the inmates' names and PRN medications from the RHU book, checked to see who was due medications, and pre-poured medications into cups that you took in your pocket to the RHU.  After the shift commander questioned you about the procedures for delivering medications to the RHU, you called the RHU officer and became confrontational and questioned her about this issue.  The correct procedures for

PIERCE, BRIAN                                                              PAGE 3

delivering medications to the RHU were specifically addressed with you on March 11, 2002.

On April 9, 2002, it was reported that you had a conversation in the hallway with inmates about the RSAT program and DOC programming in general, stating that the programming "was a joke". It was further reported that you made negative comments about the RSAT program to the inmates.

Several staff statements report that you have pre-poured medications prior to the start of medication line, and that you have walked away and left the medications unattended during the last three week period. You admitted to borrowing medications from other inmates' blister cards rather than using stock medication. It was also reported that you are not crushing psychiatric medications as required. This is in direct violation of our procedures as well as DOC policy 13.4.1.

You have the right to have Union Representation during this conference if you so choose. It will be your responsibility to arrange such representation with an AFSCME A-1 designated representative.

Based upon the information established during the conference appropriate action shall be initiated up to and including possible dismissal. If you elect not to attend this conference, a decision will be made based upon the facts at hand.

Sincerely,

Marilyn S. Brooks
Superintendent
For
Jeffrey A. Beard, Ph.D.
Secretary


MSB/NW

CC: Deputy Wilkes
    Deputy Good
    BHR/Labor Relations Division
    Sharalee Raun, AFSCME

47

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
SCI-Cambridge Springs
(814) 398-5400
April 17, 2002

This is to acknowledge that I, Brian Pierce, have received a copy of my PDC
Notification dated 4/17/02.

_____
Employee Signature

_____
Date

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values

JEFFREY A. BEARD, Ph.D
SECRETARY
DEPARTMENT OF CORRECTIONS

WILLIAM J. LOVE
DEPUTY SECRETARY

COMMONWEALTH OF PENNSYLVANIA

STATE CORRECTIONAL INSTITUTION

AT CAMBRIDGE SPRINGS

451 Fullerton Avenue
Cambridge Springs, PA 16403-1223
Telephone 814-398-5400

MARILYN S. BROOKS
SUPERINTENDENT

Address All Replies
To Superintendent

November 15, 2001

Brian Pierce
313 S. Main Street
Cambridge Springs, Pa 16403

Re:  Complainant: Brian Pierce (2001 – 04)
     State Correctional Institute SCI Cambridge Springs

Dear Mr. Pierce :

This letter is in response to your complaint received in this office on October 26, 2001.

Federal and state laws and/or Department of Corrections policy prohibit employment discrimination because of a person's race, color, religious creed, national origin, ancestry, sex, age of 40 years or over, non-job-related disability; AIDS; HIV status; because of opposing discrimination or participating in the discrimination complaint process; and because of citizenship status, sexual orientation or union activity.

A charge of discrimination is an allegation by an aggrieved person that (s)he was *harmed because of one or more of these prohibited bases*.  Based on the information you have provided, you have not alleged this to be the case, and have, therefore, not made a charge of unlawful discrimination.  Your case is therefore closed.

You may, however, still have a personnel issue that can be addressed by your supervisor, management, or Human Resources staff.

If at any time you feel you have been discriminated against (harmed because of a protected class), please feel free to contact us.  Please keep in mind, however, that complaints must be filed with the Department of Corrections within 90 days of the date of the alleged act of discrimination.

You have a right to appeal these findings to the Director of the Office of Equal Employment Opportunity, PA Department of Corrections, PO Box 598, Camp Hill, PA 17001-0598 if not satisfied with findings for further review.  For an appeal to be considered timely, it must be received by the Office of Equal Employment Opportunity, or postmarked within 20 calendar days from the date of the written notification resulting from the investigation of the complaint.  I am also attaching a copy off the "Avenues of Recourse for Discrimination Complaints."

EXHIBIT //

"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."

49

The State Employee's Assist⎘                                                    you
are experiencing personal probl⎘.                                              ay
contact SEAP at 1-800-692-745⎘.


Cc:    file
       certified mail 11/6/0,

# Avenues of Recourse for Discrimination Complaints

**PA Department of Corrections (D.O.C.)
Office of Equal Employment Opportunity and
Contract Compliance**

*Within 90 calendar days of alleged occurrence*
PO Box 598, 2520 Lisburn Road
Camp Hill, PA 17001-0598
Phone: (717) 975-4934
Fax: (717) 731-7115

**State Civil Service Commission**
*Within 20 calendar days of alleged occurrence*

Central Region
PO Box 569
Harrisburg, PA 17120
(717) 783-3058

Eastern Region
State Office Building, Room 101
1400 Spring Garden Street
Philadelphia, PA 19130-4088
(215) 560-2253

Western Region
State Office Building, Room 411
300 Liberty Avenue
Pittsburgh, PA 15222-1210
(412) 565-7661

**Pennsylvania Human Relations Commission
(PHRC)**

*Within 180 calendar days of alleged occurrence*

Harrisburg Regional Office
1101-1125 S. Front Street, 5th Floor
Harrisburg, PA 17104-2515
(717) 787-9780 (voice)
(717) 787-7279 (TT)

Philadelphia Regional Office
711 State Office Building
1400 Spring Garden Street
Philadelphia, PA 19130-4088
(215) 560-2496
(215) 560-2552 (TT)

Pittsburgh Regional Office
11TH Floor State Office Building
300 Liberty Avenue
Pittsburgh, PA 15222-1210
(412) 565-5395
(412) 565-5711 (TT)

**Equal Employment Opportunity Commission
(EEOC)**

*Within 300 calendar days of alleged occurrence
(180 days for ADA complaints and immigration-
related discrimination complaints)*

Philadelphia Area Office
Bourse Bldg. Suite 400
221 South 5th Street
Philadelphia, PA 19106-2515
(215) 451-5700

Pittsburgh Area Office
Liberty Center
1001 Liberty Avenue, Suite 300
Pittsburgh, PA 15222-4187
(412) 644-3444
(412) 644-2720 (TTY)

Note: *Age* discrimination complaints against the *state government are no longer* to be filed with the EEOC, but can be filed
under state law with the PHRC. *Ancestry* discrimination complaints may only be filed with PHRC. *Immigration-related*
discrimination with EEOC. Complaints of discrimination on the basis of *union activity* may be filed
discrimination on the basis of