# ATTACHMENT  D

1

1      IN THE UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF PENNSYLVANIA
2
                        - - - -
3
BRIAN D. PIERCE,                    )
4                                   )
              Plaintiff,            )
5                                   )
              -vs-                  )      Civil Action
6                                   )      No. 03-173E
PENNSYLVANIA DEPARTMENT             )
7  OF CORRECTIONS,                  )
                                    )
8             Defendant.            )

9
                        - - - -
10
           DEPOSITION OF:  SANDRA PIETRZAK
11
                        - - - -
12

13              DATE:    January 20, 2005
                         Thursday, 3:20 p.m.
14

15              LOCATION:  Law Offices of Neal Sanders
                           1924 North Main Street Ext.
16                         Butler, PA 16001
                           724-282-7771
17

18              TAKEN BY:  Plaintiff

19
                REPORTED BY:  Toni Rennebeck, RPR
20                            Notary Public
                              NMR Reference No. 30738A
21

22

23
                    CERTIFIED COPY
24

25

```
 1              DEPOSITION OF SANDRA PIETRZAK,
       a witness, called by the Plaintiff for examination,
 2     in accordance with the Federal Rules of Civil
       Procedure, taken by and before Toni Rennebeck, RPR, a
 3     Court Reporter and Notary Public in and for the
       Commonwealth of Pennsylvania, at the Law Offices of
 4     Neal A. Sanders, 1924 North Main Street Extension,
       Butler, Pennsylvania, on Thursday, January 20, 2005,
 5     commencing at 3:20 p.m.

 6                          -  -  -  -

 7

       APPEARANCES:
 8

              FOR THE PLAINTIFF:
 9     Neal A. Sanders, Esq.
       LAW OFFICES OF NEAL A. SANDERS
10     1924 North Main Street Extension
       Butler, PA 16001
11     74-282-7771

12

              FOR THE DEFENDANT:
13     Thomas G. Eddy, Esq.
       Senior Deputy Attorney General
14     Office of Attorney General
       Commonwealth of Pennsylvania
15     Litigation Section
       6th Floor, Manor Complex
16     564 Forbes Avenue
       Pittsburgh, PA 15219
17     412-565-3578

18

19

20

21

22

23

24

25
```

4

```
 1                        - - - -

 2                   SANDRA PIETRZAK,

 3              being first duly sworn,

 4         was examined and testified as follows:

 5                     - - - -

 6                    EXAMINATION

 7                     - - - -

 8  BY MR. SANDERS:

 9  Q.    Would you state your name for the record and

10        spell it for us.

11  A.    My name is Sandra Pietrzak.  P-I-E-T-R-Z-A-K.

12  Q.    Ms. Pietrzak, my name is Neal Sanders and I'm an

13        attorney here in Pennsylvania.  Specifically

14        we're here today in the Brian Pierce case

15        concerning his allegations of wrongful

16        termination against the Department of

17        Corrections or the Commonwealth of Pennsylvania.

18              I want to thank you for coming to my

19        office.  Prior to your coming today to the

20        deposition they call this, have you ever been

21        put under oath and asked questions by an

22        attorney prior to this event today?  Have you

23        ever gone through this before?

24  A.    Yes.

25  Q.    How many times have you gone through this before
```

```
 1  Q.  What occurred in November of 2002?  Were you

 2      terminated?  Did you resign?  What happened?

 3  A.  I took disability retirement and I also retired.

 4  Q.  So you took a disability retirement as opposed

 5      to a regular retirement?

 6  A.  Yes; that's correct.

 7  Q.  What location were you working at when you took

 8      your retirement for disability purposes in

 9      November of '02?

10  A.  SCI Cambridge Springs.

11  Q.  What was your position at SCI Cambridge Springs

12      at that time?

13  A.  I was a registered nurse on the 2 to 10 shift

14      primarily working as team leader.

15  Q.  Did you know Brian Pierce LPN before he started

16      to work at SCI Cambridge Springs?

17  A.  No.

18  Q.  Were you treating for any stress related to your

19      profession prior to January of '01?

20  A.  January of '01?

21  Q.  Prior to that were you suffering any symptoms

22      that you felt were stress related to work?

23      Prior to January of '01?

24  A.  I had an ongoing illness of bipolar disorder.

25  Q.  So that would have preceded January of '01?
```

```
 1       as much as you are.  Let me ask you this.  When

 2       your illness gets out of hand, if it happens at

 3       work, can you tell me some of the things that

 4       you might do or say?

 5                 Let's try the do part.  Do you know

 6       any things that you might do that would be a

 7       function of your illness becoming a problem at

 8       work?  Would your voice go up?  Would you get

 9       angry?  Would you get sad?  Would you have

10       crying episodes?  Whatever.

11   A.  No.  My anxiety manifested itself in difficulty

12       sleeping.

13   Q.  Would that result in your being tired at work

14       from time to time because you didn't get the

15       adequate sleep?

16   A.  Perhaps.

17   Q.  Okay.

18   A.  Irritability.

19   Q.  All right.  There's been some testimony earlier

20       today from the prior witness, Ms. Giroux -- I

21       think I'm pronouncing it correctly.

22   A.  Giroux.

23   Q.  -- Giroux, that sometime just prior to your

24       announcing your leaving in November of '02 that

25       you were going to be called to a predisciplinary
```

1           conference.

2   A.      Uh-huh.

3   Q.      Do you know about that?

4   A.      Yes, I do.

5   Q.      Did you know about it before you took your

6           leave?

7   A.      Yes, I did.

8   Q.      Did you know any of the allegations that they

9           were making?

10  A.      Yes, I did.

11  Q.      What were some of the allegations they were

12          claiming you as a nurse were being accused of?

13  A.      That I was becoming irritable with inmates and

14          staff.

15  Q.      Did you agree with that having happened?

16  A.      Yes.

17  Q.      Anything else that they were going to be

18          bringing up at the PDC that you never attended?

19  A.      That's what I know to my knowledge.

20  Q.      Did you ever get that in writing that that's

21          what the subject of the PDC would be?

22  A.      No, I didn't.

23  Q.      You just got told verbally?

24  A.      Yes.

25  Q.      Do you remember who told you verbally that that

| | | |
|---|---|---|
| 1 | A. | With Nancy and with Paul. |
| 2 | Q. | Okay. |
| 3 | A. | The exact contents, no. |
| 4 | Q. | All right.  When you would get upset at work, |
| 5 | | you would have this illness act up on you at |
| 6 | | work, would you have occasion to lose your |
| 7 | | temper or -- let's start with that.  Would you |
| 8 | | lose your temper with co-employees? |
| 9 | A. | Not usually.  In fact, rarely. |
| 10 | Q. | All right.  What would you do that would cause |
| 11 | | them to be writing you up and sending you to a |
| 12 | | PDC then?  What was it you were agreeing with me |
| 13 | | that occurred? |
| 14 | A. | I don't know that any employee wrote me up. |
| 15 | Q. | Did you ever write up any employees? |
| 16 | A. | Yes. |
| 17 | Q. | Do you remember any of their names? |
| 18 | A. | Yes. |
| 19 | Q. | What were some of them? |
| 20 | A. | Brian Pierce. |
| 21 | Q. | Anyone else? |
| 22 | A. | I would have to think. |
| 23 | Q. | Go ahead. |
| 24 | A. | Maybe two years earlier I had written up an |
| 25 | | officer. |

1  Q.  Whose name was, or is?

2  A.  Mark Kelley.

3  Q.  Mark Kelley?

4  A.  Uh-huh.

5  Q.  Anyone else?

6  A.  I can't recall.

7  Q.  But there were others?

8  A.  Maybe over 10 years.  Early on.

9          Yes.  An officer Ryan.  I wrote her

10     up on one occasion.

11  Q.  A female officer named Ryan?

12  A.  Yes.

13  Q.  R-Y-A-N?

14  A.  Yes.

15  Q.  What did you write up Mark Kelley about?

16  A.  It was an issue that had to do with threatening.

17  Q.  Him threatening you?

18  A.  Yes.

19  Q.  What about Ms. Ryan?

20  A.  Behaving inappropriately in front of an inmate

21     that I felt put the inmate in harm I believe.

22  Q.  Did you consider the PDC that you were about to

23     go to in terms of your timing as to when you put

24     in for your disability retirement?  Did it have

25     anything to do with your decision so that you

1   Q.   So during the later part of your career you had

2         occasions to have differences with Peggy Sue

3         Haight and Yvonne McGuire and other people; is

4         that correct?

5   A.   I do not remember that Yvonne McGuire and I had

6         an ongoing difficult relationship; no, I do not.

7   Q.   But that's not the correct answer to the

8         question about Peggy Sue Haight.  That you

9         remember.

10   A.   Yes.

11   Q.   And, in fact, you were so upset with Peggy Sue

12         Haight and the way that she and you related with

13         one another that you had suggested that she be

14         terminated, didn't you?

15   A.   That's not correct.

16   Q.   Did you ever complain about her to any of your

17         supervisors?

18   A.   Yes, I did.

19   Q.   And Ms. Haight left the employ of SCI Cambridge

20         Springs in December of 2000?

21   A.   Yes, she did.

22   Q.   And it was her vacancy that Brian Pierce filled,

23         wasn't it?

24                 If I tell you that Brian started with

25         you at SCI Cambridge Springs in January of '01

1     and that he filled the Peggy Sue Haight vacancy,

2     do you have any reason to doubt me?

3  A.   No.

4  Q.   Did you ever have occasion to go into Chris

5     Massung's office from time to time with

6     complaints?

7  A.   On occasion.

8             MR. SANDERS:  That's all the

9     questions I have of you, ma'am.

10            THE WITNESS:  Okay.

11            MR. SANDERS:  Mr. Eddy may have some.

12            MR. EDDY:  I have none.

13            MR. SANDERS:  Your deposition is

14    over, and Mr. Eddy may have a question to ask

15    you about whether you want to read this exchange

16    before it becomes final, but I'll leave that to

17    your lawyer, but, thank you for coming.

18            THE WITNESS:  You're welcome.

19            MR. EDDY:  The question simply is

20    whether or not you, after she types your

21    testimony, if you want to review it to make sure

22    that it reflects everything you said accurately,

23    or do you want to waive that?

24            Do you want to read it?

25            THE WITNESS:  I would.

```
 1   COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE

 2   COUNTY OF ALLEGHENY          )      SS:

 3        I, Antoinette M. Rennebeck, RPR, a Court

 4   Reporter and Notary Public in and for the

 5   Commonwealth of Pennsylvania, do hereby certify that

 6   the witness, SANDRA PIETRZAK, was by me first duly

 7   sworn to testify to the truth; that the foregoing

 8   deposition was taken at the time and place stated

 9   herein; and that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13        I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17        I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21        IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 31st day of

23   JANUARY, 2005.
```

_Antoinette M. Rennebeck_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Antoinette M. Rennebeck, Notary Public
Richland Twp., Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries

# ATTACHMENT E

1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
          WESTERN DISTRICT OF PENNSYLVANIA
2
                      - - - -
3
BRIAN D. PIERCE,                    )
4                                   )
          Plaintiff,                )
5                                   )
          -vs-                      )    Civil Action
6                                   )    No. 03-173E
PENNSYLVANIA DEPARTMENT             )
7   OF CORRECTIONS,                 )
                                    )
8         Defendant.                )

9
                      - - - -
10
          DEPOSITION OF:  CHRISTINE MASSUNG
11
                      - - - -
12

13              DATE:    January 20, 2005
                         Thursday, 3:50 p.m.
14

15           LOCATION:   Law Offices of Neal Sanders
                         1924 North Main Street Ext.
16                       Butler, PA 16001
                         724-282-7771
17

18           TAKEN BY:   Plaintiff

19
          REPORTED BY:   Toni Rennebeck, RPR
20                       Notary Public
                         NMR Reference No. 30738B
21

22

23
                    CERTIFIED COPY
24

25

2

1          DEPOSITION OF CHRISTINE MASSUNG,
   a witness, called by the Plaintiff for examination,
2  in accordance with the Federal Rules of Civil
   Procedure, taken by and before Toni Rennebeck, RPR, a
3  Court Reporter and Notary Public in and for the
   Commonwealth of Pennsylvania, at the Law Offices of
4  Neal A. Sanders, 1924 North Main Street Extension,
   Butler, Pennsylvania, on Thursday, January 20, 2005,
5  commencing at 3:50 p.m.

6                      - - - -

7

   APPEARANCES:
8
          FOR THE PLAINTIFF:
9  Neal A. Sanders, Esq.
   LAW OFFICES OF NEAL A. SANDERS
10 1924 North Main Street Extension
   Butler, PA 16001
11 74-282-7771

12
          FOR THE DEFENDANT:
13 Thomas G. Eddy, Esq.
   Senior Deputy Attorney General
14 Office of Attorney General
   Commonwealth of Pennsylvania
15 Litigation Section
   6th Floor, Manor Complex
16 564 Forbes Avenue
   Pittsburgh, PA 15219
17 412-565-3578

18

19

20

21

22

23

24

25

13

1    as a result of Peggy Sue Haight quitting, do you

2    remember that?

3    A.   Not offhand, no.

4    Q.   Do you remember Peggy Sue Haight?

5    A.   Yes.

6    Q.   Do you remember her being disciplined by SCI

7    Cambridge Springs before she quit in December of

8    2000?

9    A.   I remember her being disciplined at different

10   times but I don't remember that specific date.

11   Q.   Okay.  Do you remember Nancy Pietrzak being

12   disciplined?

13   A.   Yes.

14   Q.   Do you remember Yvonne McGuire being

15   disciplined?

16   A.   Yes.

17            MR. EDDY:  One thing, Neal.  Did you

18   mean to say Sandra?

19            MR. SANDERS:  I meant to say Sandra

20   Pietrzak.  Did I misspeak?

21            MR. EDDY:  You said Nancy.

22            MR. SANDERS:  All right.

23            THE WITNESS:  Oh, I thought -- I was

24   thinking Sandy anyway in my mind.  Sandy

25   Pietrzak.

14

1               MR. SANDERS:  I appreciate that, Tom.

2               THE WITNESS:  Yeah.

3   BY MR. SANDERS:

4   Q.   Do you recall Sandy Pietrzak being disciplined?

5   A.   Yes.

6   Q.   All right.  Now, who would have been your

7        supervisor in the last two years of your career?

8   A.   Deputy Good.

9   Q.   Is Deputy Good male or female?

10  A.   It's a male.  Deputy Dave Good.

11  Q.   Who was your supervisor before Dave Good?

12  A.   I can't remember his name.

13  Q.   That's all right.

14  A.   He had passed away.

15  Q.   All right.  Did Deputy Dave Good ever indicate

16       to you at any time that he felt that you had not

17       met expectations in your performance as a health

18       care administrator?

19  A.   Not in that way.

20  Q.   Tell me the way that he represented it to you.

21  A.   We just talked about how -- what his

22       expectations are.  And he's the type of person

23       that would let me say what I wanted to do and

24       then we both just conversed about it, that's

25       all.

```
 1        was anybody else.

 2                  I'm trying to think of the nurses

 3        themselves and --

 4  Q.    Well, let's go beyond the nurses.  Marilyn Books

 5        was at SCI Albion for a time and then she came

 6        to SCI Cambridge Springs; right?

 7  A.    Yes.

 8  Q.    And you had other people that came from SCI

 9        Albion to SCI Cambridge Springs other than Brian

10        Pierce.

11  A.    Yes.

12  Q.    All right.  Did you have a program set up for

13        orientation for people like Brian Pierce when

14        they came from SCI Albion so they could

15        understand the differences and the way you ran

16        things differently at SCI Cambridge Springs,

17        ma'am?  A formal program?

18  A.    We had an orientation program that we have set

19        up for all of them.  In fact, when they came

20        through, they had a written sheet of paper that

21        had what they had to accomplish during their

22        orientation.  They had to see like personnel and

23        all the different things like that.  Definitely

24        that had that.

25  Q.    And if I tell you that all happened on one day,
```

45

1  Q.  Did you personally ever request any disciplinary

2      action against Mr. Pierce?

3  A.  Not really.  Not to have a PDC hearing, no.

4  Q.  In any fashion other than a PDC?

5  A.  Just discipling him for something he was doing

6      that he wasn't supposed to.

7  Q.  Do you have any specific recollection of that?

8  A.  Yes.

9  Q.  Could you elaborate please?

10  A.  Brian, when he came over to our facility, wanted

11      to do something that was -- he wanted to

12      pre-pour medications.  And when we had first

13      started the facility they said -- an inspector

14      came in and said we weren't allowed to pre-pour

15      medicines, so we never did that, thinking it was

16      -- you know, they said it was a law.  Weren't

17      allowed to do that.

18              When Brian came over --

19  Q.  Who said it was a law?

20  A.  I don't know their names because it was years

21      ago.  10 years ago.  But the inspectors that

22      came in to inspect us.  And because we had

23      inspectors come in like monthly or so to inspect

24      us making sure that everything was kosher.

25      Actually every year they came in.  But when they

1          first started, they said we were not allowed to

2          pre-pour medicines.

3  Q.    Were those DOC employees?

4  A.    Yes.

5  Q.    Okay.

6  A.    So what happened was I had told Brian, because

7          he wanted to pre-pour medications, and I told

8          Brian we are not to pre-pour medications because

9          it's the rule in here that we're not to pre-pour

10         medications, and he challenged me on it.

11  Q.    How did he challenge you?

12  A.    Well, first of all he said -- he gave me all the

13         reasons why he thinks he should pre-pour them.

14         And I listened to that and I said that sounds

15         really good and everything but I also gave him

16         things that said it was wrong to do.  Why it

17         would not be good to do.

18                 But then what he would do is, because

19         we were on a -- I was on the first shift and he

20         was on the second shift, he did it anyway.  And

21         we actually walked in on him with pre-poured

22         medications sitting there, and he had gotten

23         caught.  And Nancy Giroux, I do know that she

24         had disciplined him a couple times.

25  Q.    When you say we walked in, who's we?

47

1  A.    I walked in one day, and at other times she had

2        walked in.

3  Q.    Oh, okay.

4  A.    And she had disciplined him.  And I thought it

5        was over with, but I had walked in on him, and

6        it was the med line time and he had pre-poured

7        medications and I said to him, Brian, you see

8        these pre-poured medications here?  You're not

9        allowed to pre-pour.  You knew you're not

10       allowed to pre-pour medications, but I am not

11       going to do it right now because there's inmates

12       standing there.  I mean, they couldn't hear you

13       from outside anyway but I said since you are in

14       the med line, I'm not going to stop this

15       business, but we're going to discuss this

16       business.  And that's what happened.  We

17       discussed it.

18 Q.    Did he admit to pre-pouring the medications?

19 A.    Yes, he did.

20 Q.    You said he knew he wasn't allowed to pre-pour

21       medications.  How would he know that?

22 A.    He had been disciplined by Nancy Giroux I know

23       of two times at least.  I don't remember the

24       dates or anything but I know that she did that.

25       And that's why I thought it was over with; that

1        she told him no, no, no.

2  Q.   You mean prior to the time that you observed him

3        doing that?

4  A.   Yes. And then when I walked in, they were

5        already pre-poured. I talked to him about it.

6        And he still argued the fact that he thought he

7        should do them. And so I said, okay, let me --

8        I was being nice about it. I said, let me go

9        find different books if there's any rulings or

10       laws or anything like that. And I do remember

11       going into books and things, and there was one

12       Fundamentals of Nursing that I looked into and

13       they said that wouldn't be a good idea to do,

14       and they gave the reasons, and I thought that's

15       basically what we were thinking but --

16  Q.   Do you remember the reasons?

17  A.   Yes. For one thing those medications are out of

18       the bottles. They're collecting dirt from the

19       air. That's one thing.

20               If you have them there and you happen

21       to have to leave in an emergency, somebody might

22       come in and not realize what those meds are and

23       stuff and have to give -- and you're supposed to

24       -- when you give them, you're supposed to be

25       popping them out to that person right then, not

1    be having them ahead of time, because if they

2    would leave, then -- you have to leave for some

3    reason and then somebody has to come in and fill

4    in for that, that's not a good idea to do that.

5    You could give them the -- you know, something

6    could be messed up.  That's basically the

7    reason.

8  Q.  Is there also a possibility of tampering?

9  A.  Tampering.  Anything could happen.

10 Q.  Did Mr. Pierce ever use the defense or state to

11    you that this was a practice at Albion and

12    that's why he did it here?

13 A.  I don't think he ever used that on me.  I don't

14    think so.

15 Q.  Do you know if they do that sort of thing at

16    Albion?

17 A.  I don't remember.  I don't know if they did, no.

18    I just said here we don't at least.  I don't

19    know if he did.

20 Q.  You made it clear to him that at least at

21    Cambridge Springs it doesn't happen there?

22 A.  Right.

23 Q.  But you stated that you felt that was a DOC

24    policy by virtue of these inspectors that had

25    come around and told you not to do that.

1    was in there, then things started to change with

2    the way he wanted things done when he wanted

3    them done.  This is the way we should do it

4    here.  This is the way it should be done here.

5    And it was just always that way.

6            Basically that was it.  I always just

7    felt that he was trying to be contrary to what

8    we were doing there.  And we did listen to him.

9    We did.  We listened to him about the things

10    that he wanted to do, and we took it into

11    consideration.  And then we would come and say

12    this is the reason why we don't want to, and he

13    just didn't like the reasons.

14   Q.  Did you ever discipline Mr. Pierce because he

15       was a man?

16   A.  No.

17   Q.  In the instances where you did discipline him,

18       in your opinion he was guilty of either

19       infractions of policy or refusal to correct

20       behavior for which he had been previously

21       warned?

22   A.  Yes.

23   Q.  Do you know of any female nurses who would have

24       been not disciplined for the same behaviors?

25   A.  No.  Because like I said earlier, I did not

1    remember how certain ones, like Ms. Haight, but

2    she was disciplined for actions similar to that

3    and we did that with her.  And I just don't

4    remember all the in's and out's about it or the

5    basic things, but I remember her being

6    disciplined for that kind of thing too.

7  Q.  Do you remember her correcting her behavior?

8  A.  Yes, she did.  She corrected it.

9  Q.  So the distinction between things that might

10    have happened to Mr. Pierce and somebody like

11    Ms. Haight would lie in the fact that one

12    corrected their behavior and the other refused

13    to?

14  A.  Yes.

15            MR. EDDY:  That's all I have.

16                  - - - -

17            RE-EXAMINATION

18                  - - - -

19  BY MR. SANDERS:

20  Q.  You left out a little bit here.  Let's go over

21    some things.  You remember you're under oath;

22    correct?

23  A.  Yes.

24  Q.  One of the things that you forgot to tell

25    Mr. Eddy when he was questioning you is that on

60

1  BY MR. EDDY:

2  Q.  Were you aware that Mr. White had a

3      discrimination case pending against the

4      Department of Corrections at any time?

5  A.  Yes.

6  Q.  Were you ever a part of that proceeding?

7  A.  No.

8  Q.  Were you a decision-maker at all in connection

9      with anything that might have happened to him?

10 A.  No.

11 Q.  Do you have an opinion on Mr. White?  Do you

12     have any personal animosity towards him?

13 A.  No.

14 Q.  Did you ever take any action, disciplinary

15     action against Mr. Pierce because he might have

16     been involved in Mr. White's case against the

17     department?

18 A.  Absolutely not.

19 Q.  Did anybody ever insinuate or infer or instruct

20     you to do that?

21 A.  No.

22             MR. EDDY:  That's all I have.

23                  -  -  -  -

24             RE-EXAMINATION

25                  -  -  -  -